UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------------- x
In re                                                          :   Dist. Ct. No. 12-4376 (LAK)
                                                               :
AMR CORPORATION, et al.,                                       :
                                                               :   Ch. 11 Case No. 11-15463 (SHL)
                    Debtors.                                   :   (Jointly Administered)
-------------------------------------------------------------- x
ALLIED PILOTS ASSOCIATION,                                     :
            Plaintiff-Appellant,                               :
                        v.                                     :   Adv. Proc. No. 12-01094 (SHL)
AMR CORPORATION and                                            :
AMERICAN AIRLINES, INC.,                                       :
            Defendants-Appellees.                              :
-------------------------------------------------------------- x
```

### REPLY BRIEF OF APPELANT ALLIED PILOTS ASSOCIATION

JAMES & HOFFMAN, P.C.
1130 Connecticut Avenue, NW, Suite 950
Washington, DC 20036
Tel: (202) 496-0500
Facsimile: (202) 496-0555

STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, NY 10036
Tel: (212) 506 3900
Facsimile: (212) 506 3950

*Counsel for Allied Pilots Association*

# Table of Authorities

*Cases*

*Bhd. of Locomotive Eng'rs v. Baltimore & Ohio R.R.*, 372 U.S. 284 (1963)..................1

*Bhd. of Ry. & Steamship Clerks v. Florida East Coast Ry.*, 384 U.S. 238 (1966) ..........8

*Chicago & N.W. Ry. Co. v. United Transp. Union*, 402 U.S. 570 (1971) .......................1

*Detroit & Toledo Shore Line R.R. v. United Transp. Union*, 396 U.S. 142 (1969).........1

*EEOC v. United Air Lines,* 755 F.2d 94 (7th Cir. 1985)...................................................7

*Florida E. Coast Ry. Co. v. Bhd. Of R. R.* Trainmen, 336 F.2d 172 (5th Cir. 1964).......8

*Florida E. Coast Ry. Co. v. United* States, 348 F.2d 682 (5th Cir.1965) ....................8, 9

*IAM v. Reeve Aleutian Airways, Inc.*, 469 F.2d 990 (9th Cir. 1972) ................................8

*In re Charles. P. Young Co.*, 111 B.R. 410 (Bankr. S.D.N.Y. 1990) ............................10

*In re Hostess Brands, Inc.*, 2012 WL 2374235 (Bankr. S.D.N.Y. June 22, 2012)........10

*In re Northwest Airlines Corp.,* 349 B.R. 338 (S.D.N.Y. 2006)...................................6, 7

*Manning v. American Airlines,* 329 F.2d 32 (2d Cir. 1964),
    *aff'g* 221 F. Supp. 301(S.D.N.Y. 1963) ......................................................5, 7

*Order of R.R. Conductors & Brakemen v. Florida E. Coast Ry. Co.*, 252 F. Supp. 586
    (M.D. Fla. 1965) ....................................................................................................8

*Terminal R.R. Ass'n of St. Louis v. Bhd. of R.R. Trainmen*, 318 U.S. 1 (1943) ..............1

*Statutes*

Bankruptcy Code
11 U.S.C.
    § 1113..................................................................................................................9
    § 1113(c) ...........................................................................................................10
    § 1113(e) ...........................................................................................................10

Railway Labor Act
45 U.S.C.
    § 152....................................................................................................................1
    § 152, Seventh....................................................................................................2

§ 156..........................................................................................................................1, 2

*Other Authorities*

National Mediation Board, *The Railway Labor Act at Fifty: Collective Bargaining in the Railroad and Airline Industries* (U.S.G.P.O. 1976) (Charles M. Rehmus, Ed.) ............. 3-4

Agreement Between Northwest Airlines, Inc. and Flight Attendants, available at <http://kas.cuadra.com/star/images/nmb/Northwest%20IBT%20Flight%20Attendants%202000-2005.pdf >........................................................................................................... 5-6

The brief of Appellees AMR Corporation and American Airlines, Inc. (collectively "American" or "the Company") misstates the issues before this Court, ignores governing contractual provisions, misreads pertinent cases, and fails to refute the grounds for reversal established by the Appellant Allied Pilots Association ("APA").

1.  The Company's most serious and pervasive error is its failure to distinguish between a current contract – a consensual agreement which is in force by its own terms – and a legal duty to continue to honor certain conditions established by a contract even after that contract expires. A labor contract, like other contracts, exists solely by virtue of, and solely to the extent of, the parties' voluntary mutual consent.[1] As the APA's opening brief explained, any such agreement endures or expires only as provided by the contract itself. *See* Brief of Appellant ("APA Br.") at 4-6, 14-15, 18-19.

By contrast, the Railway Labor Act ("RLA") imposes a separate, independent and *involuntary* legal requirement on the APA and the Company, even when their contract is no longer in force by its own terms. Under RLA Section 6, 45 U.S.C. § 156, the parties must refrain from unilaterally altering any aspect of pilots' statutorily defined "rates of pay, rules, or working conditions" until the RLA's bargaining-mediation procedure has been exhausted and the National Mediation Board ("NMB") has released the parties to change the status quo. Though this statutory status quo obligation may include many of the conditions originally established by contract, it is neither coextensive with nor limited by the provisions of a particular CBA because the CBA, itself, need not conform to the precise scope of Section 6. Rather, the Section 6 status

---

[1] The RLA "does not undertake governmental regulation of wages, hours or working conditions." *Bhd. of Locomotive Eng'rs v. Baltimore & Ohio R.R.*, 372 U.S. 284, 289 (1963) (quoting *Terminal R.R. Ass'n of St. Louis v. Bhd. of R.R. Trainmen*, 318 U.S. 1, 6 (1943)). Given the "strong federal labor policy against governmental interference" with collective bargaining agreements, even the express statutory requirement to "exert every reasonable effort to make and maintain agreements" under RLA Section 2, 45 U.S.C. § 152, would not authorize a court to impose non-consensual contract terms. *Chicago & N.W. Ry. Co. v. United Transp. Union*, 402 U.S. 570, 579 n.11 (1971).

1

quo is defined as encompassing "actual, objective working conditions" regardless of whether they are prescribed in a CBA, while excluding even express contractual commitments that fall outside the terms of Section 6.  *See* APA Br. at 19 and n.10 (citing *Detroit & Toledo Shore Line R.R. v. United Transp. Union*, 396 U.S. 142, 153 (1969), and other authorities).[2]

        2.      Ultimately, the core of the disagreement between APA and American lies in how the parties interpret the RLA's command that "[n]o carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title."  45 U.S.C. § 152, Seventh.  The Company claims that this requirement means that all collective bargaining agreements remain in force indefinitely *as agreements*, regardless of any contractual duration specified by the parties.  APA contends, rather, that the statute respects the parties' freedom to structure their own contracts as they choose, while requiring the parties to continue to honor certain conditions originally prescribed in a labor contract even after that contract no longer exists as an agreement.  *See* APA Br. at 18-19 (discussing RLA status quo as defined in *Shore Line*).

        American's view of the RLA is entirely unsupported by the text of the statute.  American has identified no provision in the statute prohibiting contractual provisions, like Section 26-C of

---

[2] American misses the distinction between current contracts and continuing legal duties, for example, when it emphasizes the aim of the RLA "to settle strikes and avoid interruption to commerce."  See Brief of Appellee at 2, 6.  Nowhere in its brief does the Company explain why a currently effectively *agreement*, as opposed to a separate legal duty to maintain the status quo, is necessary or helpful in avoiding strikes and maintaining labor peace.  In fact, the APA's position here is fully consistent with this statutory purpose.  Under the RLA regime those airline labor relations matters most significant to labor peace and the public interest in uninterrupted commerce, such as the ability to strike and the duty to arbitrate disputes, are not creatures of contract but, instead, are dictated by the statute itself.  Consequently, American's repeated references to the RLA's purpose – and its attempts to distinguish Chapter 11 cases involving debtors governed by the National Labor Relations Act based on that purpose – are beside the point.

the 2003-2008 CBA, under which the CBA itself expires or becomes terminable, *as a contract,* under specified conditions. And nothing in the RLA prevents parties from actually exercising such a contractual right to terminate their underlying contract at a specified time, as was done by timely notice in this case. Instead, as noted above, the RLA simply regulates the consequences and the parties' ensuing behavior – i.e., by preventing strikes or unilateral changes in certain statutorily defined working conditions, without NMB release, even after the parties' private, mutually agreed contractual restraints have expired or been terminated through the parties' own freely agreed-upon procedures.

3. Moreover, *The Railway Labor Act at Fifty*,[3] an NMB-commissioned set of studies and reports reviewing the enactment and implementation of the RLA during its first fifty years, directly refutes American's suggestion that the RLA deprives the bargaining parties of their freedom to fashion terminable contracts or otherwise limit the duration of their voluntary *contractual* obligations. Specifically, Chapter III of that publication describes the flexibility and freedom of contract preserved by the RLA as follows:

> Another among the railroad industry practices which influenced the provisions of the Railway Labor Act was that of negotiating open-end collective bargaining agreements. Railroad agreements do not expire on a given date but remain in effect until one party or the other proposes modification of certain of the agreement's provisions, whereupon negotiations take place on the specific issues raised and, when agreement is reached, the contract is modified accordingly. The earliest railroad agreements known, dating back to the last quarter of the 19th Century, were of this open-end type and the practice continues throughout the industry to the present time. This procedure permits adaptation of rules to changing local work conditions or to the introduction of new work as the need arises without waiting for the termination date, perhaps two or three years later, of a fixed expiration date agreement. Section 6 of the Railway Labor Act provides for "thirty days written notice of an intended change in agreements affecting rates of pay, rules or working conditions . . ." thus accommodating to the open-end contracts.

---

[3] National Mediation Board, *The Railway Labor Act at Fifty: Collective Bargaining in the Railroad and Airline Industries* (U.S.G.P.O. 1976) (Charles M. Rehmus, Ed.).

3

> *Without any change in Section 6 provisions, however, the procedures of the Act have been sufficiently flexible to adapt to airline bargaining with its fixed termination date contracts* and to national bargaining on the railroads. *Section 6 notices in the airline industry normally open the full range of their agreements just as occurs in industry generally, where the entire contract expires.* . . .
>
> . . . .
>
> Although the same procedural requirements of the Railway Labor Act cover both railroad and airline negotiations, their bargaining practices have developed differently. *Airline contracts are not continuing instruments. They expire in their entirety on the date set forth in the agreement.* However, the status quo provisions of the Act prevent a strike on that date unless the procedures of the Act have been exhausted. As in the railroad industry, mandatory mediation under the Act continues until settlement is reached or the National Mediation Board determines that further efforts would be fruitless. At that point the final procedures of the Act begin: the proffer of arbitration, and, if the proffer is rejected, the final 30-day period of restraint under the Act. . . .
>
> . . . .
>
> It has been observed that the Railway Labor Act has *permitted the bargaining practices in the two industries governed by it to develop the structure they have found most suitable to their needs.* . . .
>
> The airlines, as indicated earlier, *use the same Section 6 procedures under the Railway Labor Act as the railroads do in their bargaining, but they negotiate complete contracts which expire in their entirety at an agreed-upon date. Airline bargaining, in that respect, has developed along the same lines as in industry generally, without being restricted in its structure by the requirements of the Act.*
>
> . . . .
>
> Finally, it should again be emphasized that the Railway Labor Act provides only the framework within which the parties and the National Mediation Board function to *maintain free collective bargaining* while protecting the larger public interest. *That the parties are free to develop their relationships in accordance with their own interests is evident from the different paths taken by the two industries under the Act.*[4]

    4.      Rather than refer to the text of the RLA, the Company cites a treatise and a variety of cases that it claims support its view. Yet, none of that authority holds that the RLA forbids terminable and requires amendable-only labor contracts, and the cases relied on do not

---

[4] Burgoon, "Mediation Under the Railway Labor Act," in *The Railway Labor Act at Fifty,* 72, 92, 94 (emphasis added). *The Railway Labor Act at Fifty* is archived in a series of files on the NMB's website; Chapter III is available at <http://www.nmb.gov/documents/rla50-chapter03.pdf#xml=http://www.dmssearch.gpoaccess.gov/PdfHighlighter.aspx?DocId=794&Index=D%3a%5cWebsites%5cUseIndex%5cNMB&HitCount=50&hits=16e+16f+170+171+172+517+518+519+51a+51b+89c+89d+89e+89f+8a0+1094+1095+1096+1097+1098+1456+1457+1458+1459+145a+1b9b+1b9c+1b9d+1b9e+1b9f+1f41+1f42+1f43+1f44+1f45+22f7+22f8+22f9+22fa+22fb+26cd+26ce+26cf+26d0+26d1+2ceb+2cec+2ced+2cee+2cef+. >

4

foreclose material disputes over the expiration of a contract.  Where the ultimate issue is *how* a party must behave, and the governing law would require the same conduct with or without a contractual duty, it may be unnecessary for the parties to raise or fully litigate a factual dispute involving the technical reason why.  Nonetheless, as the APA's opening brief showed in its careful discussion of *Manning v. American Airlines,* 329 F.2d 32, 34-35 (2d Cir. 1964), *aff'g* 221 F. Supp. 301 (S.D.N.Y. 1963), where parties assert consequential differences between contractual and RLA statutory requirements, this Court must recognize both distinct forms of legal obligation and give appropriate effect to each.  *See* APA Br. at 4-11.

      Contrary to the Company's argument, neither the Second Circuit nor this Court has previously decided whether Section 1113 authorizes a Bankruptcy Judge to circumvent the NMB and relieve the parties of the statutory post-expiration status quo obligations imposed by the RLA.  The APA's opening brief demonstrated that in both *Northwest* and *Ionosphere* the existence of a current contract was merely assumed by the parties and the courts, rather than fully litigated and decided.  *See* APA Br. at 11-14.  As the Company has not refuted that detailed showing, we will not revisit it here.

      We do note, however, that a review of the relevant contractual duration/renewal provision in *Northwest*, together with the timetable reflected in the court proceedings, suggests why the existence of a current contract was not disputed in that case.  Unlike the duration and renewal provision in *Manning* and Section 26-C of the APA's contract, the operative clause in the *Northwest* CBA (Section 33) provided only a narrow, 30-day window period during which service of bargaining notice would prevent automatic renewal of the contract:

> This Agreement constitutes and states the full and complete settlement and agreement between the parties . . . for the period June 1, 2000, through May 31, 2005, and shall renew itself without change until each succeeding June 1 thereafter unless written notice of intended change is served in accordance with

>  Section 6, Title I, of the Railway Labor Act, as amended, by either party hereto *at least sixty (60) days but not more than ninety (90) days prior to May 31, 2005*, or June 1 in any year thereafter.[5]

Under a different provision of that CBA (Section 32), either party could "at any time propose in writing to the other party any amendment, or amendments which they may desire to make to this Agreement;" but absent mutual agreement to the changes, neither party could invoke RLA processes to compel further consideration of such a proposal without satisfying Section 33's limited notice-window deadlines.[6]  The parties in *Northwest* apparently began their negotiations over concessionary changes in the CBA as early as December 2004, several months before the March 1-April 1, 2005 window period for notice specified in Section 33.[7]  Given that any such amendment proposals were untimely (i.e. too early) to prevent automatic renewal under the express terms of Section 33, if no subsequent notice was served timely (between March 1 and April 1, 2005), the CBA would have renewed itself by its own terms for at least another year beginning on June 1, 2005.  In that event, the CBA would have remained in place as a current contract, *pursuant to its own terms*, as of the Chapter 11 filing (September 14, 2005) and at the

---

[5] Agreement between Northwest Airlines, Inc. and Flight Attendants, Section 33-I (emphasis added). This provision was quoted by the Company in its original Motion to Dismiss Complaint, at n.10, Adv. Proc. ECF No. 7 at 14.  An electronic copy of the Northwest Airlines CBA is available at <http://kas.cuadra.com/star/images/nmb/Northwest%20IBT%20Flight%20Attendants%202000-2005.pdf >.

  In contrast to the Northwest CBA's window period for notice, Section 26-C of the APA's CBA provided that the contract would renew itself for an additional year unless written notice was served "at least sixty (60) days prior to May 1, 2008, or May 1 of any subsequent year," without specifying any corresponding limit on how far in advance (e.g., "but not more than" a set number of days) such notice could be given.  *See* APA Br. at 3.  The CBA duration/renewal provision in *Manning* likewise specified only the latest date for serving timely notice ("at least sixty (60) days prior to April 30"), without prescribing an earliest date.   *See* APA Br. at 6 (citing 329 F.2d at 33).

[6] Northwest Airlines CBA, Section 32, available at <http://kas.cuadra.com/star/images/nmb/Northwest%20IBT%20Flight%20Attendants%202000-2005.pdf >.

[7] *In re Northwest Airlines Corp.*, 349 B.R. 338, 347 (S.D.N.Y. 2006) (noting that the parties "had been in collective bargaining negotiations since December 2004").

6

time Northwest filed its Section 1113 motion to reject the CBA (October 12, 2005).[8]

If the duration provision of APA's contract had been written like Section 33 of the *Northwest* CBA, specifying only a narrow window period for notice to prevent renewal, and if the facts here proved failure to serve timely notice such that the CBA renewed and remained in force by its own terms at the time of the Section 1113 application, this case would present the same predicate assumed in *Northwest* – the existence of a current contract subject to rejection under Section 1113 of the Code – and there would be no threshold challenge to the Bankruptcy Court's authority. But the stipulated facts here are wholly different, and they squarely raise the issues that were neither litigated nor decided in prior airline bankruptcy proceedings.

5.   The authority discussed in APA's opening brief confirms the APA's interpretation of the text of RLA and is consistent with the NMB's historical analysis, quoted above at 3-4. Even a small sampling of decisions illustrates airline industry negotiators' freedom to structure the duration provisions of their contracts in varying ways that accommodate their particular preferences and practice. *See* APA Br. at 4-11, 14-18. Some airline CBAs, such as in *EEOC v. United Air Lines,* 755 F.2d 94, 97 (7th Cir. 1985), are structured as open-ended contracts that impose a periodic moratorium on modifications, and that remain in effect indefinitely, by their own terms, throughout negotiations over proposed amendments. Other contracts, like the dues check-off agreement in *Manning*, 329 F.2d at 33, are written for a stated term only, with a definite ending date, thus requiring affirmative action and agreement of both parties to renew or extend. Still others, such as the main CBA in *Manning* and the APA's 2003-2008 CBA, specify a definite duration coupled with some form of automatic renewal mechanism, giving parties the option either to do nothing, thus allowing their contract to roll over for an additional period, or to

---

[8] *Northwest Airlines*, 349 B.R. at 347 (reciting Chapter 11 and Section 1113 filing dates).

7

take action (e.g., by serving notice at specified times) preventing automatic renewal and ending the contract on its expiration date.

While the significance of the differing duration structures may vary depending on the statutes and legal claims at issue in any given case, all of these contractual arrangements are equally lawful and enforceable according to their terms.  APA's position here holds that the federal courts should continue recognizing and applying the wide array of contract duration provisions, whether common or unusual, while at the same time holding parties to their separate statutory obligations if and when the contract itself lapses.

6.     The Company's citation of *Bhd. of Ry. & Steamship Clerks v. Florida East Coast Ry.*, 384 U.S. 238 (1966), adds nothing to its argument.  Indeed, to the extent that case has any relevance, it only reinforces the APA's position here.  In *Florida East Coast*, the carrier and the union were party to collection of open-end railroad industry contracts that did not expire, but, rather, remained in effect by their own terms while the parties exhausted the RLA's bargaining and mediation processes and thereafter during the union's lawful strike.[9]  The question before the

---

[9] The Supreme Court's and lower courts' decisions repeatedly refer to the "existing" agreements between the parties.  *See Bhd. of Ry.*, 384 U.S. at 241, 242, 243; *Florida E. Coast Ry. Co. v. United* States, 348 F.2d 682, 684, 685, 686 (5th Cir.1965); *Florida E. Coast Ry. Co. v. Bhd. Of R. R.* Trainmen, 336 F.2d 172, 176 (5th Cir. 1964); *Order of R.R. Conductors & Brakemen v. Florida E. Coast Ry. Co.*, 252 F. Supp. 586, 587, 589 (M.D. Fla. 1965).  The brief filed by the Solicitor General in *Florida East Coast* confirmed that the case involved labor contracts that remained in effect at all relevant times by their own terms.  *See* Brief for the United States, 1966 WL 115476 (U.S.) *24-25 n.17 (citing "Rule 76, Agreement Between Florida East Coast and Clerical and Station Employees, Prescribed by the Brotherhood of Railway and Steamship Clerks, etc., pp. 88-89, providing that "[t]his agreement . . . shall continue in effect until changed as provided herein or in accordance with the Railway Labor Act . . ."). *Accord, IAM v. Reeve Aleutian Airways, Inc.*, 469 F.2d 990, 993 (9th Cir. 1972) (*Florida East Coast* "dealt with *a contract that had no termination date and that continued in force until a new contract had been reached*.  The question there was whether the contract continued in effect during the course of a strike.  It was held that the strike did not serve to terminate the contract.  Here, however, it is not the strike but *the contract terms themselves* that have brought the contract to an end.") (emphasis added).

8

Court was whether and to what extent the RLA permitted the carrier to deviate from its currently effective contracts in response to the strike.  Rejecting the proposition that the strike had the legal effect of terminating existing contracts, the Court concluded that the carrier could depart from the terms of an *existing agreement* only to the extent "reasonably necessary" to maintain public service during the strike.  *Florida East Coast,* 384 U.S. at 248.

Thus, the admonition in *Florida East Coast* that the carrier "must [otherwise] respect the continuing status of the collective bargaining agreement," simply acknowledges the existence of an ongoing, open-ended contract that unquestionably remained in force by its own terms during a lawful strike.  *Id.*  That statement, quoted by the Company, does not purport to address an explicitly terminable contract, like the APA's 2003-2008 CBA, that has been caused to lapse as a contract pursuant to its own provisions.  As *Florida East Coast* confirms, it is the terms of the contract itself, not the parties' exercise of RLA rights to self-help, that determine whether a given CBA expires or continues in force as a contract at any given time.

7. In short, despite the Company's repeated mischaracterizations, the contract before this Court is clearly not an open-ended, amendable-only contract.  Rather, the 2003-2008 CBA prescribed a definite five-year duration, with an option for additional one-year renewals that either party could prevent by timely written notice, and such timely notice was indisputably given.  Thus, the question in this case is not, as the Company mistakenly framed it, whether Section 1113 of the Bankruptcy Code permits rejection of a currently effective contract that has merely become "amendable" while continuing by its terms.  Rather, the issue here is whether, after a contract has come to an end pursuant to its own provisions, Section 1113 authorizes a Bankruptcy Judge to circumvent the NMB and relieve the parties of the statutory post-expiration status quo obligations imposed by the RLA.

9

8. Having failed to refute APA's showing that its CBA had expired, leaving pilots' working conditions protected solely by the RLA's status quo requirements at the time of the AMR Chapter 11 proceedings, the Company largely ignores APA's case that the Bankruptcy Court lacks authority under Section 1113(c) to relieve a debtor of its statutory obligations. Instead, American asserts that limiting the application of Section 1113(c) to existing agreements, as required by its plain language, is bad policy, and that honoring the NMB's jurisdiction and the RLA's requirements might cause a struggling carrier to "slip into oblivion." The authority relied on by the APA effectively counters such arguments. *See* APA Br. at 20-25. Most significantly, the appropriate recourse for a debtor allegedly facing "oblivion" as a result of statutory status quo obligations is not under Section 1113(c), but, rather, under Section 1113(e), which authorizes interim relief "during a period when the collective bargaining agreement continues in effect . . ." 11 U.S.C. § 1113(e). The plain language of Section 1113(e), by contrast to Section 1113(c), includes a period when a CBA has expired by its own terms but the debtor remains obligated to maintain conditions by operation of law rather than by contract. *In re Hostess Brands, Inc.*, 2012 WL 2374235, *3-4 (Bankr. S.D.N.Y. June 22, 2012) (citing *In re Charles. P. Young Co.*, 111 B.R. 410, 413 (Bankr. S.D.N.Y. 1990)). *See* APA Br. at 21.

## CONCLUSION

For all the reasons set forth above and in the APA's opening brief, this Court should reverse the Decision and Final Order below and direct entry of judgment for APA.

Edgar N. James*  
Kathy Krieger*  
David P. Dean*  
Darin M. Dalmat*  
Daniel M. Rosenthal*  
**JAMES & HOFFMAN, P.C.**

Respectfully submitted,

/S/ JOSHUA R. TAYLOR  
Filiberto Agusti  
Joshua R. Taylor*  
**STEPTOE & JOHNSON LLP**  
1114 Avenue of the Americas

10

| | |
|---|---|
| 1130 Connecticut Ave., N.W., Suite 950 | New York, NY 10036 |
| Washington, DC 20036 | Tel: (212) 506 3900 |
| Tel: (202) 496-0500 | Facsimile: (212) 506 3950 |

Dated: July 26, 2012

*Admitted *Pro Hac Vice*