Exhibit 1

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| AMR CORPORATION, *et al.*, | Case No. 11-15463 (SHL) |
| Debtors. | (Jointly Administered) |

----------------------------------------------------------------x

### <u>MEMORANDUM OF DECISION</u>

**A P P E A R A N C E S :**

**STEPTOE & JOHNSON LLP**
*Counsel for the Allied Pilots Association*
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
By:     Filiberto Agusti, Esq.
          Joshua Robert Taylor, Esq.

**JAMES & HOFFMAN, P.C.**
*Counsel for the Allied Pilots Association*
1130 Connecticut Avenue, N.W., Suite 950
Washington, D.C. 20036
By:     Edgar N. James, Esq.
          Kathy L. Krieger, Esq.
          David P. Dean, Esq.
          Darin M. Dalmat, Esq.
          Daniel M. Rosenthal, Esq.

**GUERRIERI, CLAYMAN, BARTOS & PARCELLI, P.C.**
*Counsel for the Association of Professional Flight Attendants*
1625 Massachusetts Avenue, N.W., Suite 700
Washington, D.C. 20036
By:     Robert S. Clayman, Esq.
          Jeffrey A. Bartos, Esq.
          Carmen R. Parcelli, Esq.
          Paul E. Knupp III, Esq.
          N. Skelly Harper, Esq.

**LOWENSTEIN SANDLER PC**
*Counsel for the Transport Workers Union of America, AFL-CIO*
65 Livingston Avenue
Roseland, New Jersey 07068
By:    Sharon L. Levine, Esq.
       John K. Sherwood, Esq.
       S. Jason Teele, Esq.
       Paul Kizel, Esq.
       Tania Ingman, Esq.

**PAUL HASTINGS LLP**
*Counsel for the Debtors*
875 15th Street, N.W.
Washington, D.C. 20005
By:    John J. Gallagher, Esq.
       Neal D. Mollen, Esq.
       Scott M. Flicker, Esq.
       Margaret H. Spurlin, Esq.

-and-

191 North Wacker Drive, 13th Floor
Chicago, Illinois 60606
By:    Mark D. Pollack, Esq.
       Jon A. Geier, Esq.
       Kenneth W. Gage, Esq.

-and-

515 South Flower Street, 25th Floor
Los Angeles, California 90071
By:    Stephen H. Harris, Esq.

-and-

75 East 55th Street
New York, New York 10022
By:    Todd C. Duffield, Esq.

-and-

600 Peachtree Street, N.E., 24th Floor
Atlanta, Georgia 30308
By:    Erika L. Leonard, Esq.

**WEIL, GOTSHAL & MANGES LLP**
*Counsel for the Debtors*
767 Fifth Avenue
New York, New York 10153
By:    Harvey R. Miller, Esq.
        Stephen Karotkin, Esq.
        Alfredo R. Pérez, Esq.
        Stephen A. Youngman, Esq.
        Lawrence J. Baer, Esq.

**SKADDEN ARPS SLATE MEAGHER & FLOM LLP**
*Counsel for the Official Committee of Unsecured Creditors*
Four Times Square
New York, New York 10036
By:    Jay M. Goffman, Esq.

-and-

155 North Wacker Drive
Chicago, Illinois 60606
By:    John Wm. Butler, Jr., Esq.
        Al Hogan, Esq.

**SEHAM, SEHAM, MELTZ & PETERSEN LLP**
*Counsel for the American Independent Cockpit Alliance, Inc. and*
 *the Supplement B Pilot Beneficiaries*
445 Hamilton Avenue, Suite 1204
White Plains, New York 10601
By:    Lucas K. Middlebrook, Esq.

-and-

2915 Wayzata Boulevard
Minneapolis, Minnesota 55405
By:    Nicholas P. Granath, Esq.

**SNR DENTON US, LLP**
*Counsel for the Pension Benefit Guaranty Corporation*
1221 Avenue of the Americas
New York, New York 10020
By:    Carole Neville, Esq.
        Fruman Jacobson, Esq.
        Gary Meyerhoff, Esq.

## TABLE OF CONTENTS

**BACKGROUND** ................................................................................................................ 4

**I.**  **AMERICAN AIRLINES, INC. AND ITS OPERATIONS** ............................................ 4

**II.**  **DEVELOPMENTS IN THE AIRLINE INDUSTRY** ..................................................... 6

    A.  Domestic Deregulation and the Entry of Low Cost Carriers ........................................ 6

    B.  International Deregulation ............................................................................................ 7

    C.  External Shocks to the Airline Industry ...................................................................... 8

**III.**  **THE DECLINE OF AMERICAN** .................................................................................. 8

    A.  Increased Price and Service Competition .................................................................... 9

    B.  American's High Labor Costs and Productivity Issues .............................................. 12

    C.  Mergers and Restructurings of Other Carriers .......................................................... 13

**IV.**  **RECENT DEVELOPMENTS REGARDING AMERICAN** ........................................ 14

**DISCUSSION** ................................................................................................................... 22

**I.**  **THE STANDARD UNDER SECTION 1113** ................................................................ 22

    A.  Necessity .................................................................................................................... 25

    B.  Fair and Equitable Treatment .................................................................................... 27

    C.  Complete Information and Information Necessary to Evaluate the Proposal ........... 28

    D.  Good Faith/Good Cause ............................................................................................. 29

    E.  Balance of the Equities .............................................................................................. 30

**II.**  **EVALUATION OF AMERICAN'S PROPOSAL TO THE APA** .............................. 31

    A.  Necessary for Reorganization .................................................................................... 32

        1.  Blanket Objections to American's Motion ........................................................... 33

            a)  Potential Merger with US Airways ............................................................... 33

            b)  Objections to the Business Plan .................................................................... 40

i

| | | c) | Convergence | 49 |
| | 2. | | Objection to Proposed Changes in Benefits to All Employees | 52 |
| | | a) | Pension Plans | 53 |
| | | b) | Medical Costs Generally | 54 |
| | | c) | Active Medical | 54 |
| | | d) | Retiree Medical | 55 |
| | | e) | Objections to Proposed Benefit Changes | 56 |
| | 3. | | Objections To Proposed Changes Relevant Only to the Pilots | 58 |
| | | a) | Regional Jets | 58 |
| | | b) | Codesharing | 66 |
| | | c) | Furlough | 71 |
| | | d) | Schedule Maximum | 73 |
| | | e) | Sick Leave | 74 |
| | | f) | Valuation of Proposal | 75 |
| B. | | | Fair and Equitable Treatment | 76 |
| C. | | | Complete and Reliable Information/Information Necessary to Evaluate the Proposal | 80 |
| D. | | | Good Faith Negotiations/Good Cause to Refuse the Proposal | 87 |
| | 1. | | Criticism that American Failed to Change Its Section 1113 Request for Concessions | 87 |
| | 2. | | American's Alleged Refusal to Negotiate over Specific Terms | 92 |
| | 3. | | American's Alleged Refusal to Accept the APA's Counterproposal | 93 |
| E. | | | Balance of the Equities | 96 |
| F. | | | Objections to the Motion By Other Parties | 100 |
| **CONCLUSION** | | | | **105** |

ii

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is a motion by debtor American Airlines, Inc. ("American" or the "Company") under Section 1113 of the Bankruptcy Code to reject the collective bargaining agreements between American and its pilots, flight attendants and some of its transit workers (the "Motion"). These employees are represented by three unions (collectively, the "Unions"): (1) the Association of Professional Flight Attendants (the "APFA"); (2) the Allied Pilots Association (the "APA"); and (3) the Transit Workers Union of America, AFL-CIO (the "TWU").

Under Section 1113 of the Bankruptcy Code, a court may authorize a debtor to reject a collective bargaining agreement if certain requirements are met. These requirements include that, before seeking court relief, a debtor must a proposal to the union that: (i) provides for modifications that are "necessary" to the debtor's ability to reorganize; (ii) treats the creditors, debtor, and affected parties fairly and equitably; and (iii) is based on the most complete and reliable information available. The debtor must also establish that: (i) it has shared such relevant information with the union as is necessary to evaluate the proposal; (ii) it has conferred in good faith to try to reach an agreement; (iii) its proposal has been rejected by the authorized representative of the employees without "good cause;" and (iv) the balance of the equities clearly favors rejection. Through these seven interrelated requirements, Section 1113 attempts to "reconcile the public policy that favors collective bargaining with the reality of bankruptcy, recognizing that Chapter 11 is not merely business as usual but an extremely serious process that can lead to liquidation and the loss of the jobs of all the debtor's employees as well as of the creditors' opportunity for any meaningful recovery." *In re Northwest Airlines Corp.*, 346 B.R. 307, 314 (Bankr. S.D.N.Y. 2006).

1

The Court held a three week trial on this matter (the "Trial"). After the Trial, all parties continued negotiating in the hope of reaching new collective bargaining agreements. As a result of those efforts, American has reached a new collective bargaining agreement with the TWU and presented a new proposal to the APFA that is currently the subject of a ratification vote by APFA members. *See* COLLIER ON BANKRUPTCY ¶ 1113.01 (Alan N. Resnick & Henry J. Somner eds., 16th eds.) ("Collier") ("The language and history of section 1113 make clear that the preferred outcome under section 1113 is a negotiated solution rather than contract rejection."). But as efforts at a negotiated solution with the pilots have failed, the Court now reluctantly issues this opinion solely to address the merits of the Motion as to the APA.

In evaluating the Motion, this Opinion will first set forth the factual background and relevant legal authority for understanding this dispute. It will next analyze American's Section 1113 proposal to the APA as to each of Section 1113's requirements, with a particular emphasis on the highly disputed issue of necessity.

For the reasons discussed below, the Court concludes that American has established that significant changes are necessary to the APA's collective bargaining agreement for reorganization. Crucial to this conclusion is the undisputed fact that American labor costs for pilots are among the highest of its network competitors and that American has lost more than $10 billion since 2001, including more than $1 billion in 2011. The Court rejects the APA's contention that American must engage in a merger transaction before being granted relief under Section 1113 as such a notion is inconsistent with the expedited relief contemplated by the statute and the simple fact that no merger transaction has been presented to this Court. The Court also rejects the APA's related contention that American's business plan is fatally flawed and thus an improper basis for seeking Section 1113 relief. The Court finds instead that

2

American's business plan is very similar to the business plans presented in other airline

bankruptcies and thus provides an appropriate basis for establishing that significant changes are

necessary to the APA's existing collective bargaining agreement.

Turning to the specific details in American's proposal, the Court finds that American has

demonstrated that changes are necessary to employee benefits that apply to all union employees,

including the pilots, and to many of the collective bargaining terms that apply only to the pilots.

The need for change is supported by both American's business plan and by comparing the

existing pilot agreement to the pilot agreements of American's competitors.  Notably, the Court

concludes that change is necessary to the scope clause that defines the extent of flying done by

American's pilots.   The Court further finds that most of the specific changes in American's

proposal satisfy all of the requirements of Section 1113.

As explained in more detail below, however, the Court concludes that two of the

proposed changes—the expansion in American's ability to furlough pilots and to use codesharing

to expand American's network—are inconsistent with Section 1113's concept of necessity.  This

is because these proposed changes would give American unrestricted use of furlough and

codesharing where such unfettered discretion has not been justified as necessary either in

American's business plan or by the practices of American's competitors.  Given the importance

of these two specific issues in the context of American's overall proposal to the APA, the Court

must deny the Motion as to the APA on the present record.  Such a denial is without prejudice to

American seeking relief in the future with a new proposal as to the APA that remedies these

deficiencies.[1]

---

[1]    The Court will render a subsequent decision as to the APFA if the ratification vote does not result in a
    new APFA collective bargaining agreement.  Notwithstanding that the Court today does not rule on
    the Motion as to the TWU and the APFA, the Court has considered evidence presented at Trial as to

3

This opinion constitutes the Court's findings of fact and conclusions of law.[2]

## BACKGROUND

## I. AMERICAN AIRLINES, INC. AND ITS OPERATIONS

American, established in 1934, is the principal subsidiary of AMR Corporation ("AMR"). Motion at 7.[3] American is a "network carrier," a term that generally refers to an airline that is one of "the surviving set of large carriers, most of which were established long before deregulation, that operate on a 'hub and spoke' traffic model, service a wide variety of both domestic and international destinations using multiple aircraft types, and have workforces relatively more senior than the newer entrants." (Kasper Decl. ¶ 6 n.7). The term network carriers is generally understood to include American, Delta (recently merged with Northwest), United (recently merged with Continental), and US Airways. (*Id.*).

In 2000, American was the largest passenger airline in the world in terms of revenue and capacity. (Kasper Decl. ¶ 6; Goulet Decl. ¶ 5). Today, however, American ranks fifth among

---

those parties where that evidence sheds light upon whether American has satisfied the requirements of Section 1113. The Unions raised many common objections, and thus they presented overlapping arguments and evidence on a variety of issues. Given the number of common arguments raised by the APA and the APFA, particularly as to American's business plan and a possible merger, this Opinion will unavoidably address issues raised by the APFA.

[2] Certain information relevant to a determination of this Motion is confidential business information of American that has been redacted from this Opinion. Such redactions have been kept to a bare minimum given the importance of these issues to all stakeholders in this case and the interest of transparency in these proceedings. An unredacted version of this Opinion has been made available to counsel to all parties that participated at the Trial.

[3] There is an extensive evidentiary record in this Section 1113 proceeding. Trial testimony is cited as "Trial Tr. [page:line] [date] [Witness]." Testimony provided by written declaration is cited as "[Witness] Decl. ¶ ___ ." Where a witness has provided a second declaration in the rebuttal case, it is cited as "[Witness] Supp. Decl. ¶ ___ ." Exhibits are cited as "[Party] Ex. ___ ." This Opinion also includes some references to the briefs filed by the parties. American's initial Motion and related memoranda of law are cited as "Motion ___ ." The Unions' oppositions to the Motion are cited as "[Union] Opp. ___ ." The parties' proposed findings of fact and conclusions of law are cited as "[Party] Proposed Findings ___ ."

passenger carriers worldwide and fourth among U.S. carriers.  (Kasper Decl. ¶ 6; Goulet Decl. ¶ 8).

Domestically, American is focused primarily on the New York, Los Angeles, Chicago, Dallas/Fort Worth, and Miami business markets.  (First Day Affidavit of Isabella D. Goren ¶ 7) ("Goren First Day Aff.").  Internationally, American, as one of the founding members of the Oneworld Alliance, collectively serves with other Alliance members, 750 destinations in approximately 150 countries, with more than 8,400 daily departures.  (Goren First Day Aff. ¶ 8).  Through the Oneworld Alliance, American provides its customers with an extensive route network, opportunities to earn and redeem frequent flyer miles across the combined oneworld network and access to more airport lounges and clubs.

As of November 1, 2011, American maintained a fleet of over 600 jet aircraft and operated approximately 1,800 scheduled daily departures to approximately 160 destinations throughout North America, the Caribbean, Latin America, Europe, and Asia.  (Goren First Day Aff. ¶ 5).  Presently, American has approximately 65,000 active employees, 70% of whom are represented by one of three labor unions under nine separate collective bargaining agreements that were negotiated pursuant to the Railway Labor Act.  (Goren First Day Aff. ¶14; Brundage Decl. ¶ 6).  American's management and support staff employees, which include office and clerical employees, as well as its passenger service agents, representatives, and weight and balance planners, are excluded as they are not unionized.  Accordingly, American determines their wages, benefits, and work rules.

## II.   DEVELOPMENTS IN THE AIRLINE INDUSTRY

### A.  Domestic Deregulation and the Entry of Low Cost Carriers

Prior to the enactment of the Airline Deregulation Act of 1978, the airline industry faced

little market competition.  The federal government, through the United States Civil Aeronautics

Board ("CAB"), regulated licensing, ticket prices and airline routes, and precluded new market

entry while enabling airlines to maintain significant pricing power.  (Kasper Decl. ¶ 11).  As a

result, airline fares were inflated and largely uniform with few discounts and route systems were

generally linear and incapable of supporting frequent flights between cities.  Moreover, airlines

were often precluded from reducing their prices to take advantage of lower costs and thus lacked

incentives to seek measures that would minimize their cost structure.

Deregulation changed everything.  The Airline Deregulation Act of 1978, passed on

October 24, 1978, transformed the entire landscape of the U.S. airline industry.  Specifically, the

Act was enacted to "encourage, develop, and attain an air transportation system which relies on

competitive market forces to determine the quality, variety, and price of air services, and for

other purposes." Airline Deregulation Act of 1978, Pub. L. No. 95-504, 92 Stat. 1705, 1705

(codified as amended in scattered sections of 49 U.S.C.).  Accordingly, the Act allowed carriers

to set prices and establish flight schedules based on market forces.  This promulgated the

widespread adoption of hub-and-spoke networks among large network carriers like American.  It

also permitted so called low-cost carriers ("LCCs"), like Southwest Airlines, to enter the market

and expand their scope of networks.  (Kasper Decl. ¶ 15).  The entry and expansion of LCCs

resulted in an increase in demand in air travel which the United States Department of

Transportation coined in 1993 as the "Southwest Effect." *See* OFFICE OF AVIATION ANALYSIS,

U.S. DEP'T OF TRANSP., THE AIRLINE DEREGULATION EVOLUTION CONTINUES:  THE SOUTHWEST

EFFECT (1993), *available at* http://ostpxweb.dot.gov/aviation/X-50%20Role_files/Southwest%20

Effect.doc.  But only the LCCs were able to capture the benefits of this Southwest Effect by

virtue of their lower cost structures and increased their market share while the large network

carriers experienced dramatic losses.  (Kasper Decl. ¶ 16).  Since the passage of the Airline

Deregulation Act of 1978, the LCCs have experienced dramatic growth and expansion.  (Kasper

Decl. ¶¶ 18–19; AA Exs. 2–3 (showing the breadth and scope of the LCCs' nationwide reach)).

     As network carriers like American cannot compete with LCCs on price, they must

respond in a number of ways to remain competitive in the industry, including: (i) lowering their

costs and prices as much as possible; and (ii) offering more destinations, additional frequencies,

and increased amenities.  (Vahidi Decl. ¶¶ 7, 12; Trial Tr. 166:18–168:9, April 23, 2012

(Kasper)).  Through these measures, network carriers hope to attract customers (such as business

travelers and other frequent fliers—so called "high value" customers) willing to pay a premium

for added convenience.  (Trial Tr. 166:18–168:9, April 23, 2012 (Kasper)).

     Other recent changes also have shaped the airline industry, including advances in

internet-based airline search and booking tools that have enabled passengers to compare fares

across all carriers.  (Kasper Decl. ¶ 20).  The resulting increase in price transparency has placed

further downward pressure on domestic airfares.  (Kasper Decl. ¶¶ 20, 72–73).

**B.  International Deregulation**

     Large network carriers also faced increased competition in the international air travel

markets following the passage of a number of "Open-Skies Agreements" between the United

States and its major trading partners in the early 1990s.  Since 1993, the United States has

entered into Open Skies Agreements with 105 countries.  (Kasper Decl. ¶ 22; AA Ex. 5).  In

promoting these agreements, the federal government has pursued a liberalized aviation policy

which removed restrictions on international flight routes, the number of designated carriers, capacity and flight frequencies, and allowed fares to be determined by competitive market forces as opposed to regulations. (Kasper Decl. ¶ 22).

### C. External Shocks to the Airline Industry

In addition to deregulation in both domestic and international markets, the airline industry has also faced a number of external shocks that have either reduced demand and/or increased costs. These include, but are not limited to, the terrorist attacks of September 11th; the outbreak of SARS; rising fuel prices; the wars in Iraq and Afghanistan; and various natural disasters, such as Hurricane Katrina. (Kasper Decl. ¶¶ 24–25). The September 11th terrorist attacks in particular led to an immediate decrease in demand in air travel that was later further compounded by the increased inconvenience resulting from changes in passenger screening which continues to date. (Kasper Decl. ¶¶ 23–24).

### III. THE DECLINE OF AMERICAN

American has suffered losses of approximately $6.6 billion since 2003 and cumulative losses of more than $10 billion since 2001. (Goulet Decl. ¶ 7; Kasper Decl. ¶ 33; AA Exs. 10–12, 104). Indeed, American has maintained negative net margins since 2003, averaging -3.6% over the period of 2003–2011. (Kasper Decl. ¶¶ 30, 33; AA Exs. 9, 12). In addition, American has a much higher percentage of secured debt than do the other network carriers, (Trial Tr. 214:13–18, May 14, 2012 (Yearley)), and has run out of unencumbered assets to pledge as collateral for additional financing. (Goulet Decl. ¶ 39; Trial Tr. 97:19–98:2, May 23, 2012 (Goulet)).

American's poor financial performance over the last few years stands in sharp contrast not only to that of the LCCs, but also to other large network carriers. American lost $1.06 billion

in 2011, the only network carrier that failed to earn a profit last year.  (Trial Tr. 98:20–25, April 24, 2012 (Goulet); Goulet Decl. ¶ 9; AA Exs. 106, 125).  While other airlines maintained positive net margins in 2011, American had net margins of -4.4%.  (Kasper Decl. ¶¶ 31–32; AA Exs. 10–11).  While American ranked first in the world in terms of overall capacity in 2000, it now ranks fourth in the world and third in the United States, behind Delta and United.  (Vahidi Decl. ¶ 15; Goulet Decl. ¶¶ 5, 8; AA Exs.102, 105, 123).  Moreover, as a result of American's smaller route network relative to United/Continental and Delta, American is at a greater competitive disadvantage in attracting passengers, particularly time-sensitive, high-yield business travelers who value larger networks that offer more non-stop flight options and more convenient connecting options with less travel time.  (Kasper Decl. ¶ 62).  On a similar note, American's financial weakness has hurt its ability to invest in products and services that may have enabled it to counter further erosion of its revenue.  (Kasper Decl. ¶ 63).

The decline in American's financial performance results from many factors, including but not limited to:  (1) increased price and service competition from LCCs, other large network carriers and foreign fare carriers; (2) high labor costs and low productivity; and (3) mergers and restructurings of other carriers.  (Kasper Decl. ¶ 6).

### A.  Increased Price and Service Competition

Since 1998, the LCC market share of the domestic airline market has approximately doubled, seizing market share from large network carriers such as American and penetrating virtually all of American's hubs and former focus cities.  (Kasper Decl. ¶ 40; AA Ex. 14; Kasper Decl. ¶ 42; AA Ex. 16 (noting that LCCs have added approximately 250 new non-stop routes from American hubs and former focus cities, dramatically decreasing American's market share at many of these locations); Kasper Decl. ¶ 48; AA Ex. 21 (discussing how LCCs have

penetrated virtually all of American's hubs and former focus cities)).  American has greater

exposure to ever-expanding LCC competition on its route structure than do the other network

airlines, as more American passengers have access to LCC options than passengers on other

airlines.  (Trial Tr. 131:2–132:19, April 23, 2012 (Kasper); AA Exs. 2–3, 1745; Trial Tr. 85:3–

12, 86:3–13, May 21, 2012 (Kasper)).  LCCs now operate on 49 of American's top 50 routes, up

from 39 in 2003.  (Trial Tr. 156:19–157:7, April 23, 2012 (Kasper); AA Ex. 17).  Likewise, 78%

of American's passengers had an LCC option for their travel in 2011, up from 65% in 2003, and

only 37% in 1998.  (Trial Tr. 157:8–24, April 23, 2012 (Kasper); AA Ex. 22).

In certain instances, the competition from LCCs has forced American to discontinue

service on established routes.  (AA Ex. 18; Kasper Decl. ¶ 45 (noting that American's average

non-stop fares from 2000 to 2010 between Boston and San Francisco declined by nearly 60% (in

2011 dollars) and caused the airline to terminate service on that route); Kasper Decl. ¶ 47; AA

Ex. 20 (showing that American has been forced to cede market share to LCCs in cities such as

Boston)).  The LCC's expansion in the Caribbean and Latin American region has hit American

particularly hard because a large portion of American's revenue had traditionally been generated

from this region.  (Kasper Decl. ¶ 56 (American's average inflation-adjusted fares to this region

have dropped by approximately 9% between 1998 and 2011 notwithstanding a five-fold increase

in the price of jet fuel)).

To compete with LCCs, major network carriers, including American, have sought various

measures to reduce costs to reach levels closer to those that LCCs maintain.  (Trial Tr. 166:23–

167:13, April 23, 2012 (Kasper)).  The goal with reducing costs is to enable a large network

carrier to "deliver the kind of services [it wants] to deliver," including large network service

connections, flights to many points and different types of aircraft as well as mixed fleets.  (*Id.*)

In addition to reducing costs, large network carriers must also seek ways to increase revenue in order to drive profit margins up.  (*Id.* at 167:14–168:9).  To do so, large network carriers need to focus on ways to improve their products so as to attract "high value" customers—business and/or frequent travelers who value convenience, quality service, greater schedule frequency and flight destinations.  (*Id.*)  Doing so would enable these large network carriers to attract and hopefully retain passengers that are generally willing to pay more, thereby driving up average fares in a manner that LCCs cannot because they do not offer such premium services.  (*Id.*)

In addition to LCCs, American faces heightened competition from other large network carriers that either have been able to modify their cost structures and reduce their labor and other costs through Chapter 11 restructurings, or have been able to create increasingly more comprehensive domestic and international route networks through mergers.  (Kasper Decl. ¶¶ 60–61; AA Ex. 30 (highlighting how the scope of American's network today lags far behind those of competing large network carriers such as Delta and United/Continental)).  Moreover, unlike other large network carriers, American has been unable to achieve lower operating costs and to enhance profitability that would enable American to invest in improving service offerings thereby permitting American to attract and retain more customers.   (Kasper Decl. ¶¶ 60, 63; AA Ex. 32).  These factors, coupled with American's smaller route network relative to Delta and United/Continental, have put American at a competitive disadvantage with respect to customers who prefer more non-stop flight options which reduce travel time.  (Kasper Decl. ¶ 62; AA Ex. 31 (showing how American's passenger unit revenues now lag behind Delta and United/Continental)).

American faces growing competition from foreign carriers such as Emirates, Jet Airways, Qatar, etc. that often offer levels of in-flight service quality that exceeds those offered by

American.  (Kasper Decl. ¶¶ 66–68; AA Ex. 36).  A number of these new international carriers

have added new services to key international gateways such as New York City.  (Kasper Decl. ¶

68; AA Ex. 37; Kasper Decl. ¶ 69 (noting that foreign carriers have increased competition for

American both with non-stop gateway-to-gateway routes but also with respect to connecting

city-pairs served by the oneworld alliance members)).

### B. American's High Labor Costs and Productivity Issues

American's overall costs per available seat mile ("CASM")—a common industry

metric—significantly exceed those for most of its competitors.  (Kasper Decl. ¶ 59; AA Exs. 15,

29; Trial Tr. 81:8–12, May 21, 2012 (Kasper)).  A significant reason for this difference is labor

costs, American's largest controllable cost.  (Trial Tr. 81:20–84:20, May 21, 2012 (Kasper);

Kasper Decl. ¶ 78; AA Exs. 41, 1744).[4]  American's labor CASM is approximately 24% higher

than the average of the other network carriers and 79% higher than the average of the LCCs with

which American competes.  (Trial Tr. 175:9–13, April 23, 2012 (Kasper); AA Ex. 42).  Several

factors contribute to American's high unit labor cost, including relatively high wage scales for

employees, pilots and flight attendants; generous benefits; and a more senior workforce.  (Kasper

Decl. ¶¶ 82–85; AA Exs. 41–47; Kasper Decl. ¶¶ 90–91 (indicating that American employees

and pilots receive some of the highest wage compensation in the country); Kasper Decl. ¶¶ 86,

96; AA Exs. 48, 51 (noting how American has maintained the highest pension accounting costs

per ASM and that American's labor CASM is 21% higher than the average of other large

network carriers and 70% higher than the LCC average)).

---

[4]    American's largest cost is fuel.  (Kasper ¶ 78; AA Ex. 41).  Airlines are limited in their ability to
control the price of fuel but can reduce fuel consumption.  (Trial Tr. 136:16-19, 137:6-11, April 23,
2012 (Kasper)). American has done so but its fuel prices per ASM are still the highest among the
network carriers due to American's aging fleet and restrictions in its collective bargaining
agreements.  (Kasper Decl. ¶ 136; AA Ex. 79; Goulet Decl. ¶ 23 n.13).

In conjunction with its high labor costs, American also faces low productivity among its employees and pilots. (Kasper Decl. ¶¶ 93–94; AA Ex. 55 (indicating that because of American's low pilot productivity, American's pilot compensation per ASM is the second highest in the industry)). American's total labor costs for its pilots are $1.8 billion per year, and constitute 29% of the Company's total labor costs. (Brundage ¶ 26; AA Ex. 507). American's pilot labor costs are among the highest of its network competitors, (Newgren Decl. ¶ 11), a fact essentially conceded by the APA. (Trial Tr. 25:9–11, May 14, 2012); *see also* APA's Proposed Findings ¶ 30 ("American's current pilot labor costs are admittedly greater than those of the other legacy carriers . . ."). Counsel to the APA has conceded that this status quo is unsustainable. (Trial Tr. 25:9–11, May 14, 2012).

### C. Mergers and Restructurings of Other Carriers

In the last decade, the airline industry also has been reshaped by mergers and bankruptcy restructurings, all of which have made it more difficult for American to compete. All of American's major network competitors have already filed for bankruptcy, some more than once. (Glass Decl. ¶¶ 43–55; Kasper Decl. ¶ 6; AA Ex. 8). Between 2002 and 2005, four network carriers filed for bankruptcy protection. (Goulet Decl. ¶ 20). US Airways has undergone four rounds of labor concessions in its two bankruptcies. (Glass Decl. ¶¶ 43, 45). United filed two separate Section 1113 motions during its three years in bankruptcy. (Glass Decl. ¶¶ 47, 50). Delta underwent two rounds of labor concessions, one prior to bankruptcy and one during bankruptcy. (Glass Decl. ¶¶ 51–52). Northwest underwent two rounds of labor cost reduction agreements, one prior to bankruptcy and one during bankruptcy. (Glass Decl. ¶¶ 53–54). Continental filed for bankruptcy twice, in 1983 and in 1990. (Glass Decl. ¶ 55; AA Ex. 8). In bankruptcy, American's network competitors were able to shed debt, cut labor and non-labor

operating costs, freeze or terminate pension obligations, restructure their balance sheets, and obtain relief from work rule and scope restrictions in their collective bargaining agreements. (Kasper Decl. ¶ 38; Goulet Decl. ¶ 20; Glass Decl. ¶¶ 39–55). Additionally, by 2007, US Airways emerged from Chapter 11 strengthened by its merger with America West. (Goulet Decl. ¶ 34). Subsequent to emerging from bankruptcy, Northwest and Delta merged in 2008, and in 2011 United acquired Continental. (Goulet Decl. ¶ 36).

It has been suggested that American's financial difficulties stem not from its high labor costs, but rather from the consolidation of American's competitors. (Akins Decl. ¶ 5). But that view ignores that American's financial difficulties existed before it fell to being the fourth U.S. carrier in terms of domestic revenues. (Kasper Decl. ¶ 29). American has incurred approximately $6.6 billion in net losses since 2003, a pattern that began well before 2007. (Trial Tr. 171:13–18 May 17, 2012 (Akins) (stating that he did not dispute that over the last 10 years, American has lost billions of dollars, including one billion last year alone); AA Ex. 33). It also ignores the vast evidence that American's labor cost structure is, as a general matter, at or near the top of the network carriers. (Trial Tr. 172:7–172:14, May 17, 2012 (Akins) (conceding that "American's labor CASM comprises a higher percentage of overall CASM than the other airlines currently operating today.")).

## IV.    RECENT DEVELOPMENTS REGARDING AMERICAN

Given all these competitive pressures, American itself flirted with bankruptcy in 2003. It avoided bankruptcy at that time only because it was able to negotiate new collective bargaining agreements in which the Unions provided significant economic concessions over their prior agreements. More specifically, American achieved labor cost reductions of $1.8 billion in 2003, including $1.6 billion in annual Union labor cost reductions and $200 million in labor cost

14

reductions from its non-union employees. (Goulet Decl. ¶ 21). But these consensual labor cost reductions were much smaller than those subsequently achieved by American's competitors in their Chapter 11 restructurings. (Goulet Decl. ¶ 6; Trial Tr. 45:15–19, April 24, 2012 (Glass); Glass Decl. ¶¶ 43–55). Thus, while American's cost-saving collective bargaining agreements from 2003 are still in place for the Unions by virtue of the Railway Labor Act,[5] they have been insufficient to allow American to regain profitability.

In the years following 2003 and prior to its bankruptcy filing in November 2011, American again sought labor concessions. American's executives described their strategy during this time as "kick[ing] the can" down the road to permit the Company to "limp along" until sometime in the future when there might be increased demand, a benign fuel environment, and a convergence in American's labor costs vis-à-vis other carriers. (Trial Tr. 171:4–10, April 26, 2012 (Brundage); Trial Tr. 240:14–17, April 24, 2012 (Goulet)). But these events did not occur. (Trial Tr. 242:21–243:3, April 24, 2012 (Goulet); Trial Tr. 171:15–173:8, April 26, 2012 (Brundage)). With the exception of a few TWU employee groups that reached new agreements with the Company, American was unable to reach new collective bargaining agreements with the APA, the APFA and TWU prior to filing bankruptcy.

On November 29, 2011, American filed for bankruptcy, together with its parent AMR Corporation, and other affiliates. In their first day filings, the Debtors foreshadowed this Section 1113 proceeding. Specifically, the Debtors' first day affidavit explained that they have "been unable to match its competitors' abilities to adequately deal" with the variables associated with

---

[5]   *See Allied Pilots Ass'n v. AMR Corp. (In re AMR Corp.)*, 471 B.R. 51 (Bankr. S.D.N.Y. 2012) (a collective bargaining agreement that has become amendable under the Railway Labor Act remains in place and subject to Section 1113 of the Bankruptcy Code).

the airline industry because the "airline industry is labor intensive" and the Debtors have "higher

labor-related costs." (Goren First Day Aff. ¶ 28).[6]

      Some two months later, on February 1, 2012, American began the process leading up to

its Section 1113 application. It unveiled its new business plan, labeled the "Plan for Success,"

for the six year period from 2012 through 2017 (the "Business Plan"). The Business Plan

contains a detailed business model, a network plan and a fleet plan, including details about the

markets in which American plans to operate and the equipment it intends to use to serve those

markets.[7] (Trial Tr. 102:9–16, April 24, 2012 (Goulet)). The fundamental principles behind the

Business Plan include:

- Concentration on the five key hub markets for American: Dallas-Fort Worth, Miami, Chicago, Los Angles, and New York;

- Expanding American international presence, particularly through the use of joint business agreements and codesharing;

- Increasing passenger feed to American's hub and across its network through codesharing with domestic air carriers and increased use of regional jets;

- Implementing a long-term fleet plan sufficient for both replacement and growth;

- Creating a capital structure that allows American to grow and compete, attract capital at favorable rates and withstand external shock to the business; and

- Setting up a sustainable cost structure.

---

[6]    As one industry analyst stated: "Although we believe AMR at its core has all the elements of a strong franchise, it will never be able to achieve its potential until it has a competitive cost structure." (Goren First Day Aff. ¶ 22 (quoting Michael Linenberg, *AMR Corporation: Sept Q Loss Underscores AMR Challenges,* DEUTSCHE BANK EQUITY RESEARCH REPORT (Oct. 20, 2011)).

[7]    The network plan identifies the markets in which American plans to operate, while the fleet plan identifies the equipment that it intends to use to serve those markets. (Trial Tr. 102:9-16, April 24, 2012 (Goulet)).

(Goulet Decl. ¶¶ 46–62; Vahidi Decl. ¶¶ 9, 21–44).  The Business Plan is designed to enable American to better compete for its share of "high value" customers and restore its unit revenue to levels consistent with those of other network carriers.  (Trial Tr. 15:9–16, May 23, 2012 (Dichter)).

Two aspects of American's business strategy require some explanation:  codesharing and the use of regional jets.  Codesharing is an aviation business arrangement where two or more airlines share the same flight.  A seat can be purchased on one airline but is actually operated by a cooperating airline under a different flight number or code.  Codesharing allows greater access to cities through a given airline's network without having to offer extra flights, and makes connections simpler by allowing single bookings across multiple planes.  The use of regional jets involves a small regional airline flying smaller-sized aircraft referred to as regional jets on behalf of a network carrier.  The use of regional jets is meant to assist larger carriers in their network planning by matching the type and size of an aircraft with the demand in certain local markets.  In this way, passengers can be connected from smaller airports to larger airports that serve as hubs for the larger carriers.

The Business Plan forecasts revenue growth using the metric of EBITDAR, a common financial metric that measures a company's earnings before interest, tax, depreciation, amortization, and rent ("EBITDAR").  (Resnick Decl. ¶¶ 10, 26).   EBITDAR permits a comparison of the operating profits of companies that may have different business models or financial structures.  (*Id.*).[8]

---

[8]    The EBITDAR projections over the six year period of the Business Plan are confidential business information that have been filed under seal.  The EBITDAR projections are set forth in detail by American and its experts at AA Exhibit 306A.

American retained McKinsey & Company, Inc. ("McKinsey") to assist with preparing

the Business Plan. (Trial Tr. 21:2–6, April 26, 2012 (Dichter)). McKinsey is a management

consulting firm that works with companies to help improve their performance. (Trial Tr. 8:17–

21, April 26, 2012 (Dichter)). Among McKinsey's primary tasks for American was to create a

detailed revenue model capable of forecasting revenue performance at a market and key hub

level using drivers of revenue performance such as American's projected capacity, projected

competitor capacity, projected industry demand, the relationship between supply-demand

imbalance and industry revenue, and the historical relationship between market share and

average fare. (Dichter Decl. ¶¶ 7, 21; Trial Tr. 105:20–106:1, April 24, 2012 (Goulet); Trial Tr.

22:13–24, 25:6–20, April 26, 2012 (Dichter)). This revenue model includes details of

American's projected growth in specific origin-and-destination pairs, which American used to

forecast the revenue the network and fleet plans would generate. (Trial Tr. 102:15–17, April 24,

2012 (Goulet); Trial Tr. 44:6–10, May 23, 2012 (Dichter); AA Ex. 1776). McKinsey was also

asked to provide an independent perspective on the Business Plan. (Trial Tr. 101:19–25, April

24, 2012 (Goulet); Goulet Decl. ¶ 44; Dichter Decl.¶ 7). McKinsey concluded that the Business

Plan is "reasonably certain" and, together with relief under Section 1113, will result in a "very

healthy airline." (Trial Tr. 11:8–9, 12:19–13:4, May 23, 2012 (Dichter)).

In addition to McKinsey, American also retained Rothschild, Inc. ("Rothschild") to

provide financial advisory and investment banking services. (Resnick Decl. ¶ 9). Rothschild

provided financial metrics based upon its experience and on the reorganization plans of the other

network carriers that had recently filed for bankruptcy. (Tr. 21:17–23:6, April 25, 2012

(Resnick)). After analyzing the Business Plan and testing the financial assumptions embodied in

it, Rothschild endorsed the viability of the Business Plan, including the EBITDAR targets for its

18

six year period.  (Trial Tr. 145:24–146:1, May 22, 2012 (Resnick);  Resnick Decl. ¶ 9).  The

chair of Rothschild's global restructuring practice, David Resnick, testified that his team

> spent a considerable amount of time from the company's filing to the presentation
> of the business plan in February working closely with the company, with
> McKinsey, and the team that the company had put together to produce the
> business plan, to challenge the assumptions, to work through the issues.  So my
> point was that this is a document with which we're very comfortable, that we
> think is thorough, and is a very reasonable basis for going forward in the
> progression of the Chapter 11.

(Trial Tr. 147:6–15, May 22, 2012 (Resnick)).

At the same time as it unveiled its Business Plan, American also provided term sheets

containing American's initial proposal to modify each of the Union's collective bargaining

agreements.  These proposals were based upon the predictions and targets set forth in the

Business Plan, including the EBITDAR projections for the six year period.  In discussing these

term sheets with the Unions, American explained that it was seeking a 20% reduction in costs

from each labor group, or $1.25 billion in average annual costs over a six year period from all

labor groups.  Of this number, American sought $370 million from the pilots, $230 million from

the flight attendants, and $390 million from its transit workers.   At this time, American proposed

to terminate its pension plan for all employees and institute uniform plans for active employee

medical, future retiree medical, and pensions.  During and after the February 1st meeting with

American, the Unions requested information regarding the Business Plan and the term sheets.

After February 1, 2012, American and the Unions negotiated regarding American's

proposed concessions.[9]  While American stated its willingness to change the components that

---

[9]  Because of the complicated nature of these collective bargaining agreements, the parties negotiate on
an issue-by-issue basis with each issue subject to the normal tradeoffs inherent in collective
bargaining.  Notwithstanding any meeting of the minds on a particular issue, the parties have no
agreement on a collective bargaining agreement until such time as a union sends out a specific
proposed agreement for a vote and it is ratified by the union membership.  So while the parties at

make up the requested savings, it did not change the overall requested amount of savings.  On March 21, 2012, American delivered a new term sheet to the pilots.  The overall requested amount of average labor concessions of $1.25 billion sought from all Unions did not change, but the new term sheet included two substantial changes from the Company's initial term sheet.  The most notable change was American's decision to freeze its defined pension plans rather than terminate them, which would cease the accrual of new benefits, but preserve benefits already accrued as of the date the plans were frozen.  The second change was to lower the monthly cost share of American's medical plan for active employees from 23% to 21% and to add additional features to that plan.  (Wright Decl. ¶¶ 26–27).

On March 27, 2012, American filed its Motion seeking authority to reject some nine collective bargaining agreements with the three Unions pursuant to Section 1113 of the Bankruptcy Code.  The March 21st and 22nd term sheets to the APA, APFA, and the TWU, respectively, were the proposals set forth in the Motion.

After the filing of the Motion, American continued to negotiate with the TWU and, to a lesser extent, the APA and the APFA.  At the same time, the Unions were negotiating with US Airways, which had made public for some time its desire to merge with American.   The negotiations with US Airways quickly resulted in term sheets setting forth proposed contractual terms for each Union for a possible merger between US Airways and American.  (APA Ex. 432A).  But the term sheets are generally conditioned upon due diligence on any merger transaction and related business plan.  (Trial Tr. 12:15–21, May 14, 2012; Trial Tr. 116:22–119:12, May 14, 2012 (Roghair); Trial Tr. 214:11–19, 227:14–17, 230:6–23, May 16, 2012

Trial made repeated references to agreements on specific issues reached during negotiations, those reflect only progress towards an agreement, not a binding agreement itself.

(Glading)). At the time that these term sheets were executed, American and US Airways had not

had any merger negotiations.

The Court held the Trial on the Motion from April 23, 2012 to May 25, 2012.[10] In

support of its case, American filed declarations in lieu of direct testimony for 22 witnesses,

together with over 500 accompanying exhibits. Eleven of these witnesses also presented

extensive live testimony: Daniel M. Kasper (airline consultant); Beverly K. Goulet (Chief

Restructuring Officer of AMR Corp.); Virasb Vahidi (American's Senior President of Marketing

and Planning); David L. Resnick (investment banker at Rothschild); Alexander Dichter (airline

management consultant at McKinsey); Jeffery J. Brundage (American's Senior Vice President of

Human Resources); Brian J. McMenamy (American's Vice President and Controller); Jerrold A.

Glass (human resources, airline industry, and labor relations consultant); Dennis Newgren

(American's Managing Director of Flight); Taylor M. Vaughn (American's Managing Director

of Employee Relations); and Bruce Richards (chief actuary and quality leader for Mercer Health

& Benefits).

In response to American's case, the APA presented declarations for six witnesses and

some 60 accompanying exhibits. All of these witnesses presented live testimony: Andrew

Yearley (an airline and labor industry financial expert at Lazard Frères & Co. LLC); Allison

Clark (Director of Industry Analysis for the APA); Christopher Heppner (health actuary at The

Segal Company); Neil Roghair (pilot and Chair of the APA Negotiating Committee); James

Eaton (pilot and prior Chair of the APA Scope Committee); and Lawrence Rosselot (pilot and

---

[10]   Prior to the Trial, American submitted extensive memoranda in support of its Motion that totaled
       close to 300 pages, with one brief addressing its general business situation and others separately
       covering the proposed changes to each Unions' collective bargaining agreement. The Unions filed
       oppositions to the Motion that totaled more than 200 pages.

Chair of the APA Negotiating Committee and the Technical Analysis and Scheduling

Committee).[11]

After the Trial, three significant developments occurred on the collective bargaining

front.  First, the TWU ratified a new collective bargaining agreement for the TWU members that

had not previously reached an agreement.[12]  Second, the APFA decided to send out a new

American proposal to APFA members for a ratification vote, which is scheduled to conclude

later this month.   Third and finally, the APA Board decided to send a new American proposal to

APA members for a ratification vote but APA members subsequently voted to reject American's

latest proposal.  Accordingly, American requested that this Court issue a decision on the Motion

as to the APA.

## DISCUSSION

## I.    THE STANDARD UNDER SECTION 1113

Section 1113 "encourages the collective bargaining process as a means of solving a

debtor's financial problems insofar as they affect its union employees." *Century Brass Prods.,*

*Inc., v. International Union (In re Century Brass Prods., Inc.)*, 795 F.2d 265, 272 (2d Cir. 1986).

The statute was enacted in response to the Supreme Court's decision in *NLRB v. Bildisco &*

*Bildisco*, which held that a debtor may unilaterally reject a collective bargaining agreement under

---

[11]  The APFA's Trial record included declarations for seven witness and over 75 accompanying exhibits.
Five of these witnesses presented live testimony: Laura Glading (President of the APFA); Daniel
Akins (air transport economist consultant); Anne Loew (Chief Negotiator of APFA's Negotiating
Committee); Adam Condrick (actuary consulting with The Segal Company); and Leon Szlezinger
(financial advisor at Jefferies & Company, Inc.).  The TWU presented declarations for three witnesses
and more than 10 exhibits.  All three of these witnesses presented live testimony: Donald M. Videtich
(licensed airframe and power plan mechanic and International Representative of the Air Transport
Division of the TWU); Thomas R. Roth (financial and economic consultant in the airline and labor
industries at Labor Bureau, Inc.); and Henry F. Owsley (investment banker at Gordian Group, LLC).

[12]  Two groups represented by the TWU ratified an agreement after the Trial while five groups had
previously ratified a new agreement during the Trial.

Section 365(a) of the Bankruptcy Code by showing that the agreement "burdens the estate, and that after careful scrutiny, the equities balance in favor of rejecting the labor contract." *Bildisco*, 465 U.S. 513, 526 (1984). As the *Bildisco* decision raised congressional concern that bankruptcy would be used as a weapon in the collective bargaining process, Section 1113 was quickly enacted to "replace the *Bildisco* standard with one that was more sensitive to the national policy favoring collective bargaining agreements . . . ." *Wheeling-Pittsburgh Steel Corp. v. United Steelworkers of America*, 791 F.2d 1074, 1089 (3d Cir. 1986). The statute is drafted so as to "ensure that well-informed and good faith negotiations occur in the market place, not as part of the judicial process." *New York Typographical Union No. 6 v. Maxwell Newspapers, Inc. (In re Maxwell Newspapers, Inc.)*, 981 F.2d 85, 90 (2d Cir. 1992).

Section 1113(b) requires that a debtor take a number of procedural steps prior to the rejection of a collective bargaining agreement.[13] Under Section 1113(b)(1), the debtor must

---

[13]    Section 1113(b) provides in pertinent part:

> (1) Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section 'trustee' shall include a debtor in possession), shall—
>
> (A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and
>
> (B) provide . . . the representative of the employees with such relevant information as is necessary to evaluate the proposal.
>
> (2) During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on the date of the hearing . . . the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement.

11 U.S.C. § 1113(b).

23

provide the union with its proposed modifications to a collective bargaining agreement prior to

filing an application with a court to reject the union's agreement. The proposed modifications

must be (1) "based on the most complete and reliable information available at the time of the

proposal;" (2) "necessary to permit the reorganization of the debtor;" and (3) "assure[] that all

creditors, the debtor and all of the affected parties are treated fairly and equitably." 11 U.S.C. §

1113(b)(1)(A). The debtor must also provide the union with the relevant information necessary

for the union to evaluate the proposal. Section 1113(b)(2) further requires that, between the time

that the debtor's 1113 proposal and the hearing date on any 1113 application, the debtor must

bargain in good faith with the union in an attempt to reach an agreement.

Section 1113(c) sets forth additional substantive requirements for rejection of a collective

bargaining agreement.[14] First, the debtor must establish that it made a proposal that fulfills the

requirements of subsection (b)(1). Second, the debtor must show that the union refused to accept

the proposal without good cause. Third, the debtor must prove that the balance of the equities

favors rejection of the agreement. The Debtor bears the burden of proof by the preponderance of

---

[14] Section 1113(c) provides in pertinent part:

> The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that—
>
> (1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);
>
> (2) the authorized representative of the employees has refused to accept such proposal without good cause; and
>
> (3) the balance of the equities clearly favors rejection of such agreement.

11 U.S.C. § 1113(c).

the evidence on the elements of Section 1113. *See Truck Drivers Local 807 v. Carey Transp., Inc.*, 816 F.2d 82, 88 (2d Cir. 1987); *Northwest*, 346 B.R. at 320–21.[15]

### A. Necessity

A debtor must show that its proposed modifications to the collective bargaining agreement are necessary for reorganization. Necessary, however, "should not be equated with 'essential' or bare minimum." *Carey Transp.*, 816 F.2d at 89; *see also New York Typographical Union No. 6 v. Royal Composing Room, Inc. (In re Royal Composing Room, Inc.)*, 848 F.2d 345, 350 (2d Cir. 1988) ("A debtor's proposal need not be limited to the bare bones relief that will keep it going.").[16] Rather, a debtor must prove that "its proposal is made in good faith, and that it contains necessary, but not absolutely minimal changes that will enable the debtor to complete the reorganization process successfully." *Carey Transp.*, 816 F.2d at 90. To determine whether

---

[15] In *Delta*, Judge Hardin eloquently expressed the challenges in applying the flexible standard of Section 1113:

> Section 1113 must surely be one of the most unusual provisions in the Bankruptcy Code or any other statute because of the remarkable degree of subjective discretion which a bankruptcy court must exercise in order to carry out its mandate. The italicized words and phrases in the foregoing quotation (*viz.,* "necessary" (twice); "fairly and equitably"; "good faith"; "good cause"; "balance of the equities") admit of no precise meaning in common parlance." We all know in a general or abstract sense the meaning of fairness, good faith and equity, but when it comes down to hard cases reasonable minds will differ over what is just and fair, and the impetus of small or subtle changes in the circumstances may alter one's perspective and conclusions. Every fact and circumstance is relative to some unspecified and undefinable benchmark in the context of what is necessary, fair and equitable, good faith, good cause, and the balance of the equities.

*In re Delta Air Lines*, 342 B.R. 685, 691 (Bankr. S.D.N.Y. 2006).

[16] The Second Circuit has specifically rejected the Third Circuit's requirement that necessity "be construed strictly to signify only modifications that the trustee is constrained to accept." *Wheeling-Pittsburgh Steel*, 791 F.2d at 1088. Such a requirement would make it impossible for the debtor to show it negotiated in good faith since "an employer who initially proposed truly minimal changes would have no room for good faith negotiating, while one who agreed to any substantive changes would be unable to prove that its initial proposals were minimal." *Carey Transp.*, 816 F.2d at 89.

changes are necessary for a successful reorganization, the court must "look[] into the debtor's

ultimate future and estimate what the debtor needs to attain financial health." *Id.* at 89. Thus, a

court should focus

> on the long-term economic viability of the reorganized debtor, as opposed to the
> debtor's short-term economics as they may have evolved during the course of the
> bankruptcy. . . . It is self-evident that a debtor's long-term ability to compete in
> the marketplace for its product is essential for the viability of any reorganization .
> . . . The Second Circuit has recognized the necessity of rejection when a debtor's
> labor costs are higher than those of its competitors and where the debtor faces
> "enormous competitive pressure."

*In re Delta Air Lines, Inc.*, 359 B.R. 468, 477–78 (Bankr. S.D.N.Y. 2006) (quoting *Royal*

*Composing,* 848 F.2d at 350). That is not to say that a debtor must prove the modifications will

guarantee a successful reorganization. "The Debtors are not required to show either that their

proposals are necessary to avoid liquidation, or that the union's less stringent counter-proposals

are sufficient to avoid liquidation . . . . Further, the Debtors were not required to prove that the

modifications are necessary to make them more attractive to a purchaser . . . ." *In re Horsehead*

*Indus., Inc.*, 300 B.R. 573, 586–87 (Bankr. S.D.N.Y. 2003).

The focus should be on whether the proposal as a whole is necessary for reorganization,

as opposed to analyzing each individual element. *See Royal Composing*, 848 F.2d at 348;

*Northwest*, 346 B.R. at 321. Requiring that the elements of a proposal be examined

independently would allow a union

> to play 'hit-and-run:' refusing to negotiate toward a compromise, safe in the
> knowledge that it will almost certainly be able to defeat a rejection application by
> attacking some vital modification by saying that it cannot be 'necessary' if
> reasonable substitutes could have been offered.

*Royal Composing*, 848 F.2d at 348. Furthermore, "necessary" modifications are not limited to

changes in wages, but can also include non-economic modifications to the collective bargaining

agreement that have a significant economic impact on the debtor's financial operations.  *See Northwest*, 346 B.R. at 322.  "[T]he Second Circuit has held that pay scales which materially exceed competitive industry standards were among the factors that justified rejection of the collective bargaining agreement in *In re Carey Transportation Inc. . . .*'"  *Delta*, 342 B.R. at 702 (citing *Carey Transp.*, 816 F.2d at 90–91).

### B.  Fair and Equitable Treatment

Section 1113(b) also requires that the proposed modifications affect all parties in a fair and equitable manner.  This requirement "spread[s] the burden of saving the company to every constituency while ensuring that all sacrifice to a similar degree."  *Carey Transp.*, 816 F.2d at 90 (quoting *Century Brass Prods.,* 795 F.2d at 273); *see In re Elec. Contracting Servs. Co.*, 305 B.R. 22, 28 (Bankr. D. Colo. 2003) ("A debtor will not be allowed to reject a union contract where it has demanded sacrifices of its union without shareholders, non-union employees and creditors also making sacrifices.").  Courts take a flexible approach in considering what constitutes fair and equitable treatment due to the difficulty in comparing the differing sacrifices of the parties in interest.  *See Northwest*, 346 B.R. at 326 (citing *Carey Transp.*, 816 F.2d at 90–91; *In re Indiana Grocery Co.*, 136 B.R. 182, 194 (Bankr. S.D. Ind. 1990)).  A debtor can meet the requirement "by showing that its proposal treats the union fairly when compared with the burden imposed on other parties by the debtor's additional cost-cutting measures and the Chapter 11 process generally."  *Northwest*, 346 B.R. at 326 (citing *Carey Transp.*, 816 F.2d at 90).

The affected parties need not receive identical modifications, and the concessions asked of the unions can reflect the differences in the individual unions' wage and benefit levels.  *See Northwest*, 346 B.R. at 325 (citing *In re Allied Delivery Sys. Co.*, 49 B.R. 700, 702–03 (Bankr. N.D. Ohio 1985)); *Carey Transp.*, 816 F.2d at 90–91; *Delta*, 342 B.R. at 699 ("'[S]imilar' does

27

not mean identical, and 'fairly and equitably' surely admits of differences in treatment where justified by the particular facts of the case."). "The debtor is not required to prove, in all instances, that managers and non-union employees will have their salaries and benefits cut to the same degree that union workers' benefits are to be reduced. [However], such a showing would assure the court that these affected parties are being asked to shoulder a proportionate share of the burden . . . ." *Carey Transp.*, 816 F.2d at 90. The mere fact that the proposed changes to a collective bargaining agreement will impose great hardship upon employees is not, by itself, a basis for denying a Section 1113 application. *In re Mesaba Aviation, Inc.*, 341 B.R. 693, 759 n.100 (Bankr. D. Minn. 2006) (court acknowledging that the impact of the proposed cuts on flight attendants with less than five years of seniority would be "an utter horror"); *In re Valley Steel Prods. Co., Inc.*, 142 B.R. 337, 342 (Bankr. E.D. Mo. 1992) ("It is clear that the Proposals would have a negative impact on the Teamster Drivers' incomes. It is equally clear that if the Debtors do not receive these concessions they will be forced to liquidate and the Teamsters will be unemployed.").

### C. Complete Information and Information Necessary to Evaluate the Proposal

Section 1113(b) provides that the proposal made by the debtor must be based on the most complete and reliable information available at the time the proposal is made. The debtor is required to gather the "most complete information at the time and to base its proposal on the information it considers reliable," excluding "hopeful wishes, mere possibilities and speculation." *In re Karykeion, Inc.,* 435 B.R. 663, 678 (Bankr. C.D. Cal. 2010). Additionally, the debtor must provide the union with the relevant information necessary to evaluate the proposal. "[T]he breadth and depth of the requisite information will vary with the circumstances, including the size and complicacy of the debtor's business and work force; the complexity of the

wage and benefit structure under the collective bargaining agreement; and the extent and severity of modifications that the debtor is proposing." *Mesaba*, 341 B.R. at 714.

### D. Good Faith/Good Cause

Section 1113(b)(2) requires that after a proposal is made, but before a hearing on rejection, the debtor meet with the union at reasonable times to negotiate in good faith. To satisfy the requirement of negotiating in good faith, a debtor cannot approach negotiations with a "take it or leave it" mentality. *Northwest*, 346 B.R. at 327 (quoting *Delta*, 342 B.R. at 697).

> [A] debtor cannot be said to comply with its obligation under Section 1113(b)(2) . . . when it steadfastly maintains that its initial proposal under subsection (b)(1)(A) is non-negotiable. . . . [T]he evident purpose and objective of Section 1113(b)(2) is to compel the debtor to negotiate in good faith to reach 'mutually satisfactory modifications.' With rare exceptions . . . true negotiation necessarily requires compromise in each side's bargaining positions. When one side presents a non-negotiable, take-it-or-leave-it proposal, negotiation stalls because there is nothing of substance to bargain for when one side must bid against itself.

*Delta*, 342 B.R. at 697. This should be determined, however, on a case by case basis. For "depending on the facts of the case, a debtor may not be obligated to reduce the total amount of cost savings requested in its original proposal to demonstrate good faith." *Northwest*, 346 B.R. at 327 (citing *Indiana Grocery*, 136 B.R. at 195–96). A union may also argue that a debtor sought to manipulate the process in bad faith by including terms that would stalemate negotiations and result in outright rejection as opposed to negotiation and compromise. *See Northwest*, 346 B.R. at 327.

Closely related to good faith is the requirement of Section 1113(c)(2) that a collective bargaining agreement can only be rejected if the union has refused to accept the proposal without good cause. *See Northwest*, 346 B.R. at 327; *Horsehead Indus.*, 300 B.R. at 584. This provision is meant to encourage the debtors to act in good faith by proposing only necessary changes while

protecting the debtor from a union's refusal to agree to the changes without a good reason for doing so. *See Maxwell Newspapers*, 981 F.2d at 90.

"[E]ven though the debtor retains the ultimate burden of persuading the court that the union lacked good cause for refusing proposed modifications, the union must come forward with evidence of 'its reasons for declining to accept the debtor's proposal in whole or in part . . . .'" *Carey Transp.*, 816 F.2d at 92 (quoting *In re Royal Composing Room, Inc.*, 62 B.R. 403, 407 n.5 (Bankr. S.D.N.Y. 1986)). Thus, if a union insists on economically unworkable terms without offering a compromise that will provide the debtor with necessary savings, the court will find that the union has not acted with good cause. *See Maxwell Newspapers*, 981 F.2d at 90 (citing *Royal Composing*, 848 F.2d at 349). The Second Circuit has made clear that "'stonewalling' post-petition negotiations and hoping that the courts will find that the proposal does not comply with subsection (b)(1) . . . is unacceptable and inconsistent with Congressional intent. . . ." *Carey Transp.*, 816 F.2d at 92. Furthermore, "[a] union's presentation of a counter-offer that its members do not support does not satisfy the good cause requirement." *Carey Transp.*, 816 F.2d at 92. The union representatives must offer a counterproposal supported by its rank and file which also meets the debtor's financial needs. *See Horsehead Indus.*, 300 B.R. at 588.

### E. Balance of the Equities

Section 1113(c)(3) permits rejection of a collective bargaining agreement if it is clearly favored by the balance of the equities. This requirement is a codification of the standard set out in *Bildisco*. *See Carey Transp.*, 816 F.2d at 92 (citing *Century Brass Prods.*, 795 F.2d at 273). The Second Circuit has provided the following six factors for use in determining if the equities favor rejection of the collective bargaining agreement:

(1) the likelihood and consequences of liquidation if rejection is not permitted;

    (2) the likely reduction in the value of creditors' claims if the bargaining
        agreement remains in force;

    (3) the likelihood and consequences of a strike if the bargaining agreement is
        voided;

    (4) the possibility and likely effect of any employee claims for breach of contract
        if rejection is approved;

    (5) the cost-spreading abilities of the various parties, taking into account the
        number of employees covered by the bargaining agreement and how various
        employees' wages and benefits compare to those of others in the industry; and

    (6) the good or bad faith of the parties in dealing with the debtor's financial
        dilemma.

*Carey Transp.*, 816 F.2d at 93. The equities must be examined in relation to the debtor's

attempts to reorganize. *See Bildisco*, 465 U.S. at 527 ("[T]he Bankruptcy Court must focus on

the ultimate goal of Chapter 11 when considering these equities. The Bankruptcy Code does not

authorize freewheeling consideration of every conceivable equity, but rather only how the

equities relate to the success of the reorganization.").

## II.      EVALUATION OF AMERICAN'S PROPOSAL TO THE APA

      On March 21, 2012, the Company made its final Section 1113 proposal to the APA prior

to filing the Motion (the "March 21 Proposal"). As with the other Unions, the March 21

Proposal sought a 20% reduction in the APA's total labor costs, averaged over the six-year term

of the proposed agreement. (AA Ex. 507). This amounted to an "ask" of $370 million annually

in cost reductions. (AA Ex. 507). The March 21 Proposal proposed changes to a wide variety of

provisions in the collective bargaining agreement, including benefits, the scope of work done by

union pilots, and work rules. In making the proposal, American attempted to preserve both base-

pay and take-home pay rates, while making uniform the health and retirement benefits for all

employee groups. (Brundage Decl. ¶ 25). Reductions in costs would, therefore, primarily be

attained through improvements in productivity and changes to work rules.

## A. Necessary for Reorganization

The Second Circuit has held that in determining whether a debtor's proposal has satisfied the necessity requirement of Section 1113, the proposal should be viewed as a whole and not by each specific element. *See Royal Composing*, 848 F.2d at 348; *see also Horsehead Indus.*, 300 B.R. at 584; *Northwest*, 346 B.R. at 321. In reviewing the necessity of a debtor's proposal as a whole, however, courts often separately discuss the main terms of a Section 1113 proposal, and any criticism of each of those terms. *See, e.g., In re Frontier Airlines Holdings, Inc.*, 2008 Bankr. Lexis 4151 (Bankr. S.D.N.Y. 2008) (discussing outsourcing), *rev'd on other grounds*, 2009 U.S. Dist. Lexis 61699 (S.D.N.Y. 2009). The APA here has leveled a variety of challenges to the necessity of American's proposal. These fall into three distinct categories, each of which will be discussed separately.

The first of these challenges are blanket objections to American's request for Section 1113 relief, where the APA argues that American should consider merger options before seeking Section 1113 relief and that American's Section 1113 proposal is based on a flawed business plan. The second category of objections relates to proposed changes to benefits for all American's unionized employees, including pilots, where APA raises two challenges to American's valuation of these proposed changes. The third category is objections to specific proposed changes relating only to the pilots, including APA's argument that American seeks to improperly outsource union flying through the use of codesharing and regional jets. This third category also includes proposed changes regarding the furloughing of pilots, the use of sick leave, and the valuation of American's proposal.

1.  **Blanket Objections to American's Motion**

    a) **Potential Merger with US Airways**

The APA objects to the Motion based on a potential merger between US Airways and American. It claims that a merger of American and US Airways is inevitable given recent consolidation in the airline industry. It argues that a merger is the best path forward and, as evidenced by the Unions' term sheets with US Airways, will require fewer sacrifices of Union employees like the pilots than are sought under American's Section 1113 proposal. It notes that American has already begun to consider consolidation opportunities. Given these facts, it contends that American has an obligation to pursue such a merger before availing itself of Section 1113 relief and that, until it does so, American cannot demonstrate that rejection is necessary.[17] Looked at another way, the argument is about the proper sequence for obtaining Section 1113 relief in the context of the life of a bankruptcy case, particularly as it relates to the ultimate plan of reorganization for this large Chapter 11 case.[18] But while the Court recognizes the possibility that American's future might involve a merger of some kind—a possibility conceded by American—the Court rejects the notion that this possibility bars the current application under Section 1113 for several reasons.

---

[17]  In arguing that the possibility of a US Airways merger bars rejection of these collective bargaining agreements, numerous provisions of Section 1113 are implicated. In addition to arguing that American's proposals are not necessary for reorganization, the APA argues that the proposal is not based on complete and reliable information, *see* Section 1113(b)(1)(A), that the proposed changes are not fair and equitable, *see* Section 1113(b)(1)(A), that it has good cause to reject American's Section 1113 proposals, *see* Section 1113(c)(2), and that the balance of the equities does not clearly favor rejection, *see* Section 1113(c)(3). All these arguments, of course, presuppose that it is proper for the Court to consider a possible merger with US Airways in this Section 1113 analysis. Based on the facts before the Court and for the reasons stated above, the Court rejects that notion.

[18]  (Trial Tr. 47:11-48:12, May 21, 2012 (Owsley)) (TWU investment banking expert opining that nothing gets done in a restructuring case "until everything gets done at the same time, and the TWU is being asked to take an early hit out of sequence, which would violate that prin[ciple]").

First and foremost, the APA's argument is undercut by the evidence before the Court about the possibility of a US Airways and American merger. Put simply, there is no merger for the Court to consider. While the Unions have signed term sheets with US Airways, there is no evidence before the Court of a proposed merger between the two airlines. While American has begun the process of considering strategic alternatives to its Business Plan, that process has not yet been completed. *See Joint Motion of Debtors and Official Committee of Unsecured Creditors Pursuant to 11 U.S.C. § 1121(d) to Extend Exclusivity Periods to December 28, 2012 and February 28, 2013, Respectively* (ECF No. 3440). Indeed, no merger transaction with any airline has been presented to the Court. Nor is there evidence that the two airlines have reached an agreement in principle. *See Horsehead Indus.,* 300 B.R. at 589.[19] There is not even evidence as to whether or when negotiations might take place between the two airlines. *See In re Worldcom, Inc.*, No. 02-13533, 2007 WL 7558276, at *6 (Bankr. S.D.N.Y. July 5, 2007) ("Where the assumptions underlying an expert's opinions are unsupported and speculative, the expert's testimony may properly be excluded.").[20]

---

[19]  The circumstances in *Horsehead Industries* appear to offer a cautionary tale for this case. In that case, no transaction had been agreed upon by the debtors and a potential third party acquirer. But the presence of the third party nonetheless appeared to play a significant role in derailing labor negotiations between the debtors and the unions. *See Horsehead Indus.,* 300 B.R. at 589 (noting that the third party was "not even a party to an acquisition agreement approved by the Court. [It] could walk from the deal, as it eventually did, after agreeing with [the union] to less stringent concessions that set a ceiling on what the union would be prepared to give up.").

[20]  Indeed, the Unions' experts at Trial were not universal in their level of conviction about a merger transaction involving American. For example, the TWU's investment banking expert opined that American's business model "probably" is going to require it to get bigger and thus he found the term "inevitable" to be "perhaps a little strong" in describing the possibility of a merger. (Trial Tr. 54:1-10, May 21, 2012 (Owsley)). Moreover, Mr. Owsley's written direct testimony did not offer an opinion about the likelihood of a particular merger transaction—one with US Airways—but simply mentioned the possibility of a merger with another airline. (Owsley Decl. ¶ 8). This is relevant because the Unions have signed term sheets with US Airways that provide protections to the Unions on the terms of an agreement but have no such term sheets with other airlines. As noted previously, however, even the US Airways term sheets are conditional. (Trial Tr. 12:15-21, May 14, 2012 (APA

The APA's argument is also undercut by history, which demonstrates that proposed

airline mergers do not always succeed. (Trial Tr. 52:7–53:1, May 17, 2012 (Akins) (prior to

merger with Continental in 2010, United had unsuccessful merger talks with Continental that fell

apart in 2008)). US Airways itself has been a party to unsuccessful merger talks in the past.

(Trial Tr. 50:11–51:2, May 17, 2012 (Akins) (prior to merger with Northwest, Delta was

approached by US Airways about a merger)). If American were to follow the trend set in recent

airline reorganizations, a merger would very likely not occur until after the Debtors have exited

bankruptcy. (Trial Tr. 150:19–151:12, May 22, 2012 (Resnick)). Of course, American, as a

fiduciary, must consider all possibilities, including a merger, to maximize value for the estate

before ultimately proposing any plan of reorganization. But there is no deadline for completing

that process. This is not surprising given that American's bankruptcy is only nine months old,

and the Debtors' still retain the exclusive right to propose a plan of reorganization. *See* 11

U.S.C. § 1121(b) (debtor has a 120–day period during which it has an exclusive right to file a

plan); *see also* 11 U.S.C. § 1121(d) (exclusivity period may be extended up to 18 months).

American sought, and received, its second extension of its exclusive filing period until December

28, 2012. (*See* ECF No. 3635).[21]

---

counsel describing term sheet with US Airways as contingent); Trial Tr. 116:22-119:12, May 14,
2012 (Roghair) (describing terms that still need to be negotiated); Trial Tr. 227:14-17, May 16, 2012
(Glading) (describing term sheet as contingent); Trial Tr. 230:6-23, May 16, 2012 (Glading)).

[21]  The TWU's own investment banking expert conceded that other network carriers, including United
and Delta, first aligned their labor costs through bankruptcy restructurings before they merged with
other airlines. (Trial Tr. 59:15-24, May 21, 2012 (Owsley) (stating that "'realigning their labor costs
was a big, big part of their reorganizations'")). This is particularly important given that labor costs
generally migrate upward in a merger, and any merger involving American might be subject to labor
cost dis-synergies if American failed to address its labor costs prior to a consolidation. (Trial Tr.
70:22-71:7, April 26, 2012 (Dichter)).

Second, the APA's argument is not supported by the language of Section 1113. The

statute does not include any restraints on when a debtor may invoke the Section 1113 process.

*See United Food & Commercial Workers Union v. Family Snacks, Inc. (In re Family Snacks,*

*Inc.)*, 257 B.R. 884, 896 (B.A.P. 8th Cir. 2001) ("[T]here is nothing in the language of § 1113

that dictates when an application to reject must be made."). Indeed, the notion of imposing a

waiting period for Section 1113 relief is at odds with the urgency present elsewhere in the

statute, which requires a court to consider a Section 1113 application expeditiously. For

example, a court must schedule a hearing no later than 14 days after the filing of an application

under Section 1113, subject only to an extension of not more than seven days. *See* 11 U.S.C. §

1113(d)(1). Similarly, a court must rule on a Section 1113 application within 30 days after the

commencement of the hearing, subject only to extensions mutually agreed to by the debtor and

the union. *See* 11 U.S.C. § 1113(d)(2).[22]

The notion of a time restraint on the exercise of Section 1113 is also inconsistent with the

language contained in subsection (b) of the statute, which addresses a debtor's obligation to

propose a new agreement to the union. Rather than restrict the time period for seeking Section

1113 relief, subsection (b) requires only that a proposal can be made any time "[s]ubsequent to

filing a petition and prior to filing an application" for rejection with the court. 11 U.S.C. §

1113(b)(1). *See Matter of Century Brass Prods., Inc.*, 55 B.R. 712, 716 (D.C. Conn. 1985)

("Section 1113 has no time restraint relative to when the debtor, following the submission of a

---

[22]  The statute has other indicia of the desire for speed in addressing a Section 1113 application. The
statute provides that the debtor "may terminate or alter any provisions of the collective bargaining
agreement pending the ruling of the court on such application" if a court fails to issue an opinion
within the applicable period of time. 11 U.S.C. § 1113(d)(2). The statute also permits a debtor to
seek interim changes in the "terms, conditions, wages, benefits, or work rules" of a collective
bargaining agreement, pending a ruling on a Section 1113 application. 11 U.S.C. § 1113(e) (interim
relief available, *inter alia*, to avoid irreparable harm to the estate).

proposal, may file its rejection application"), *rev'd on other grounds*, 795 F.2d 265 (2d Cir.

1986).

      Third and finally, the APA's request that the Court focus on a potential merger

transaction is inconsistent with the fact that the Section 1113 inquiry is tethered to the proposal

made by a debtor, not some other party. For example, Section 1113(b) looks to the terms of the

debtor's Section 1113 proposal, including whether the proposal is "necessary." Similarly,

Section 1113(c) instructs the Court to examine whether a union has rejected the debtor's

proposal for good cause. Given this statutory focus, courts have rejected attempts to focus the

Section 1113 inquiry on a proposal made by a party other than the debtor. In *Delta Air Lines,*

*Inc.*, for example, the court rejected a request to consider whether a union's proposal satisfied the

requirements of Section 1113, noting:

> [i]t bears repeating that Section 1113 focuses on the debtor-employer's proposal,
> not the union's. It is Comair's proposal which must pass muster under the several
> requirements of the statute, and Congress has not authorized the Court to decide a
> Section 1113 motion by acting as a sort of super-arbiter choosing between
> competing proposals. The Court is required to focus on the debtor's proposal and
> grant or deny the motion based upon its conclusions as to whether the debtor's
> proposal meets the statutory criteria.

*Delta*, 359 B.R. at 488. Similarly, courts have rejected a union's argument that the Section 1113

focus should be on a third party, even where that third party has already been identified as a

potential purchaser of the debtor. In *Horsehead Industries*, the debtor was pursuing Section

1113 relief to make the company more attractive to an already-identified potential purchaser, and

the union sought to bring that potential purchaser into the labor negotiations. The court found

that the union's rejection of the debtors' Section 1113 proposal on that basis was not for "good

cause:"

[The union's] insistence that [the third party] participate in the negotiations may
have been understandable, but the refusal to negotiate unless [the third
party] participated led to a rejection without good cause.  The Debtors, not [the third
party], were parties to the collective bargaining agreements.  They made it clear to
the [union] that they had to reduce the *Debtors'* costs under the *Debtors'* labor
contract in order for the *Debtors* to survive.

*Horsehead Indus.*, 300 B.R. at 589 (emphasis in the original).[23]

In addition to arguing that American's proposed changes are not necessary due to a

potential merger, the APA claims that American's proposals were not based on the most

complete and reliable information available because American failed to consider a merger

transaction.  To support this position, the APA cites to *Karykeion*.  *Karykeion* states that the

complete and reliable information requirement

goes to the comprehensiveness of the underlying factual support for a debtor's
projections under § 1113(a)—its breadth, depth, and objective credibility. Clearly,
the statute's idea is that a debtor-employer must make a proposal firmly grounded
in the historical reality of operational economics, an unvarnished evaluation of its
current straits, and a thorough analysis of all of the incidents of income and
expense that would bear on its ability to maintain a going concern in the future,
whether subject to the financial obligations of its collective bargaining
agreement(s) or not. The requirement essentially bars a debtor in possession from
making a proposal that is cursory or arbitrary, or one whose specific terms are
result-driven in isolation rather than process-derived and based on actual
experience.

435 B.R. at 677 (quoting *Mesaba*, 341 B.R. at 709).  The key to this requirement lies in the

language of the statute, which specifically states that the proposal must be "based on the most

---

[23]   *Cf. Bowen Enters., Inc. v. United Food & Commercial Works International Union (In re Bowen
Enters., Inc.),* 196 B.R. 734, 747 (Bankr. W.D. Pa. 1996) (finding that union did not have good cause
under Section 1113(c) to reject where union wanted debtor to fail so that union could "cut a deal"
with subsequent buyer of debtor's business).  The requirement that the debtor and union must
negotiate with each other, notwithstanding the existence of interested third parties, is also consistent
with the parties' obligations under the Railway Labor Act that govern these labor contracts. *See
Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1007 (9th Cir. 1990) (a union under the Railway
Labor Act is "under an obligation to negotiate in good faith with an existing employer even while it
negotiate[s] with [a potential new employer].").

38

complete and reliable information *available at the time of such proposal.*"  11 U.S.C. §

1113(b)(1)(A) (emphasis added).  The standard can often be a difficult one for a debtor to apply,

because the available information may change based on the twists and turns of the bankruptcy.

*See Karykeion*, 435 B.R. at 678.  But ultimately "[t]he debtor is simply required to gather the

most complete information available at the time and to base its proposal on the information it

considers reliable.  This requirement by definition excludes hopeful wishes, mere possibilities

and speculation."  *Id.*  Such is the case before the Court.  There was no strategic transaction in

existence at the time of the Section 1113 proposal, nor is there one today.  The only thing that

was (and still is) in place is an initial agreement between the unions and US Airways as to what

US Airways would offer the unions if a merger were eventually to be consummated.  The

agreement itself is tentative at best, and several key terms are still subject to further negotiation.

In any event, the facts of *Karykeion* are far different than those before this Court.  In

*Karykeion*, the debtor's formulation of its proposal to the unions was based on a purchase offer.

But the debtor itself had sought out potential buyers to discuss selling substantially all of its

assets through a liquidation plan and had only done so because its economic situation had so

deteriorated that reorganization was no longer possible.  *See Karykeion*, 435 B.R. at 667.

For all the reasons discussed above, the Court rejects the APA's argument that Section

1113 relief should be denied because of the possibility of a merger in the future between

American and US Airways, or some other carrier.[24]

---

[24]  It has been suggested that there is no urgency as to American's Section 1113 application because
American has nearly $5 billion of cash on hand.  (*See, e.g.*, Yearley Decl. ¶ 9).  But as explained
above, there is no time restraint on a debtor's exercise of Section 1113, provided that it meets the
requirements in the statute including that rejection is necessary for reorganization.  Moreover, the
amount of cash available for an airline is not dispositive of American's need for restructuring or for
relief under Section 1113.  As American's Chief Restructuring Officer Beverly Goulet explained, an
airline should maintain approximately 20% in cash reserves to address so-called exogenous events—

### b) Objections to the Business Plan

The APA objects to American's Business Plan as an insufficient basis for the Section 1113 application. The APA's threshold objection to the Business Plan is simply to the fact that it exists at all. In its view, American's stand-alone plan is not the appropriate platform for this Section 1113 application because of a potential merger with US Airways. But for the reasons explained above, the Court concludes that the possibility of a merger is not a bar to Section 1113 relief. Moreover, the Court agrees with American that it is appropriate—and indeed necessary— for American to formulate a stand-alone business plan at this point in time. As the TWU's investment banking expert conceded at Trial, it is "investment banking 101" to develop a stand-alone business plan. (Trial Tr. 55:9–14, May 21, 2012 (Owsley)). Such a business plan serves as a basis for comparing all of the business options available to a debtor to maximize the value of the estate for all stakeholders. (Trial Tr. 55:9–12, May 21, 2012 (Owsley); Trial Tr. 47:17–48:1, May 21, 2012 (Owsley) ("[Y]ou of course want to have a stand-alone plan because you like to have an alternative . . . ."); Trial Tr. 166:7–9, April 25, 2012 (Resnick) (you need a stand-alone plan "as a basis against which to analyze alternatives that would produce maximum value" for stakeholders)). Indeed, it would be fatal to any Section 1113 application if American could not explain the fundamental business assumptions for its Section 1113 proposals; the Business Plan serves the purpose of explaining those assumptions. *See, e.g. Northwest*, 346 B.R. at 324 (looking to debtors' business plan on issue of necessity). Moreover, labor costs are "absolutely"

---

events over which the airline has no control—such as spikes in fuel prices, disasters and other unanticipated events that impact travel demand. (Trial Tr. 97:5-18, May 23, 2012 (Goulet) (American's cash on hand is approximately 20% of revenue, which is the minimum American likes to have as a buffer against various exogenous events)). As American has few unencumbered assets that it can borrow against, the need to maintain appropriate cash reserves is even more critical. (Trial Tr. 97:19-98:6, May 23, 2012 (Goulet)). Ms. Goulet's testimony about the need for such cash reserves was not rebutted.

a part of any business plan. (Trial Tr. 55:15–17, May 21, 2012 (Owsley)); *see, e.g.*, *Northwest*, 346 B.R. at 323 ("The Debtors' aggregate "ask" to its unions, including the $195 million asked of the flight attendants, is an integral part of their business plan."); *Ass'n of Flight Attendants-CWA v. Mesaba Aviation, Inc.*, 350 B.R. 435, 445 (D. Minn. 2006) (stating that labor cost cuts were based on the debtor's business plan); *In re Allied Supermarkets, Inc.*, 6 B.R. 968, 979 (E.D. Mich. 1980) (explaining that reducing labor costs was a "crucial component" of the debtor's business plan).

The APA also levels more detailed objections to the merits of the Business Plan. It criticizes the current Business Plan, for example, as being a flawed extension of American's prior business plan, the "Cornerstone Strategy." Indeed, the Business Plan contains only two significant additions from American's prior "Cornerstone Strategy:" the purchase of new aircraft and the labor savings proposed in this Section 1113 proceeding. The APA also attacks various assumptions associated with the Business Plan as being unsupported or overly optimistic. Relatedly, the APA contends that American's EBITDAR targets—an earnings benchmark used by American—are overly optimistic and inappropriately punitive given that the higher the EBITDAR targets, the more cost savings will be asked of American's unionized employees.

In considering these criticisms, it is important to note where the Business Plan fits into the Section 1113 inquiry. As the Second Circuit has observed, a debtor seeking Section 1113 relief has the "burden to demonstrate that each of its proposed modifications to [a collective bargaining agreement], both economic and non-economic, are necessary to its business plan." *Teamsters Nat'l Freight Indus. Negotiating Comm. v. Howard's Express, Inc. (In re Howard's Express, Inc.)*, 151 F.App'x. 46, 49 (2d Cir. 2005); *see* Collier ¶ 1113.05[3][c]. Relatedly, a debtor must provide information about that business plan to demonstrate the "underlying factual

41

support for a debtor's projection under § 1113(a)—its breadth, depth, and objective credibility."

*See Mesaba,* 341 B.R. at 722–24, *rev'd on other grounds*, 350 B.R. 435 (D. Minn. 2006).  As the

*Mesaba* court explained:

> Clearly, the statute's idea is that a debtor-employer must make a proposal firmly
> grounded in the historical reality of [its] operational economics, an unvarnished
> evaluation of its [own] current straits, and a thorough analysis of all of the
> incidents of [its own] income and expense that would bear on its ability to
> maintain a going concern in the future . . . .

*Id.*

But it is equally important to note that Section 1113 does not require a debtor to propose

a plan of reorganization, complete with all the details regarding the debtor's ultimate

reorganization.  (APA's Proposed Findings ¶ 17 (acknowledging that Section 1113 does not

require the Debtors to finalize its plan of reorganization prior to rejection of the collective

bargaining agreements (citing *In re Garofalo's Finer Foods, Inc.*, 117 B.R. 363, 373 (Bankr.

N.D. Ill. 1990))); *see also Carey Transp.*, 816 F.2d at 91 ("Because a section 1113 application

will almost always be filed before an overall reorganization plan can be prepared, the debtor

cannot be expected to identify future alterations in its debt structure."); *In re Kentucky Truck

Sales, Inc.*, 52 B.R. 797, 802 (Bankr. W.D. Ky. 1985) ("This requirement of equivalent sacrifice

does not mean that the debtor must formally propose his plan of reorganization prior to seeking

rejection of the collective bargaining agreement.").

Applying this guidance here, the Court finds that Debtors have established—by a

preponderance of the evidence—that American's Business Plan is a reasonable stand-alone

business strategy to serve as the basis for American's Section 1113 Motion.  There are several

reasons for the Court's conclusion.

First, the Court finds that the strategy set forth in the Business Plan is, as a general

matter, a reasonable approach.  In this regard, the Court found the testimony of American's

airline industry expert, Alexander Dichter, to be particularly credible and persuasive in

explaining the justification and workings of American's Business Plan.[25]  In American's direct

case, Mr. Dichter walked through an overview of the Business Plan and explained the tasks that

he performed as part of McKinsey's engagement to assist American with its business planning

efforts.  (Trial Tr. 25:6–27:5, 27:19–31:9, 33:16–35:18, April 26, 2012 (Dichter); Dichter Decl.

¶¶ 7–8, 18–31, 35)).  During American's rebuttal case, Mr. Dichter returned to the witness stand

to thoughtfully address particular criticisms made by the Unions of the Business Plan.  Mr.

Dichter's ultimate conclusions about the reasonableness of the Business Plan were echoed by

David Resnick, American's expert from Rothschild, who was conceded to be "a very

experienced and respected member" of the investment banking community.  (Trial Tr. 48:22–23,

May 21, 2012 (Owsley)).  It is worth noting that, as was the case in the Section 1113 proceeding

in Northwest, the Unions here did not offer an alternative stand-alone model to American's

---

[25]  Mr. Dichter is a director at McKinsey who leads its global airline practice and co-leads its global transportation and logistics practice.  (Trial Tr. 8:10-21, April 26, 2012 (Dichter)).  During his 14 years with the firm, 90% of his activity has focused on the airline industry, and most of the rest of his work has focused on matters related to the airline industry.  (*Id*. at 8:22-10:2).  His airline work has been in four areas: strategic work like mergers and acquisitions, operational improvements, organization issues, and business planning.  (*Id*. at 10:3-11:2).  Before McKinsey, Mr. Dichter was a pilot and instructor at Continental Airlines and Continental Express for close to a decade.  (*Id*. at 12:8-20).

At the start of his direct testimony, the Unions objected to the scope of Mr. Dichter's testimony and his designation as an expert witness.  (Trial Tr. 13:2-20:24, April 26, 2012 (Dichter)).  As there was no objection to him testifying about his work as an airline consultant for American, which would include his work on the Business Plan, it appears that the Unions' objection is of little practical consequence.  (*Id*.)  In any event, the Court overrules any objection to Mr. Dichter's expert testimony.  He proved exceedingly knowledgeable, candid, and helpful to the trier of fact in understanding the issues in the case.  Given his background and the substance of his testimony, Mr. Dichter easily satisfies all applicable requirements for an expert witness, including, but not limited to, Rules 702 and 703 of the Federal Rules of Evidence.

Business Plan, *see Northwest*, 346 B.R. at 324, despite presenting numerous experts on both the airline industry and investment banking. The Unions' inability to articulate a different overall vision of a stand-alone airline is telling.

The Court agrees that the Business Plan shares many similarities with American's prior Cornerstone Strategy, which focused on American's five hubs. (Akins Decl. ¶¶ 19–21, 29–32). But it is common for network carriers to consolidate their business in their hubs. (Trial Tr. 86:14–87:17, May 21, 2012 (Kasper); AA Ex. 1746). One of American's experts was surprised to hear a criticism of that strategy given that it is not unusual for a network carrier to focus on its hubs:

> [P]erhaps the single greatest advantage that the legacy carriers[26] have is that they have hubs and hubs permit them to serve markets . . . that low cost carrier can't afford to serve because there's not enough traffic there. So one of the things that all of these [legacy] carriers that . . . have gone through . . . bankruptcy now have done is to concentrate their service around their hubs.

(Trial Tr. 86:20–87:17, May 21, 2012 (Kasper) (citing AA Ex. 1746)).

The evidence also established that the new elements in the Business Plan—reduction in labor costs and the purchase of new aircraft—are also reasonable steps. The focus in American's Business Plan on cutting its labor costs is not much different from the business plans in Section 1113 proceedings in other airline bankruptcies. So while the Unions attack American's Business Plan as being without basis, the evidence shows that American has in fact followed an unfortunately well-worn path blazed by earlier airline bankruptcies. As one of American's expert witnesses helpfully summarized:

> I've been involved in all of the other major airlines restructurings in Chapter 11. They've all gone through a similar pattern that the carriers come up with the business plan. . . . [O]ne of the key features of all of their business plans is

---

[26] The term "legacy" carrier is another term used to identify network carriers like American.

substantial—in addition [to] shedding other debts and restructuring has been a
very substantial reduction in labor costs, specifically labor costs as measured by
labor CASM.  And when that has occurred, even carriers like US Airways, which
was literally within a week or days of running out of cash in its reorganization,
was able with the substantially restructured labor costs to emerge to become a
profitable carrier.   And I see no reason why American, which has more
fundamental strengths and a strong reputation and some residual, I think, good
will based on its long history of service [and] brand recognition, I see no reason
why American cannot do what United, Continental, Northwest and Delta and US
Airways have done previously.

(Trial Tr. 90:20–91:13, May 21, 2012) (Kasper)).  In each prior airline bankruptcy then, the

pattern appears the same: the airline enters bankruptcy with labor costs that are at or near the top

of the industry and then emerges with costs at or near the low end of the group.  (*Id*. at 92:4–

98:11; AA Exs. 1748–1749 (charts comparing US Airways labor costs before and after

bankruptcy); AA Exs. 1750–1751 (same for Delta); AA Exs. 1752–1753 (same for Northwest);

AA Exs. 1754–1755 (same for United)).[27]  American now seeks to follow in the same path.

(Trial Tr. 98:12–101:15, May 21, 2012 (Kasper); AA Exs. 1756–1757).[28]

This is also true for the purchase of new aircraft.  The business plan discussed in

Northwest's Section 1113 proceeding is remarkably similar to American's Business Plan here:

both include reductions to labor costs, revisions to work rules and scope provisions, and feature

sizable new aircraft acquisitions to replace an aging fleet.  *See Northwest*, 346 B.R. at 323.

Indeed, American's pilots greeted the aircraft purchase with enthusiasm before the bankruptcy,

---

[27]  On cross examination, these charts were criticized because they used CASM as the metric for labor
costs when airlines often use other metrics.  (Trial Tr. 105:15-106:2, May 21, 2012 (Kasper)).   But
the Court nonetheless finds the evidence probative and the overall conclusion unassailable given the
totality of the evidence presented at Trial.  (Goulet Decl. ¶ 57; AA Ex. 133).

[28]  The example of US Airways as a model is particularly apt.  Like American, US Airways was
criticized at the time of its bankruptcy for having problems with its network but it nonetheless is now
profitable because of its cost structure.  (Trial Tr. 91:24-92:2, May 21, 2012 (Kasper) (referencing US
Airways inferior route structure)).

stating that "[t]he magnitude of the order American Airlines announced was the kind of bold stroke that once characterized our airline. We're hoping it's a harbinger of things to come." (Trial Tr. 246:23–247:1, May 14, 2012 (Yearley)).

Mr. Dichter also credibly responded to criticism that the projected growth in the Business Plan is unrealistic. As Mr. Dichter explained, the Business Plan provides for American's total capacity—as measured by the common industry metric available seat mile ("ASM")— to grow at the same rate as the industry. (Trial Tr. 35:6–11, April 26, 2012 (Dichter); Trial Tr. 106:14–107:2, April 24, 2012 (Goulet)). Mr. Dichter similarly rebutted the claim that the Business Plan failed to adjust its profit predictions for instances where American's growth causes overall industry supply to exceed overall industry demand. (Trial Tr. 25:4–17, 63:2–8, May 23, 2012 (Dichter)). As he explained, the Business Plan projects negative impact on revenue where there is a mismatch between American's projected growth and projected industry supply and demand. (AA Ex. 1722; Trial Tr. 29:22–30:3, May 23, 2012 (Dichter); Trial Tr. 191:9–23, 194:6–10, 195:14–21, May 17, 2012 (Akins)).[29] Moreover, Mr. Dichter explained American's efforts to test the assumptions in the Business Plan. He explained, for example, that American modeled two alternative scenarios to its Business Plan, one assuming a smaller airline and the other assuming an airline with fewer hub cities. (Trial Tr. 41:1–42:1, April 26, 2012 (Dichter); Trial Tr. 41:16–42:6, May 23, 2012 (Dichter)). Both of these scenarios resulted in worse revenue performances than the Business Plan and, therefore, helped confirm the reasonableness of its hub-based approach. (*Id.*)

---

[29] The Court is similarly satisfied with Mr. Dichter's explanation of the Business Plan's approach to the competitive response of other airlines to American's plans. (Trial Tr. 20:17-21:7, 32:15-37:14, May 23, 2012 (Dichter)).

The last major criticism relates to American's projected EBITDAR targets over the six years of the Business Plan. American adopted the EBITDAR targets after evaluating what it would need to meet the liquidity and other requirements of the Business Plan and after reviewing the targets projected by other bankrupt network airlines in their respective plans of reorganization. (Trial Tr. 246:14–247:3, April 24, 2012 (Goulet)).[30] The Court concludes that these targets are aggressive but not unreasonable. Investment banker David Resnick explained why these EBITDAR targets were necessary:

> To meet its operating and investing needs, AMR will need continued access to capital markets over time. The ability to tap financial markets—[including any potential exit financing that might be needed in this case]—will depend on achieving and maintaining the Business Plan's financial targets and achieving financial metrics that new capital investors will find appropriate. Some of the key financial metrics include EBITDAR margins, credit ratings and leverage ratios . . . .

(Resnick Decl. ¶ 25). Indeed, Mr. Resnick testified that the EBITDAR target was designed to satisfy industry analysts. (Trial Tr. 14:4–23, 15:9–22, 21:9–22:17, April 25, 2012 (Resnick)).[31]

The reasonableness of these EBITDAR targets is confirmed by several facts. First, the EBITDAR targets are consistent with other carriers in the industry. In choosing the targets, Rothschild analyzed 2013 analyst projections of EBITDAR margins for publicly-traded network carriers and LCCs; American's 2013 EBITDAR target is within the range of those network carriers and LCCs. (Resnick Decl. ¶ 27; AA Ex. 305A; Trial Tr. 26:1–9, April 25, 2012

---

[30] The EBITDAR targets were established by Beverly Goulet, American's Chief Financial Officer, and her team. (Trial Tr. 245:18-247:3, April 24, 2012 (Goulet)).

[31] The APA notes that American picked the EBITDAR targets, not Mr. Resnick. It further highlights Mr. Resnick's testimony that the other network carriers' EBITDAR, although lower than the Company's target EBITDAR, were also in the range of reasonableness. (Trial Tr. 163:10-163:22, April 25, 2012 (Resnick); AA Ex. 310A). But Mr. Resnick's testimony that EBITDAR predictions are not an exact science and are done on a range of reasonableness does nothing more than acknowledge the obvious. And it does not change the fact that Mr. Resnick testified under oath that the targets here for American were reasonable given all the factors in this case. (Trial Tr. 25:23-26:1-9, April 25, 2012 (Resnick)).

(Resnick); Trial Tr. 159:19–160:1, May 22, 2012 (Resnick); Trial Tr. 198:6–11, May 14, 2012

(Yearley) (APA expert conceding that it was reasonable for American to target a profitability

level consistent with the norms of the U.S. airline industry)). Rothschild included LCCs in its

comparator set because American competes with LCCs on many of its routes. (Trial Tr. 26:16–

27:12, April 25, 2012 (Resnick); Trial Tr. 155:9–156:14, May 22, 2012 (Resnick); Trial Tr.

85:3–12, May 21, 2012 (Kasper); AA Ex. 1745). Other airlines in bankruptcy also considered

LCC competition in connection with their Chapter 11 restructurings. (AA Exs. 1704, 1781).[32]

Second, the appropriateness of this number is also confirmed by other airline

bankruptcies. These bankruptcies illustrate how other airlines going through reorganization—

confronting similar problems and obligations—have constructed their business plans. (Trial Tr.

160:10–19, May 22, 2012 (Resnick)). Other network carriers targeted EBITDAR margins in

their plans of reorganization that exceeded EBITDAR levels then being achieved in the industry,

and also projected growth in their margins over the duration of their business plans. (Trial Tr.

201:18–203:6, May 14, 2012 (Yearley); Trial Tr. 41:20–42:2, May 18, 2012 (Szlezinger); AA

Exs. 317A–321, 1770). American's targeted EBITDAR margins, while aggressive, are below

the average of those margins and are closer to historical norms. (AA Exs. 317A–321; Trial Tr.

---

[32]    The APA condemns Mr. Resnick's inclusion of LCCs as relevant to determining the appropriate
EBITDAR. It argues that American traditionally compares itself only to other network carriers and
LCCs do not share the same business model. The Court agrees that it is appropriate to use network
carriers as the primary comparators for American, particularly when discussing work rules and issues
like wages and benefits. But when discussing the bottom line of profit, there is no doubt that
American competes with LCCs. American faces competition from LCCs on virtually all of its routes
and an increasing number of American's passengers (nearly 80%) have the option of selecting an
LCC as an alternative to American. (Trial Tr. 155:9-17, May 22, 2012 (Resnick); Trial Tr. 156:9-
157:24, April 23, 2012 (Kasper)). American also competes with the LCCs in the purchase of aircraft
and fuel. (Trial Tr. 155:18-156:7, May 22, 2012 (Resnick); Trial Tr. 175:10-14, May 14, 2012
(Yearley) (APA financial advisor admitting that "there's no doubt" American competes against
LCCs)). Accordingly, the Court concludes that the EBITDAR of LCCs are relevant when
considering the reasonableness of the EBITDAR targets in the Business Plan.

30:9–11, April 25, 2012 (Resnick); Trial Tr. 200:4–203:6, May 14, 2012 (Yearley)).[33]  Third, the

six year EBITDAR in the Business Plan is consistent with the earnings history of the airline

industry during other six year periods.  (AA Ex. 1778A; Trial Tr. 18:6–20:11, May 23, 2012

(Dichter)).  Fourth and finally, the reasonableness of the EBITDAR targets is confirmed by

reference to other business metrics.  As Mr. Resnick explained, for example, even if American

were to achieve the full labor cost reductions, its financial performance and credit profile is not

as strong as most competitors.  (Resnick Decl. ¶ 29).  For example, the average of the EBITDA

to interest expense coverage ratio for other airlines is far greater than American's ratio.  (*Id*.).[34]

    **c)  Convergence**

The APA argues that American's proposal is not necessary under Section 1113 because

the APA's labor costs are, or soon will be, at industry standard.  More specifically, the APA

argues that, based on American's own pre-petition labor contract analysis, the pilots' labor costs

under the current collective bargaining agreement will "converge" with American's competitors

such that there is a labor cost advantage by 2014 as to other network carriers.  *See* APA Proposed

---

[33]   It is true that these other network carriers did not achieve the EBITDAR margins targeted in their plans of reorganization.  (Trial Tr. 164:3-10, May 22, 2012 (Resnick)).  This suggests the wisdom of American's decision to choose lower targets and the magnitude of the challenges faced by the industry; it does not suggest that American or the Court should ignore the numbers from those prior airline bankruptcies.  (Trial Tr. 164:7-21, May 22, 2012 (Resnick)).  *See Mesaba*, 341 B.R. at 738–39, *aff'd in relevant part*, 350 B.R. 435 (D. Minn. 2006) (airline emerging from Chapter 11 into an intensely competitive market "should come forward close to the top of the heap in strength, rather than at the bottom," and thus approved the debtor's Section 1113 motion even though the target operating margin was "set somewhat higher than the prevailing experience of airlines emerging from bankruptcy").

[34]   Relatedly, the APA complains that American should be using market-based rates for its Section 1113 proposal, rather than using the EBITDAR target as the basis for the labor "ask."  As the Court finds that the Business Plan is a reasonable basis for American's Section 1113 proposal, the Court rejects this argument.  Moreover, the Court rejects the argument as inconsistent with the evidence that the APA's contract is among the highest of American's network competitors and, therefore, is not market based.

Findings ¶¶ 33–34.  Indeed, the APA claims that convergence is occurring even faster than American expected.  *See id.* at ¶ 33.  This "convergence analysis" refers to American's stated goal before bankruptcy to achieve "something like parity with its competitors over the longer run" that would be realized through "increases over time in its competitors' labor costs, and through growth in the economy and increased employee productivity."  (Brundage Decl. ¶ 20).  Accordingly, American had structured its pre-petition bargaining proposals consistent with convergence.  (*Id.*)  At that time, American evaluated potential convergence by analyzing the "[application of] the terms of [its] competitors' labor agreements to the existing American operation" to determine the labor cost gap between American and the weighted average of the costs of its network peers.  (Brundage Decl. ¶ 19).

The APA's convergence argument is unpersuasive.  First, it is at odds with American's conclusion that its costs have not converged with the rest of the industry.  (Trial Tr. 171:4–10, 171:15–173:8, April 26, 2012 (Brundage) (describing American's pre-petition strategy as "kick[ing] the can" down the road to permit the Company to "limp along" until some future point at which there might be increased demand, steady fuel prices and a convergence in labor costs with other carriers but noting that convergence has not occurred); Trial Tr. 240:14–17, 242:21–243:3, April 24, 2012 (Goulet) (acknowledging that the convergence theory was a matter of delay and that convergence has not yet occurred); Trial Tr. 34:17–37:17, May 22, 2012 (Glass) (stating that he does not believe convergence will occur)).[35]  American's view is very strongly supported by the undisputed fact that the Company has incurred billions of dollars in net losses,

---

[35]  Jeffrey Brundage, Senior Vice President of Human Resources for American, testified for American that the convergence analysis which American previously relied upon has "been proven to have [been] an overly optimistic view of what was going to happen in terms of cost convergence."  (Trial Tr. 174:3-7, April 26, 2012 (Brundage)).

including more than $1 billion last year. The APA's convergence argument is also fatally
undercut by the APA's own admission that "American's current pilot labor costs are admittedly
greater than those of other legacy carriers, APA Proposed Findings ¶ 30, and that the current
status quo is "unsustainable." (Trial Tr. 25:9–11, May 14, 2012).

Indeed, it is not surprising that American now has a different view in bankruptcy than it
held pre-petition. Bankruptcy often alters a company's pre-petition views and forces
management to reconsider its past policies and corporate strategy. *See* Adrian Frankum, Armen
Emrikian & James Guglielmo, *Liquidity Provides Optionality: An Approach for Boards During
a Liquidity Crisis*, in NAVIGATING TODAY'S ENVIRONMENT: THE DIRECTORS' AND OFFICERS'
GUIDE TO RESTRUCTURING 128 (John Wm. Butler, Jr. ed. 2010) ("Often, restructurings require
management to reconsider long-held beliefs on the composition and strategy of the company.");
Douglas G. Baird, *The New Face of Chapter 11*, 12 AM. BANKR. INST. L. REV. 69, 81 (2004)
(stating that "[t]he board of the corporation may have been largely asleep as conditions declined,
but when the picture becomes sufficiently grim, the independent directors wake up."); A.
Mechele Dickerson, *A Behavioral Approach to Analyzing Corporate Failures*, 38 WAKE FOREST
L. REV. 1, 25–26 (2003) (discussing how the Enron case illustrates that "even financially
sophisticated directors often fail to understand the strategic or financial risks facing their firms . .
. [and sometimes] only an external influence will convince [management] that drastic measures
(including, potentially a bankruptcy filing) are needed to save the firm"). In fact, American's
pre-petition expectations regarding convergence "as to how 'open industry labor contracts
[would be] settled'" was "based on a number of assumptions, the validity of which cannot be
assured." (Akins Decl. ¶ 71 (quoting the Company's Second Quarter 2010 10Q filing with the
SEC)). But American understood, even pre-petition, that "[t]he airline industry labor contract

51

negotiation process is inherently uncertain and the results of labor contract negotiations are difficult to predict." (*Id.*).

Finally, the notion of convergence is further undermined by the unpredictable nature of an airline industry that is often subject to, and extremely sensitive towards, external shocks. (Akins Decl. ¶ 72; Trial Tr. 35:22–25, May 22, 2012 (Glass) (discussing how the airline industry is one "that is subject to outside—that is sensitive to outside events like no other industry in the United States")).

### 2.  Objection to Proposed Changes in Benefits to All Employees

American has sought common benefits changes for all its Unions, including the APA, in three areas: (1) pensions; (2) medical care for active employees; and (3) medical care for future retirees.  American has sought these changes because it has some of the highest benefit costs in the industry, with overall benefit costs approximately 54% higher than an average network carrier and 195% higher than an average low cost carrier.  (Kasper Decl. ¶ 85 (discussing benefit costs per available seat mile); AA Ex. 47).  Indeed, an APFA witness acknowledged that the Company is currently "above the industry" with respect to pension, active and retiree medical benefits.  (Trial Tr. 240:3–18, May 16, 2012 (Lowe)).  This places the Company at a significant cost disadvantage vis-à-vis its competitors.  (McMenamy Decl. ¶ 20).  As a result, approximately half of the cost reductions that the Company seeks come from across the board changes to benefits that will institute uniform pension plan, active employee medical, and future retiree medical for all employees.  (McMenamy Decl. ¶ 22).  The Company estimates that these cuts will reduce overall employee costs by approximately $563 million per year, (Wright Decl. ¶ 8; McMenamy Decl. ¶ 22), while keeping benefits industry competitive.  (Wright Decl. ¶ 18; Glass

Decl. ¶ 38).  Some background on each of these proposed changes is useful before considering

the APA's objections.

### a) Pension Plans

One of American's major cost differences when measured against competitors is its

defined benefit plan.  (AA Ex. 48).  Several other large network carriers have either frozen or

terminated their defined benefit plans and reduced associated liabilities, while low cost carriers

never instituted such plans.  (Glass Decl. ¶ 273).  These carriers have opted instead for a defined

contribution pension plan, under which they contribute a percentage of an employee's pay to a

plan, either through a match or a guaranteed contribution.  (Wright Decl. ¶ 13).  American

initially proposed to terminate all its defined benefit plans, but received strong opposition from

the Unions and the PBGC.  Thus, American is currently working with the Unions to freeze its

plans for non-pilot groups, which will cease accrual of new benefits, but preserve benefits

already accrued as of the date the plans are frozen.  (Brundage Decl. ¶ 43; Wright Decl. ¶ 47).[36]

Under American's proposal, employees will have access to a 401(k) plan, with the Company

matching 100% of up to 5.5% of an employee's plan-eligible compensation.  (Wright Decl. ¶

48).  Pilots will participate in a defined contribution plan with a guaranteed Company

contribution of 13.5% of plan-eligible compensation.  (Wright Decl. ¶ 48).  This will put

---

[36] American is also working with the pilots to find a solution to the unique issues posed by the pilots'
defined benefit plan.  (Wright Decl. ¶ 47; Brundage Decl. ¶ 43 n.26).  Specifically, the Pilot A Plan
provides a lump sum benefit option that, even if frozen, allows pilots to take retirement benefit
distributions that average over $1 million.  (Brundage Decl. ¶ 43 n.26).  Leaving this plan in place
upon exit from Chapter 11 could cause a depletion of its most senior pilots and result in an
operational crisis.  (Brundage Decl. ¶ 43 n.26).  American's proposal to the APA would allow for a
freeze of the Pilot A Plan if American is able to resolve this issue.  (Brundage Decl. ¶ 43 n.26).

The Company and the PBGC have come to an agreement on the process for freezing the non-pilot
pension plans and continue to work together to resolve the issues relating to the pilot plan.  *See
Stipulation and Agreement Between Debtors and Pension Benefit Guaranty Corporation* (ECF No.
2602).

American on par with other network carriers.  (Wright Decl. ¶ 49; Glass Decl. ¶¶ 37, 279; AA
Exs. 821–824).

### b)  Medical Costs Generally

American also has high active medical costs, which have grown dramatically in the past
decade.  (Wright Decl. ¶ 14; AA Ex. 601).  In 2011, American spent approximately $544 million
for medical and prescription drug claims and third party administrative fees and it is estimated
that, without changes, these costs will rise to ▮▮▮▮▮▮▮▮ by 2018.  (Wright Decl. ¶ 17;
McMenamy Decl. ¶ 23).  American's unfunded retiree medical and life obligations for just its
current employees is approximately $1.16 billion, (Loyal Decl. ¶ 10), whereas its competitors
have managed these costs by eliminating or reducing contributions to retiree medical coverage.
(Glass Decl. ¶ 284).

### c)  Active Medical

American's current medical plan has fifteen healthcare options, seven of which are self-
insured.  (Wright Decl. ¶ 20).  Differences in American's collective bargaining agreements result
in a variety of employee contribution levels, which complicates medical plan administration.
(Wright Decl. ¶ 20; AA Ex. 605).  Several factors contribute to American's current high
healthcare costs, including low deductibles, low out of pocket maximums, and restrictions on the
ability to negotiate with in-network providers for discounted rates.  (Wright Decl. ¶ 22).

American originally sought to modify its active employee medical plan by offering two
contractual and one non-contractual option, with the same contribution levels for all employees.
(Wright Decl. ¶¶ 26–27).  In response to Union concerns, American revised its plan to lower the
monthly cost share for the two contractual plans from 23% to 21% and added additional plan
design features.  (Wright Decl. ¶¶ 26–31).  The Company estimates that the changes proposed to

active medical will result in $134 million in annual cost reductions, along with incidental cost reductions associated with decreasing administrative burdens and inefficiencies caused by multiple medical plan design options. (Wright Decl. ¶ 18; McMenamy Decl. ¶ 25). Benefits will become comparable to other competitors. (Wright Decl. ¶ 32; Glass Decl. ¶ 281).

### d) Retiree Medical

American currently provides future retirees with life insurance and access to several self-insured heathcare options upon their retirement, with participation and cost sharing varying by workgroup. (Wright Decl. ¶ 34). The current pilot collective bargaining agreement offers retirees healthcare coverage at no cost. (Wright Decl. ¶ 34). Nearly all qualifying retirees automatically receive a $5,000 life insurance benefit upon retirement. (Wright Decl. ¶ 35). American spent approximately $125 million for retiree medical and life insurance programs in 2011, net of retiree contributions and pre-funding. (Wright Decl. ¶ 36). In addition, the Company also has a huge deferred unfunded liability that is estimated at $1.16 billion for current employees who will become retirees in the future. (Loyal Decl. ¶ 10; Wright Decl. ¶ 36).

American's proposal would terminate Company payments for retiree medical and life benefits, and implement a single program for all employees with the same coverage at the employees' cost. Under this proposal, future retirees can participate in a Company-sponsored pre-65 health plan at the retirees' cost. (Wright Decl. ¶ 39). Post-65 retiree medical coverage would be eliminated and instead the Company would provide access to a third-party retiree health program at the retirees' cost. (Wright Decl. ¶ 40). These changes are consistent with those implemented by other network carriers, (Glass Decl. ¶¶ 284; AA Ex. 1762; Wright Decl. ¶ 38), and the Company estimates that they would result in $151 million in direct annual labor cost reductions. (McMenamy Decl. ¶ 28; Wright Decl. ¶ 37).

### e) Objections to Proposed Benefit Changes

The APA challenges two of the assumptions made by the Company in calculating the savings resulting from changes to the active employee medical proposal and the future retiree medical proposal.[37]  The APA's concern is that American has undervalued the proposed changes and thus should seek fewer concessions.  The APA contends, therefore, that these proposed changes are not necessary.

First, the APA disagrees with the Company's assumption on medical utilization with respect to the active medical proposal.  The APA benefits consultant testified that the Company failed to account for an assumed decrease in medical benefit use due to the cost of higher deductibles, co-payments and out of pocket expenses.  (Heppner Decl. ¶ 11).  The APA argues that this would total $52.5 million in additional savings from what the Company estimated for the period of 2012 through 2017.  (Heppner Decl. ¶ 11).

The Court, however, gives little weight to this testimony and is persuaded that American's view is correct.  On the stand, the APA witness could not identify the amount of utilization decrease that he expected and could not offer an alternative cost estimate that was based on a reliable methodology.  (Trial Tr. 127:7–132:5, May 16, 2012 (Heppner)).  He admitted that it was the software that determined the change in utilization that was to be used in the model without any input from him directly.  (Trial Tr. 131:8–131:25, May 16, 2012 (Heppner)).  He further testified that he was unfamiliar with (1) the way in which the software he used for his calculations operated to analyze the data which it was provided (Trial Tr. 128: 15– 18, May 16, 2012 (Heppner)); (2) how many employers were included in the database used by

---

[37]  The APA's expert addressing these benefit issues does not appear to contest the methodology used in estimating the cost reductions relating to these medical changes.  (Trial Tr. 79:11-21, 86:14-23, May 16, 2012 (Heppner)).

the software (Trial Tr. 129:7–9, May 16, 2012 (Heppner)); (3) admitted that he did not know

which industries the data used by the software came from (Trial Tr. 129:10–16, May 16, 2012

(Heppner)); or (3) whether the software included income data in its calculations (Trial Tr.

129:17–20, May 16, 2012 (Heppner)).

The Court finds the testimony of American's witness on medical valuation to be more

reliable. Bruce Richards of Mercer Health and Benefits, American's actuary and consultant on

medical benefits, testified that the valuations were based on (a) Mercer's broad experience with

other clients that have made similar plan changes; (b) the assumption commonly accepted in the

actuarial profession that utilization increases and decreases resulting from plan design changes

would even out within two to three years (a phenomenon dubbed "rush-hush-crush"); and (c) the

fact that the relative value of the proposed plan design was not sufficiently different from the

current plan design to suggest a persistent decrease in utilization. (Trial Tr. 119:14–124:7, May

22, 2012 (Richards); AA Exs. 1719, 1773). American's view about utilization rates was further

supported by an article culled from training materials used by the Society of Actuaries. (Trial Tr.

122:2–7, May 22, 2012 (Richards)). Entitled "Timing's Everything: The Impact of Benefit

Rush," the article explains the basis for the "rush-crush-hush" assumption. (AA Ex. 1719). The

Court therefore finds American's valuation of its active medical benefits cost reductions to be

reasonable.

Second, the APA disagreed with an assumption used by the Company in calculating the

savings resulting from the retiree medical proposal. The APA witness testified that American

incorrectly valued these benefit reductions by using an incorrect discount rate, which is used to

calculate the present value of future benefits. (Trial Tr. 292:14–293:5, April 26, 2012

(McMenamy)). He argued that American's discount rate of 8.25% is higher than the discount

rate typically used for retiree medical valuations when measuring liabilities that are largely

unfunded. (Heppner Decl. ¶ 10). He stated that the accepted practice is to use a discount rate

that approximates the return on a high-quality bond portfolio that matches the liability cash flow,

and that the correct discount rate would be approximately 5%. (Heppner Decl. ¶ 10). The APA

argues that this would increase the economic cost impact by approximately 44.2% or $106.1

million for the period of 2012 through 2017. (Heppner Decl. ¶ 10).

The APA witness conceded, however, that 5% was not the only acceptable discount rate

for this matter. (Trial Tr. 118:4–6, May 16, 2012 (Heppner)). In fact, American used a higher

discount rate of 8.25% based on its actual rate of return on pension and medical plan trust assets.

(Trial Tr. 293:5–14, April 26, 2012 (McMenamy)). Such concrete evidence strongly supports

the discount rate chosen by American. *See In re Chemtura Corp.*, 448 B.R. 635, 673 (Bankr.

S.D.N.Y. 2011). Furthermore, if American had used a lower discount rate, its request for cost

reductions from the Unions would have been higher as a result, (Trial Tr. 294:20–295:15, April

26, 2012 (McMenamy)), a fact conceded by the APA. (Trial Tr. 120:15–23, May 16, 2012

(Heppner)). For these reasons, the Court finds American's valuation of its retiree medical

proposal to be reasonable.

### 3. Objections To Proposed Changes Relevant Only to the Pilots

In disputing the necessity of the March 21 Proposal, the APA has taken issue with a

number of specific aspects of American's proposal. The main arguments presented at Trial are

discussed below.

#### a) Regional Jets

Network carriers often enter into partnerships with smaller regional airlines, known as

commuter air carriers, under which the commuter carriers will fly smaller-sized aircraft referred

to as regional jets on behalf of the network carrier.[38]  The use of regional jets is meant to assist larger carriers in their network planning, by allowing the carriers to match the type and size of aircraft with the demand in certain local markets.  In this way, passengers can be connected from smaller airports to larger airports that serve as hubs for the larger carriers.  The APA has concerns about regional flying, because it is not done by APA members.

As a result, the existing APA agreement contains significant limitations on American's ability to use regional jets.  It permits American to partner with regional carriers flying planes with 50 or fewer seats and a maximum take-off weight ("MTOW") of no more than 64,500 pounds.  (Newgren Decl. ¶ 55).  These regional jets cannot exceed 110% of the number of narrow body aircraft flown at the mainline, allowing for the current use of up to 536[39] regional aircraft of 50 seats or less.  (Eaton Decl. ¶ 13; APA Ex. 501 § 1.D.5.c).  Additional restrictions include limitations on the type and number of routes on which these aircraft can be flown.  (Newgren Decl. ¶¶ 63–66; Glass Decl. ¶ 74).  If American does not own the commuter airline, further restrictions apply.  (Newgren Decl. ¶¶ 64–66; Glass Decl. ¶ 75; APA Ex. 501 § 1.D.5).  American has received permission from the APA to contract for flying with its owned regional affiliate, American Eagle Airlines, using 47 specific jets that have a maximum of 70 seats, but these jets cannot be replaced when they are retired.  (Newgren Decl. ¶ 55; AA Ex. 802A).[40]

The March 21 Proposal would allow American's regional partners to fly aircraft with a maximum of 88 seats and a MTOW of 114,500 pounds.  (AA Ex. 918).  The maximum number

---

[38]  For purposes of this decision, the term "regional jet" refers to the flying of these aircraft by commuter air carriers, and not by the network carrier itself.

[39]  American puts this number at 537.  (AA Ex. 802a; Glass Decl. ¶ 72 n.73).

[40]  American also utilizes some turboprop planes, but their present or future use does not appear to be contested.

of regional jets of 51 to 88 seats would be capped at the greater of 255 or 50% of the total

number of mainline aircraft in use at the time.  (AA Ex. 918; American's APA Motion at 23

n.18).  The maximum number of regional jets of 50 seats or less would remain at 110% of the

narrow body aircraft flown at the mainline at the time.  (AA Ex. 918).  Additionally, the

distinction between owned and non-owned commuter carriers would be eliminated—all would

be operated as if owned.  (AA Ex. 918).  Based on current fleet size, the APA calculates that the

March 21 Proposal would permit the Company to use 536 regional jets of up to 50 seats and 304

regional jets of 51 to 88 seats.  (Eaton Decl. ¶ 25).  The APA's primary objection relates to the

use of the larger regional jets.  The APA fears that the March 21 Proposal would permit

American to create or acquire a separate airline to fly a large fleet of Embraer 190 aircraft with

larger seat capacity, and thus would ultimately reduce flying by APA union pilots at the

mainline.  (Eaton Decl. ¶ 18).

American argues that they must be permitted to expand their use of larger regional jets

because the current restrictions inhibit American's ability to generate revenue.  Specifically,

smaller regional jets of 50 seats or less are not fuel efficient and are no longer manufactured due

to a lack of commercial viability.  (Newgren Decl. ¶ 56–57; Glass Decl. ¶73; Trial Tr. 88:13–

89:14, May 21, 2012 (Kasper)).  Additionally, these smaller regional jets have a much more

limited range and cannot be used for certain city-pairs that could be served by larger regional

jets.  (Newgren Decl. ¶ 56).  Smaller regional jets also cannot be configured to offer the type of

two-class service that generally attracts the "high value" customers that American seeks.

(Newgren Decl. ¶ 58; Glass Decl. ¶ 73; Trial Tr. 88:13–89:14, May 21, 2012 (Kasper)).

Furthermore, there are markets with significant revenue opportunities that cannot be adequately

served by American's mainline aircraft, which are too large and thus poorly suited for these

markets.  (Newgren Decl. ¶ 59).  American has stated that it cannot substitute use of its own

smaller aircraft for these regional flights due to the high cost of its operations in comparison to

regional carriers, including pilot and other labor costs.  (Newgren Decl. ¶ 59; Vahidi Decl. ¶ 19).

In evaluating what is necessary under Section 1113, courts often look to the standards in

the industry, comparing how the debtor's proposed changes stack up against its competitors.  *See*

*Carey Transp.*, 816 F.2d at 90 (labor costs).   The APA argues that the request of American is

inconsistent with industry standards, both in terms of maximum number of seats and MTOW.  It

notes that none of American's major competitors are currently using regional jets with 88 seats

or any aircraft with a MTOW of greater than 90,000 pounds.  (Eaton Decl. ¶ 19; APA Exs. 507,

510).  Consistent with the trend in the industry, however, the Court concludes that American

needs to use such jets to both compete with its peers in terms of matching market size and to

generate additional revenue.  The Court finds, therefore, that American has shown that the

request in the March 21 Proposal is reasonable and necessary when compared to its network

competitors.

With respect to the number of seats in the regional aircraft, US Airways, one of the

Company's main competitors, uses regional jets of a similar size.  There is a disagreement on the

record regarding the size and number of regional jets that US Airways is permitted to fly.  (Trial

Tr. 36:22–37:14, May 16, 2012 (Eaton); APA Ex. 513; AA Ex. 802A).  With respect to US

Airways, the APA claims that US Airways is limited to 97 regional jets of 51 to 70 seats and 93

regional jets of 77 to 88 seats.[41]  (Trial Tr. 36:22–37:14, May 16, 2012 (Eaton)).  American

disagrees, claiming that US Airways' limit is 212 aircraft in the 51-76 seat range and 153 aircraft

---

[41]    As to the second group, however, Mr. Eaton conceded at Trial that the limit was 90 seats for coach
       and 88 seats for dual class.  (Trial Tr. 33:4-23, May 16, 2012 (Eaton)).

in the 76 to 90 seat range.[42]  (Trial Tr. 11:1–18:4, May 22, 2012 (Glass); AA Exs. 1771, 1775).

The Court finds the testimony of American's witness, Mr. Glass, to be more credible on this

point.  Mr. Glass negotiated the regional jet provisions in the US Airways restructuring

agreements and cogently explained how the US Airways limits on regional jets were expanded

upwards as a result of arbitration.  (Trial Tr. 13:3–18:4, May 22, 2012 (Glass); AA Exs. 1771,

1775 at 15).  Other network carriers also have the ability to use large regional jets.  Delta is able

to use regional jets with up to 76 seats.[43]  (Trial Tr. 36:22–23, May 16, 2012 (Eaton); APA Ex.

503; AA Ex. 802A).  And while Continental is prohibited from using regional jets of greater than

50 seats, its merger partner United can use jets of up to 70 seats.[44]  (Trial Tr. 36:24–25, May 16,

2012 (Eaton); APA Exs. 502, 504; AA Ex. 802A).

       As to the total number of regional aircraft that American seeks to use, the vast majority of

network carriers are able to utilize large numbers of regional jets of over 50 seats under their

collective bargaining agreements, with some limitations.  (Trial Tr. at 87:25–88:12, May 21,

2012 (Kasper)).  United is unrestricted in the number of regional jets it can fly with up to 70

---

[42]    While US Airways can outsource regional jets up to this seat limit, (Eaton Decl. ¶ 19, 21; APA Ex. 505), it is effectively capped at the 80 seat range because it is contractually limited to outsourcing aircraft with a MTOW of 90,000 or less.  However, Mr. Glass testified that if he were negotiating a scope clause today, he would not find 90,000 to be a prudent weight limit because a "new generation aircraft are being developed.  The engines generally are more powerful and as a result the aircraft tend to be heavier, even with the same seat restrictions."  (Trial Tr. 18:17-19, May 22, 2012 (Glass); *see also* Trial Tr. 198:4-12, April 25, 2012 (Vahidi) (noting that "technology is headed in the direction of larger regional jets that produce the economics that are desired by the airlines to operate these thinner routes that have less demand or be able to compliment the schedule by adding frequencies.  So looking out over the next six years, we see technologies that are very different than what were available back in the last or early part of the decade when the other . . . union agreements were signed.")).

[43]    This limit is reduced to 70 seats if a senior Delta pilot is furloughed.  (Eaton Decl. ¶ 21; APA Ex. 503).

[44]    Though merged, pilots at Continental and United still operate under separate collective bargaining agreements.  (Eaton Decl. ¶ 21 n.7).

seats.  (Newgren Decl. ¶ 55; Glass Decl. ¶ 77; AA Ex. 802A).[45]  Furthermore, Delta's collective

bargaining agreement allows use of 255 regional jets in the 51 to 76 seat range, 120 of which can

be between 71 and 76 seats.[46]  (Eaton Decl. ¶ 26; APA Ex. 503).  (Newgren Decl. ¶ 55; Glass

Decl. ¶ 77; AA Ex. 802a).  US Airways can fly more than 300 regional jets over 50 seats.[47]

(Newgren Decl. ¶ 55; Glass Decl. ¶¶ 77, 81; AA Ex. 802A).

The APA envisions a scenario in which American uses its entire allotment of 50-plus seat

aircraft to fly the largest regional jets at 88 seats.  Such a concern is misplaced given the

evidence.  The Company has stated that it seeks this flexibility on regional jets in order to "right

size" its utilization of aircraft.  (Goulet Decl. ¶ 55, Vahidi Decl., ¶¶ 9, 30–31; Dichter Decl. ¶

27).  Right-sizing involves "match[ing] the proper gauged aircraft, meaning the right-sized

aircraft, to a particular market."  (Trial Tr. 264:22–23, April 23, 2012 (Glass)).  This concept

goes directly to the meaning of necessity under Section 1113, which is meant to provide

American with the ability to make the "necessary, but not absolutely minimal, changes that will

enable the debtor to complete the reorganization process successfully."  *Carey Transp.*, 816 F.2d

at 90.  If the market can support an 88 seat regional jet, that is what American will use to its

economic advantage, thus contributing to a successful reorganization.  If a market can only

support a 70 seat regional jet, however, it would make no economic sense for the Company to

use an 88 seat aircraft in that capacity and therefore pay higher costs for that aircraft while

---

[45]   The APA admits that there is no finite limit on the regional jets that United can operate, but argues
that a block hour limit effectively restricts them to 451 regional jets of 70 seats or less.  (Trial Tr.
16:5-18, May 16, 2012) (Eaton)).

[46]   This number is subject to increase with an increase in the size of Delta's mainline fleet.  (Glass Decl.
¶ 77).

[47]   As with Delta, an increase in the number of allowed regional jets at US Airways is also tied to an
increase in the mainline fleet.  (Glass Decl. ¶ 77).

failing to fill seats. (*See* Trial Tr. 264:18–265:12, April 23, 2012 (Glass); Trial Tr. 18:8–19:22, 53:12–19, May 16, 2012 (Eaton).[48]

The APA also argues that the March 21 Proposal with respect to large regional aircraft is not anchored to the Business Plan.[49] The Business Plan contains a network plan that sets forth American's contemplated aircraft usage. ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ The Court finds that the information in the Business Plan on regional jets is in line with American's regional jet "ask" in the March 21 Proposal, which caps the number of aircraft at the 51 to 88 seat range at the larger of 255 or 50% of the total number of mainline aircraft in use at the time. The request for 255 regional aircraft is very much in line with the projected need in the Business Plan of ████████

██████ It is true that the March 21 Proposal also contains a clause granting the Company some additional flexibility by pegging the number of regional jets to a percentage of American's mainline fleet; using today's figures, American would be able to use 304 aircraft in the 51 to 88

---

[48] That American does not intend to blindly maximize its use of 88 seat aircraft appears to be borne out by the regional jet "ask" contained in the proposal made on April 19, 2012, the last proposal made prior the start of the Trial (the "April 19 Proposal"), which sets a cap on the number of regional aircraft that American could use in the 81 to 88 seat range. Under the April 19 Proposal, American would still be able to use regional jets with a maximum of 88 seats and a MTOW of 114,500 pounds, but the maximum number of all regional aircraft used could not exceed 70% of the mainline fleet count. (AA Ex. 1733, APA Ex. 2). Of that percentage, the maximum number of large regional aircraft (between 80 and 88 seats) could not exceed 30% of the mainline fleet count. (AA Ex. 1733; APA Ex. 2). Based on current fleet count, the APA estimates that this would allow American to use up to 425 regional jets, with approximately 182 of those being aircraft with 81 to 88 seats. (Eaton Decl. ¶ 25 n.10).

[49] The Court was not presented with all of the contents of the Business Plan, which has been described as an exceedingly complex model. The Court was presented with limited evidence about the Business Plan's contemplated use of regional jets, including APA Ex. 515 and AA Ex. 130, which set forth certain predictions about the number and size of aircraft the Company will need on a year by year basis.

seat range. However, American has a "need for long-term flexibility in order to have a truly successful reorganization, one that results in a healthy company emerging from the process. A debtor's proposal need not be limited to the bare bones relief that will keep it going." *Royal Composing*, 848 F.2d at 350 (internal citations and quotations omitted.). The Court finds that the percentage proposed by American will give it the flexibility necessary in using regional jets in the future to keep pace with the industry and the changing demands of the markets. (*See* Trial Tr. 264:21–265:4, April 23, 2012 (Glass) ("[A] proposal like this gives the company exactly the kind of flexibility it needs to decide, because there's a wide range . . . of regional aircraft, and whether it's turboprop aircraft or whether it's jet aircraft, depending on its performance characteristics, depending on the market, depending on the area of the country that[] it's operating in, all of those are critical factors to determining what aircraft should be in what market.")). Thus, while American's proposal does permit more regional jets than is currently forecast in the Business Plan, American has capped that number at a range generally consistent with the Business Plan, but in a way that will provide them with the flexibility to react to changes in the market. Indeed, "[p]rojections are necessarily speculations about the future and are an art, rather than a science." *Royal Composing*, 848 F.2d at 350 (*quoting In re Royal Composing Room, Inc.*, 62 B.R. 403, 407 (Bankr. S.D.N.Y. 1986)). It is not necessary that a debtor "show the necessity of every conceivable future use of the flexibility it now requires; it is enough that . . . it needs that flexibility." *Royal Composing*, 848 F.2d at 350.

Finally, the Court notes that the Business Plan helps demonstrate the necessity of the proposed changes by detailing the increase in annual revenue to be generated from the additional use of regional jets (Dichter Decl. ¶ 24), and providing several key examples of the markets in which American intends to implement this usage. (Vahidi Decl. ¶¶ 30–31 and n.6; AA Ex. 213).

### b) Codesharing

Codesharing is a term that describes the relationship between two air carriers in which one carrier is permitted to place its schedule identifier (a unique two letter airline designation) on flights offered by the other. It allows an airline to increase the size and depth of its network by reaching locations that are served by other airlines. The existing scope clause in the APA agreement greatly restricts American's ability to codeshare. Scope clauses define the extent of work and flying opportunities for the pilots covered under a collective bargaining agreement.[50] Found in most pilot collective bargaining agreements, scope clauses generally offer job protection by imposing restrictions on an airline's ability to outsource flying to low-cost subcontractors or to form non-unionized subsidiaries to take over flying that would otherwise be performed by unionized pilots. (Eaton Decl. ¶ 10).

American currently maintains very modest codesharing relationships with just two airlines: Alaska Airlines and Hawaiian Airlines. American can codeshare with Hawaiian Airlines on inter-island flying so long as the Company operates 10 daily flights between the U.S. mainland and Hawaii. (Newgren Decl. ¶ 85). The codesharing relationship with Alaska Airlines also is restricted to certain city pairs. (Kasper Decl. ¶ 108 n.122; Trial Tr. 80:16–81:4, May 14, 2012 (Roghair)). Under the existing APA scope clause, American is only able to enter new codesharing agreements with domestic carriers if it satisfies certain conditions. American must provide the APA with notification prior to entering the agreement. (Eaton Decl. ¶ 32). In the absence of APA consent, American must engage with the APA in interest-arbitration. (Eaton

---

[50]   The central provision of the scope clause in the APA pilots' collective bargaining agreement is Section 1.C.1, which states that "[a]ll flying performed by or on behalf of the Company or an Affiliate shall be performed by pilots on the American Airlines Pilots Seniority List in accordance with the terms and conditions of this Agreement, except as expressly permitted . . . below."  (APA Ex. 501 at 1-2).

Decl. ¶ 32).  In such interest arbitration, the arbitrator must look to the "industry-standard,"

through reference to the terms of then-existing collective bargaining agreements in place at

United, Delta, Northwest, Continental and US Airways.  (Eaton Decl. ¶ 32; APA Ex. 501 § 1.H).

The existing pilot collective bargaining agreement also permits international codesharing so long

as American's own international block hours do not fall below a certain level known as an

international baseline.  (Eaton Decl. ¶ 46; Newgren Decl. ¶ 87).

The March 21 Proposal would significantly expand American's codesharing abilities by

allowing American, in its discretion, to enter into or continue commuter, domestic, or

international codesharing in any market.  (AA Ex. 918).  The March 21 Proposal would also

explicitly eliminate the limitation on the number of flights operated between the U.S. mainland

and Hawaii in the codesharing agreement with Hawaiian Airlines.  (AA Ex. 918).  American

argues that these proposed changes are necessary to compete with rival carriers that have been

able to achieve larger networks through mergers.  (Kasper Decl. ¶¶ 110–115; Newgren Decl. ¶¶

73–82).

The APA argues that the changes proposed by American would give the Company the

unlimited right to enter into domestic and international codesharing relationships.  The APA

notes that no other network carrier currently has such unlimited codesharing.  (Trial Tr. 60:4–7,

May 22, 2012 (Glass)).  The APA also observes that the request made by American goes beyond

what is contemplated in its Business Plan, which provides details regarding American's intent to

expand codesharing with specific airlines in certain markets.  (Newgren Decl. ¶¶ 73–76).

American argues that its request for expanded codesharing is consistent with the

historical pattern in the industry.  Specifically, up until industry consolidation took place in the

mid-to-late 2000s, Delta, United, Continental and Northwest maintained broad codesharing

relationships with one another to compete against American's network, which at that time was the largest in the industry.  In 2006, for example, Northwest had codeshare agreements with various carriers on 709 routes, Delta on 400 routes, Continental on 319 routes, US Airways on 276 routes and United on 196 routes.  (AA Ex. 70; Kasper Decl. ¶ 116).  Many of these airlines were able to establish broad codesharing as part of their own bankruptcy cases.  (Newgren Decl. ¶ 7).  Due to the expansion of their own networks through merger, however, these competing network carriers no longer have the same need for codesharing.  (AA Ex. 71; Trial Tr. 57:18–58:3, April 26, 2012 (Dichter)).  As a result, the current collective bargaining agreements for these carriers now contain more restrictions on codesharing.  (Eaton Decl. ¶¶ 36–37, 47).   Yet even given current restrictions at these other network carriers, they nonetheless currently maintain broader codesharing arrangements than American has under its current pilot collective bargaining agreement.  (AA Ex. 71; Kasper Decl. ¶ 117; Trial Tr. 58:4–9, April 26, 2012 (Dichter)).

     While American had little need for codesharing while it enjoyed network dominance, it now seeks to use this tool to expand its now-smaller network in order to compete.  Its ability to expand codesharing under its current collective bargaining agreement is inadequate, American argues, because any arbitrator must rely on the industry standard which now reflects the reduced use of codesharing by American's now larger network competitors.  (Newgren Decl. ¶ 68 n.44).  American justifies the lack of specific limits on its codesharing proposal by arguing that it is impossible to forecast what opportunities will arise over the course of the next six years and that the Company must have flexibility to respond to opportunities as they occur.  (Newgren Decl. ¶ 83).  American also asserts that its ability to codeshare would inherently be limited because "[t]he universe of potential domestic code-sharing partners is small. . . . From American's

perspective there are few domestic carriers whose service patterns are attractive. . . ."
American's Proposed Findings ¶ 84.

The Court concludes that a significant increase in codesharing would greatly benefit American. It is equally clear that the current collective bargaining agreement is far more restrictive on codesharing than recent industry norms for a carrier with a smaller network. Given American's need to compete with its now-smaller network, American has established a need for significant change to its codesharing abilities. American has not shown by a preponderance of the evidence, however, that essentially unlimited codesharing is necessary to achieve a successful reorganization. American has reasonably explained why it is inappropriate to measure its need for codesharing by comparing itself to current larger network competitors. But American's unlimited request for codesharing is greater even than the comparative group that American urges is an appropriate benchmark: the group of network airlines, before mergers, that used extensive codesharing in the past to compete with American's larger network.

American's codesharing request also is in excess of the Company's stated goals and contemplated arrangements expressed in the Business Plan, which American has presented as defining what is necessary to achieve a successful reorganization. ███████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████ (Newgren Decl. ¶¶ 73–76). American has not established how its codesharing proposal relates to the showing of necessity set forth in its Business Plan. American's failure to do so is problematic because of the central role the Business Plan plays in this Section 1113 proceeding:

69

> The current and projected financial condition of the debtor's business will provide the primary evidence as to whether the trustee's proposed modifications are "necessary" for reorganization, but the facts and circumstances of each case may also influence the outcome. Probative evidence necessarily will involve projections about the future business prospects and financial performance of the debtor's business. Where the trustee's business plan dictates the size of labor cost reductions required, "its assumptions and methodology are key" and are frequently challenged.

Collier ¶ 1113.05[3][c]; *see Mesaba*, 341 B.R. at 731.

The Company claims that it must maintain flexibility to respond to new opportunities that might arise over the next six years. But while the Court understands the need for some flexibility in the future, that flexibility cannot be unlimited or it would render the necessity requirement a nullity. It is the Company that presented and relied upon its Business Plan as the cornerstone of necessity, and it must accept both the benefits and drawbacks of that decision.[51] *See In re Express Freight Lines, Inc.*, 119 B.R. 1006, 1013–1018 (Bankr. E.D. Wis. 1990) (denying debtors' Section 1113 application on necessity grounds because the Court concluded that other companies operated under contract terms similar to those the debtor sought to modify); *In re Cook United, Inc.*, 50 B.R. 561, 563 (Bankr. N.D. Ohio 1985) (denying debtors' Section 1113 motion on the basis that the present operating plan still projected positive cash flow without the rejection of the collective bargaining agreement and therefore, modifications were deemed unnecessary); *see also Carey Transp.*, 50 B.R. at 209 ("There can be no pat formula. Any analysis must be undertaken on a case by case basis with due consideration given to the nature of

---

[51] One imagines that flexibility could be fairly easily achieved. One might establish, for example, a process whereby American would be entitled to additional codesharing above what is contemplated in the Business Plan by reference to various metrics measuring the size of American's network against its competitors, its profitability after emergence from bankruptcy or even as a flat percentage above a set amount. The Court expresses no view as to the most appropriate way to address this issue. *See Delta Air Lines*, 342 B.R. at 691 (the necessity inquiry is fact-sensitive and "the impetus of small or subtle changes in the circumstances may alter [the Court's] perspective and conclusions.").

the business and industry patterns."), *aff'd*, *Truck Drivers Local 807 v. Carey Transp., Inc.*, 816 F.2d 82 (1987) (emphasis in original).

### c) Furlough

As of February 1, 2012 there were 10,738 pilots on American's seniority list. (Newgren Decl. ¶ 4). Of those, 7,664 were active pilots that were flying for the Company. (Newgren Decl. ¶ 4). The remainder were on inactive status, including leave or furlough. (Newgren Decl. ¶ 4).

American argues that as part of its reorganization, it will initially need to furlough employees. (Newgren Decl. ¶ 155). The current pilot collective bargaining agreement contains two restrictions relating to furlough that American proposes to eliminate, arguing that they limit flexibility and increase cost. First, the agreement permits a pilot to voluntarily take a furlough designated for a more junior pilot who otherwise would have been furloughed based on seniority. (Newgren Decl. ¶ 156). American notes that if the pilot volunteering to take the furlough was already on leave or preparing to retire, American would not obtain the economic value of the furlough, because it must pay to furlough someone who was already inactive or planned to leave and is still required to furlough the junior pilot. (Newgren Decl. ¶ 156). Second, the agreement effectively prevents American from furloughing pilots above a certain place on the seniority list. (Newgren Decl. ¶ 156). The Company argues that this would prevent it from responding to unforeseen catastrophic events. (Newgren Decl. ¶ 155).

But the Court disagrees with American's view on the furlough provision. The APA complains that American seeks to eliminate all contractual restrictions against furlough. *See* APA Proposed Findings ¶ 14. The APA correctly notes that while the Business Plan only contemplates the furlough of 400 pilots, American has proposed to eliminate all the restrictions on its ability to furlough. The APA also accurately observes that the existing furlough protection

clause allows the Company to furlough up to 2,000 pilots, five times what the Company's

Business Plan requires. (Roghair Decl. ¶ 85). While American claims to seek more broad

furlough authority to address unforeseen emergencies, there appears to be no need to do so as the

existing agreement includes a *force majeure* exception which was used by the Company to

furlough 2,900 pilots following September 11th. The evidence proffered by American is unclear

even as to the amount of savings gained by American's proposal on furlough, with the evidence

suggesting that the savings may be as little as $300,000 a year. (*See* APA Ex. 412; Roghair

Decl. ¶ 85). Thus, American has failed to justify its request for unrestricted furlough by

reference to the savings identified in its Business Plan. Finally, American has not justified its

request for proposed changes in furlough by identifying comparable provisions in the airline

industry.

       Without being able to justify this change by reference to the industry or its Business Plan,

the Court concludes that the furlough proposal is inconsistent with the necessity requirement of

Section 1113. *See In re Fiber Glass Indus.*, 49 B.R. 202, 206–208 (Bankr. N.D.N.Y. 1985)

(denying debtors' Section 1113 application on a "necessity" basis because debtors failed to

proffer sufficient evidence to support a finding that the proposal was necessary for

reorganization); *In re Sun Glo Co., Inc.*. 144 B.R. 58, 62 (Bankr. E.D. Ky. 1992) (denying

debtors' motion to reject a collective bargaining agreement under Section 1113 on grounds that

debtors failed to "demonstrate[] that [the proposed] measures are 'necessary' to its

reorganization" and have not shown "how these particular changes will increase the likelihood of

successful reorganization").

### d) Schedule Maximum

Schedule maximum relates to the limit on the maximum number of hours that a pilot is scheduled to fly in a month. American currently has the lowest schedule maximum among network carriers, with a cap of 78 hours per month. (Newgren Decl. ¶ 121–122). Pilots cannot voluntarily work more than 83 hours per month. (Newgren Decl. ¶ 121). The March 21 Proposal changes the schedule maximum to an average of 70 to 87 hours. (AA Ex. 918). The average in a given month would be set by the Company based on anticipated passenger demand. (Newgren Decl. ¶ 123). Pilots could voluntarily work up to 100 hours per month if the Company needs the extra flying. (Newgren Decl. ¶ 123). Reserve pilots could also fly on days off if the Company needs their service, in exchange for compensation above their pay guarantee. (Newgren Decl. ¶ 123).

The APA complains that the majority of network carriers have hard caps and that the proposed changes would enable the Company to schedule individual pilots up to 94 hours per month for every month, so long as the average for all pilots does not exceed 87 hours. (Roghair Decl. ¶ 75). However, the Court finds American's proposal to be reasonable and generally consistent with industry standards. United has a 95 hour cap for narrowbody flying and an 89 hour cap for wide-body flying; US Airways' cap ranges from 85-95 hours; United pilots subject to the Continental pilot agreement can be scheduled for up to 91 hours for four months of the year and 87½ hours for the remaining months; and Delta can build monthly schedules up to an average of 82 hours. (Newgren Decl. ¶ 122; Trial Tr. 114:9–13, May 14, 2012 (Roghair) (conceding that APA proposal of 81 hours is below the majority of industry competitors); Trial Tr. 135:10–20, May 15, 2012 (Rosselot)).

### e) Sick Leave

The use of sick leave by American's pilots has increased by 60% since 2000, and in 2011, the average pilot was paid 78.4 hours of sick leave, more than one month's worth of flying.  (Newgren Decl. ¶ 157).  American's pilots also use more sick leave than any of their network airline peers.  (Newgren Decl. ¶ 157; AA Ex. 1302).   Under the March 21 Proposal, pilots will receive 100% of their hourly base rate for the first two occurrences of sick leave taken in a year (or 36 hours, whichever occurs first).  (Newgren Decl. ¶ 162; AA Ex. 1733).   Under most circumstances, a pilot will be able to return to work without providing substantiation. (Newgren Decl. ¶ 162; AA Ex. 1733).   Additional sick occurrences would be paid at 60% of their hourly base rate, but the pilot will be required to provide adequate medical substantiation. (Newgren Decl. ¶ 163; AA Ex. 1733).

The APA notes that three separate labor arbitrators have ruled that the disciplinary provisions of the current pilot collective bargaining agreement provide American with sufficient procedures to identify potential misuse of sick leave.  (Roghair Decl. ¶56; APA Exs. 419–422). It argues that the proposal will pressure pilots to fly when they are unwell and unable to do so, putting the pilots, the flight attendants and the public at risk.  (Roghair Decl. ¶57).

The Court finds that the Company's proposed changes are a reasonable way to address the extremely large amount of sick leave and the costs imposed on the Company, which totaled $88.6 million for 2011 alone.  (Newgren Decl. ¶ 157).  The pilots' use of sick leave is the highest amongst American's network peers and its costs must be controlled for the Company to remain competitive.  The Court does not credit the APA's contention that pilots would fly when they are too unwell to do so.  American's pilots are highly trained and disciplined professionals, and the Court does not believe they would put themselves, the flight attendants and the public at such

risk.  Furthermore, there are checks in place to deal with pilots who report to work too ill to fly.

(Trial Tr. 102:6–9, May 14, 2012 (Roghair)).

### f)  Valuation of Proposal

The APA contends that American has failed to show the necessity of the March 21

Proposal because the proposal would produce significantly more in annual savings than the

Company's $370 million target.  The APA has calculated the value of the savings at $460

million, exclusive of savings associated with changes to the scope clause.  The APA attributes

this difference to American's undervaluation of several of its proposals.  (APA Ex. 208).  The

Court finds that there are adequate explanations for the larger cost differences cited by the

APA.[52]

The largest of these differences as to the APA relates to changes in the policy on crew

rest seats, which the APA asserts American has undervalued by $24 million.  (APA Ex. 208).

American's proposal would eliminate one of the two seats reserved for a pilot that is resting and

move the pilot to business class on airplanes with a three class configuration.  (Trial Tr. 77:13–

20, May 15, 2012 (Clark)).  This would in turn make additional first class seats available for sale

to customers.  (Trial Tr. 77:21–24, May 15, 2012 (Clark)).  In assigning value to its proposed

labor cost reductions, however, the APA notes that American considered only direct labor cost

items and did not include a value for changes that would increase American's revenues but not

reduce its costs.  But as this methodology is consistent with the treatment of such items by US

Airways, United, Delta, and Northwest in their bankruptcy proceedings, the Court rejects the

APA's objection.  (Trial Tr. 97:21–98:4, 119:23–120:2, May 14, 2012 (Roghair); Trial Tr.

---

[52]  The APA asserts that $30 million of this undervaluation relates to active and retiree medical plans.
(APA Ex. 208).  The Court has already addressed these issues and, for the reasons previously stated,
accepts the Company's valuations.

78:23–79:17, May 15, 2012 (Clark); AA Ex. 1733).  For the remaining differences, the Court

also finds American's proposal to provide reasonable valuations.  The APA admits that valuation

is not an exact science, that the data sets and methodologies used by the Company and the APA

are very close, and that the major differences in valuation relate to assumptions on which experts

can disagree.  (Trial Tr. 53:24–54:20, May 15, 2012 (Clark)).[53]

### B.  Fair and Equitable Treatment

Section 1113(b) requires that the proposed modifications affect all parties in a fair and

equitable manner.  The APA argues that American's request for rejection of the collective

bargaining agreement should be denied because the March 21 Proposal does not provide for fair

and equitable treatment to the pilots and other unionized employees.  More specifically, the APA

contends that American has failed to establish that the March 21 Proposal will require

proportionate sacrifices from all stakeholders.  The APA argues that the concessions being asked

of the pilots and unionized employees are unfairly disproportionate because they are based on the

current, stand-alone Business Plan, while non-labor stakeholders will have the opportunity to

benefit from the synergies that will be produced by a final plan of reorganization based on

consolidation.  For the reasons stated above, however, the Court rejects the APA's argument.[54]

---

[53]  The APA raises a number of other specific arguments relating to American's proposal, including issues as to compensation, sequence protection, distance learning, compensable hours, check airmen, training flexibility, rigs, fatigue and brake release.  These items were not addressed in the APA's post-trial findings of fact and conclusions of law, but were raised in declarations, often in a summary fashion, with little, if any, live testimony at Trial.  Given the totality of the evidence, the Court believes that American has met its burden of showing that these items are reasonable when viewed in the context of the entire proposal, the needs reflected in the Business Plan, the practices in the industry, American's significant losses, and its need to reduce costs with respect to the pilot group to effectively compete in the industry.  Accordingly, the Court overrules any objections by the APA to these proposed changes.

[54]  The APA argues that the preponderance of the evidence demonstrates that the final plan of reorganization will be significantly different from the current Business Plan.  The Court rejects this argument for the reasons previously discussed.  At this juncture a transaction based on consolidation

The Court further concludes that the evidence establishes that the proposed modifications here are fair and equitable. A debtor can meet the fair and equitable requirement "by showing that its proposal treats the union fairly when compared with the burden imposed on other parties by the debtor's additional cost-cutting measures and the Chapter 11 process generally." *Northwest*, 346 B.R. at 326 (citing *Carey Transp.*, 816 F.2d at 90). It is undisputed that all constituencies will be asked to sacrifice during the Debtors' Chapter 11 process. American has taken steps during this case to reduce its non-labor costs relating to its fleet, facilities, vendor relationships, and balance sheet. (Trial Tr. 177:14–24, April 24, 2012 (Goulet)). American has identified 10,000 vendor contracts that it will address during the course of these cases, including many which will be rejected in their entirety. (Trial Tr. 179:13–180:3, April 24, 2012 (Goulet); American's Proposed Findings ¶ 51). It has also been acknowledged that unsecured creditors are not expected to be paid in full through the Debtors' plan of reorganization. (Trial Tr. 94:4–25, May 23, 2012 (Goulet); Trial Tr. 69:15–21, May 25, 2012 (Butler)). Non-unionized employees are also being impacted by cuts. Both union and non-union employees are being targeted for a 20% reduction in direct labor costs. (AA Ex. 507). Management and support staff will undergo direct annual labor cost reductions of $165 million and agents, representatives and planners will undergo direct labor cost reductions of $95 million annually. (Wright Decl. ¶ 61).

The APA argues that the pilots are being asked to make a disproportionate sacrifice when compared to other constituencies at large. Specifically, the APA argues that American's refusal to value the contractual modifications to the pilots' scope clause has led to a disproportionate "ask" of the pilots in the March 21 Proposal. American concedes that the proposed

is speculative at best, and the Court will not base a decision to deny American's request on mere conjecture.

modifications to the scope clause would account for a substantial majority of the $1 billion in

revenue enhancements that the Company would receive from the Business Plan. (Trial Tr.

252:11–17, April 24, 2012 (Goulet)). In valuing the proposed reductions to labor costs,

however, American specifically excluded changes, like these proposed changes to the scope

clause, that would increase American's revenue but not reduce its costs. American's approach is

consistent with how the same items were treated in the bankruptcy cases of US Airways, United,

Delta and Northwest. (Trial Tr. 97:21–98:4, May 14, 2012 (Roghair); Trial Tr. 78:23–79:17,

May 15, 2012 (Clark)). Furthermore, the APA did not receive monetary credit for similar

proposed changes to the scope caluse in the term sheets it recently signed with US Airways.

(Trial Tr. 119:23–120:2, May 14, 2012 (Roghair)).

　　　The APA also argues that the proposed changes to scope are not fair and equitable

because the Company's current plan to expand the use of regional jets is likely to result in the

loss of at least 313 pilot jobs and cost $21 million annually in lost wages and benefits. (Clark

Decl. ¶ 68). The APA argues that these cost reductions are in addition to the $370 million "ask"

by American. The Court disagrees. The Court credits American's arguments that the pilots are

not engaging in any monetary sacrifices because the scope changes all relate to flying currently

not done by American and the changes are designed, in fact, to increase mainline flying by

bringing additional passengers into American's hubs. (Trial Tr. 198:13–199:7, April 25, 2012

(Vahidi)). At Trial, Allison Clark, the APA's Director of Industry Analysis, failed to

demonstrate that these changes would result in a net loss of flying for the pilots. For example,

she admitted that the Company is permitted to drop routes because they are unprofitable. (Trial

Tr. 83:13–19, May 15, 2012 (Clark)). She further conceded that the routes she considered in

reaching her $21 million figure for lost wages consisted, for the most part, of such "marginal or unprofitable flying." (Trial Tr. 83:7–12, May 15, 2012 (Clark)).[55]

The Court also rejects the APA's argument that the overall size of the proposed sacrifices are unfair and inequitable given the sacrifices the APA made in negotiating its current contract in 2003. The APA argues that under the 2003 collective bargaining agreement, the pilots gave a larger percentage of the annual concessions achieved by the Company when compared to the amount of their labor costs and the size of their workforce, especially when compared with management. But the Section 1113 analysis compares a union's current contract with the proposal made by the debtor. No party disputes that all the Unions sacrificed in 2003 to allow the Company to avoid bankruptcy. The Company now seeks further concessions of all these Unions, with a 20% cut from each as against the status quo.[56] In this district, the case law suggests that an across-the-board-cut—such as the 20% proposed here— satisfies the statutory standard because "such a showing would assure the court that these affected parties are being asked to shoulder a proportionate share of the burden." *Carey Transp.*, 816 F.2d at 90. Given American's extreme losses over the past decade and that the requested changes are necessary to bring American generally in compliance with the labor costs and structure of its competitors, the Court finds that the proposed uniform cut of 20% is fair and equitable.

---

[55] Notably, the APA is not alone in arguing that it is being singled out for disproportionate sacrifice. At Trial, the TWU also challenged the overall size of the proposed sacrifices as unfair and inequitable give the TWU's current contract. Specifically, the TWU maintained that its current contract was closer to industry norms than the contracts for the pilots and the flight attendants and that because the TWU did not contribute as much to American's "labor gap" with the industry, the TWU should not be asked to sacrifice as much as the pilots and the flight attendants.

[56] The Section 1113 proceeding is fundamentally an inquiry comparing a union's current collective bargaining agreement with the proposal for changes made by a debtor. *See* Section 1113 (permitting rejection of existing collective bargaining agreement by evaluating, among other things, whether the proposal made by the debtor satisfies various criteria). Thus, it is not a vehicle to fundamentally revisit the wisdom of a collective bargaining agreement entered into almost a decade ago.

### C.  Complete and Reliable Information/Information Necessary to Evaluate the Proposal

Section 1113(b) provides that the proposal made by the debtor must be based on the most complete and reliable information available at the time the proposal is made.  The APA maintains that the March 21 Proposal was not based on the most complete and reliable information available at that time.  The APA's primary argument is that American failed to consider a merger transaction when formulating the March 21 Proposal.  This issue has been addressed above and the assertion is rejected here.  The APA also argues that American has improperly failed to analyze the impact of a smaller labor "ask" on its Business Plan.  But as the Court has already rejected the APA's challenge to American's Business Plan, the Court rejects this argument as well.  Having rejected these arguments, the Court finds that American has based the March 21 Proposal on the most complete and reliable information available at the time it was made.  *See Mesaba*, 350 B.R. at 454 (quoting *In re United States Truck Co. Holdings*, 2000 Bankr. LEXIS 1376, at *39 (Bankr. E.D. Mich. Sept. 29, 2000)) (issue is whether debtors have made "an honest effort to compile all data relevant to making its proposal").

The Court now turns to the next requirement of Section 1113, which requires that a debtor provide the union with the relevant information necessary to evaluate the debtor's proposal.  "[T]he breadth and depth of the requisite information will vary with the circumstances, including the size and complicacy of the debtor's business and work force; the complexity of the wage and benefit structure under the collective bargaining agreement; and the extent and severity of modifications that the debtor is proposing."  *Mesaba*, 341 B.R. at 714.  The APA contends that American has failed to provide it with the specific bits of relevant information necessary to evaluate the March 21 Proposal.  The Court rejects the APA's argument.

The Company has provided the Unions with the information necessary for them to evaluate the proposal. The chair of Rothschild's global restructuring practice, David Resnick, testified that the Business Plan was subject to "one of the most substantial diligence processes of stakeholder groups" in which he had been involved during his long career. (Trial Tr. 146:25–147:5, May 22, 2012 (Resnick)). Prior to the filing of the bankruptcy case, American already had in place an extensive policy of information sharing. Specifically, American would provide the Unions with the same monthly financial information that management provided to the Board of Directors, and hosted monthly meetings with the Unions during which senior management would make financial presentations and senior financial officers would be available for questions from the Unions. (Lynn Decl. ¶ 7). During past negotiations, American and the APA specifically created a model for estimating the value of work rules changes, which has led the two to reach common ground on the valuation of many items under discussion in the Section 1113 context. (Lynn Decl. ¶ 8).

During the Section 1113 process, the Company gave high priority to the fielding of Union information requests. (Brundage Decl. ¶ 37). On February 1, 2012, the opening day of the Section 1113 process, American met with the Unions to discuss the Business Plan and each Union's treatment under the proposals. (Lynn Decl. ¶¶ 12–15). That same day, the Company provided the Unions with the information that was the basis for American's proposals, including the financial modes, the costing formulae and protocols and the assumptions that America made in constructing the proposals. (Lynn Decl. ¶ 20). In the following weeks, information sessions were set up so that the Company's subject matter experts could provide additional details and

data.[57]  The Company also received over 570 information requests from the Unions, including

120 from the APA.  (Lynn Decl. ¶¶ 38–39).  American extended use of a web-based data room

called Interlinks to the Unions to facilitate the sharing of information, and entered into a detailed

protocol with the Unions to enable the sharing of confidential information.  (Lynn Decl. ¶¶ 16–

19).   According to reports run on Interlinks, the following information was accessed by the

APA:

---

[57]   The information sessions with the APA and its advisors included:

- On February 2, 2012, Brian McMenamy, Vice President and Controller, provided a detailed briefing regarding the costing methodology used in the valuations of American's proposals.

- On February 2, 2012, Beverly Goulet made the Business Plan presentation, shared with all of the Union teams on February 1, available to APA's Board of Directors, at their request.

- On February 3, 2012, advisors for each of the Unions participated in a detailed session on the Business Plan Model presented by Candice Irvin, Managing Director of Corporate Development. This session was attended by Union leadership and advisors.

- On February 6 and 10, 2012, Tricia Hershell, American's Senior Manager of Benefits Strategy, met with Union members and advisors to describe American's active and retiree medical proposals.

- On February 14, 2012, Mary Anderson and Gary Ford held a session for APA leadership and advisors regarding retirement benefits/pension and sick benefits.

- On February 17, 2012, Beverly Goulet, Jeff Brundage and Denise Lynn met with APA leadership and advisors to respond to questions about the Company's proposals and Business Plan.

- On March 1, 2012, Don Casey, Vice President of Revenue Management, Chuck Schubert, Vice President of Network Planning, Jim Butler, Managing Director of Corporate Planning, and Candice Irvin held a network and IFS presentation for APA, APFA, and TWU leadership and advisors.

- On March 7, 2012, Virasb Vahidi, Chief Commercial Officer and Senior Vice President of Marketing and Planning, Beverly Goulet, and Jeff Brundage presented the commercial and network strategy underlying the Business Plan to APA's Board of Directors and advisors.

- On March 16, 2012, Candace Irvin and representatives from Rothschild presented information regarding the updated business plan model changes to APA, APFA, and TWU leadership and advisors.

(Lynn Decl. ¶¶ 22-37).

|  | Documents Made Available | Pages of Information |
|---|---|---|
| APA Negotiating Committee Members | 632 | 10,743 |
| APA Lawyers/Advisors | 1,129 | 31,921 |

(Lynn Decl. ¶ 39; AA Ex. 1507); (*see* Lynn Decl. ¶¶ 41– 73 and AA Ex. 1503 for discussion

regarding document and information request from the APA and its counsel and advisors and the

Company responses).

Notwithstanding the extensive information provided, the APA complains that American

failed to provide them with information and analysis on the Company's fleet order in July 2011.

The APA states that the information is necessary to evaluate the March 21 Proposal because the

fleet order was a driver of American's Business Plan, including the amount of the concessions

asked of the unions.  The financial advisors specifically requested two categories of information

that the APA claims American failed to supply.  First, they requested a copy of the Business Plan

model with aircraft purchases recharacterized as financed capital expenditures instead of

operating leases.  (Yearley Decl. ¶ 35, Appx. B).  However, American informed the APA that it

had not performed such an analysis because the Business Plan was based on leasing and not

purchasing the aircraft in the fleet order.  (Lynn Supp. Decl. ¶¶ 8, 14, 16).  American instead

provided a board presentation containing the reasoning behind the structure of the fleet order and

American's net present value analysis of the transaction.  (Lynn Supp. Decl. ¶ 13).  American

also provided access to a document containing information on the aircraft order and how the

Company analyzed fleet replacement economics.  (Lynn Supp. Decl. ¶ 15).  The APA refers to

the board presentation that was provided as highly redacted and lacking pertinent information.

(Trial Tr. 191:2–7, May 14, 2012 (Yearley)).  American states that pricing information was
redacted from the presentation due to third party confidentiality agreements, but it contained the
net present value number that the Company had calculated to quantify the benefit of the
transaction.  (Lynn  Supp. Decl. ¶ 13; AA Ex. 1803).  In any event, American's failure to run an
analysis for the APA that did not previously exist cannot be considered a failure to provide the
APA with information necessary to evaluate the proposal.  "Section 1113(b)(1)(B) cannot be
read to mandate a debtor's performance of further analysis on existing source data; it only
compels the disclosure of that data and any previously-performed analysis. . . . "  *Mesaba*, 341
B.R. at 718–19 ("The Debtor's response was that it had not performed such an analysis.  During
the hearing, [the union] did not develop any evidence that the Debtor had.  Thus, because the
Debtor could not produce nonexistent financial information, it is unclear why this issue persisted
in [the union's] objection."); *see also Maxwell Newspapers*, 146 B.R. at 931.

Second, the APA blames American for failing to provide documents in response to the
APA's request for "all analyses (including management and board presentations) performed by
American or its advisors that relate to the projected return on investment and net present value
associated with all planned widebody and narrowbody aircraft purchases in the Business Plan."
(Yearley Decl. ¶ 35, Appx. B).  At the time the APA requested this document on March 26,
2012, (AA Ex. 1805 (referring to the request as "new")), American had not performed a return
on invested capital analysis, but it had conducted a net present value analysis which it made
available to the APA's advisors.  (Lynn  Supp. Decl. ¶ 18).  As an accommodation, however,
they subsequently prepared a return on invested capital analysis and provided it to the APA on
April 25, 2012.  (Lynn  Supp. Decl. ¶ 19).  While American did not provide this document until

after the Section 1113 motion was filed, the timing of the APA request on March 26th made understandable the delay in providing the information.

Third, the APA argues that American did not provide its Manpower Planning Model or information sufficient to understand the model at any time prior to the commencement of the Trial. The Manpower Planning Model is used by the Company to project its future pilot staffing needs. The APA argues that without the model, it was unable to sufficiently evaluate the impact of the Company's modifications to work rules relating to scheduling and productivity.

The Company admits that it did not provide a live version of the model itself, but cites concerns regarding proprietary software and the complexity of the model. (Trial Tr. 100:14–17, May 22, 2012 (Newgren)). American did, however, set up a two-day meeting with the APA, during which experts familiar with the model explained how it works, answered all questions that the APA had regarding the model and allowed the APA to test seven different scenarios that it requested be run. (Trial Tr. 100:18–101:8, 105:14–106:13, May 22, 2012 (Newgren); Trial Tr. 147:9–148:9, May 15, 2012 (Rosselot)). During the course of the meeting, the test results were projected on a screen and parties took notes. (Trial Tr. 105:24–106:5, May 22, 2012 (Newgren)). At the end of the meeting, the APA stated that it did not need any additional runs, but requested copies of the output that had been projected on the screen. (Trial Tr. 106:6–13, May 22, 2012 (Newgren); Trial Tr. 148:7–14, May 15, 2012 (Rosselot)). The APA ultimately received copies of the outputs for only three of the seven scenarios because American accidentally posted the incorrect document to Interlinks. (Trial Tr. 106:18–109:19, May 22, 2012 (Newgren)). While the APA made several follow-up requests for the information, at no point prior to the Trial did the APA indicate to American that the incorrect document was posted on Interlinks. (Newgren Supp. Decl. ¶ 18).

85

The APA cites to *Mesaba* for support that a debtor must provide detailed information regarding its business plan, including "live" versions of mathematical models used to support the plan. In that case, the debtor refused to provide the union with the dynamic model used in financial forecasts with certain fleet configurations. Witnesses for the union testified that "the debtor had been 'completely opaque'" with respect to the model. *Mesaba*, 341 B.R. at 716. The court held that

> industry-wide experience establishes such a model as 'relevant information as is necessary to evaluate' an employer's proposal for concessions from a union. Thus, the Debtor's failure to provide it to its unions, which could have been done under reasonable controls and under appropriate circumstances, means that the Debtor did not provide the information to them that the . . . element required it to do before it brought th[e] motion.

*Id.* at 717. In contrast to the facts in *Mesaba*, the Court believes that the access the APA was provided to the model here was adequate. Unlike the debtor in *Mesaba*, American was far from "opaque," providing the APA with significant amounts of information.[58] The APA was essentially able to test the model through the scenarios that American ran and had access to the outputs during the meeting.[59]

---

[58] The Court will not find American to have failed this prong of Section 1113 solely based on the failure to produce this information—in what appears to be an inadvertent error—considering the volume of documents and analysis provided, as well as the extensive requests for information.

[59] Additionally, the APA argues that American failed to provide adequate information because they did not provide valuations of the APA's counterproposals. However, "[c]ourts have construed this requirement as reaching only that existing information which is required to evaluate the trustee's proposal, not to the creation of new analyses, nor the provision of information necessary to evaluate the union's counter-proposals." Collier ¶ 1113.04[2] (citing *Carey Transp.,* 50 B.R. at 208–209, *aff'd*, 816 F.2d 82 (2d Cir. 1987) ("The Union never contended that Carey failed to supply financial information necessary to evaluate Carey's proposal. . . . That the Union is not satisfied with the Debtor's proposals and that the Debtor did not adopt one of the Driver's counter-proposals are insufficient bases to support a finding that Carey failed to provide relevant financial information.")).

86

### D.  Good Faith Negotiations/Good Cause to Refuse the Proposal

Section 1113(b)(2) requires that after a proposal is made, but before a hearing on

rejection, the debtor meet with the union at reasonable times[60] to negotiate in good faith.

Relatedly, Section 1113(c)(2) requires that a collective bargaining agreement can only be

rejected if the union has refused to accept the proposal without good cause.  For a variety of

reasons discussed below, the APA argues that American has failed to negotiate in good faith[61]

and that it had good cause to reject American's proposal.

### 1.  Criticism that American Failed to Change Its Section 1113 Request for Concessions

The APA first complains that American did not change its labor "ask" from its initial

proposal on February 1, 2012 to the last proposal before the filing of the Motion.  The APA

contends that the Motion should therefore be denied because of American's failure to

compromise.  *See* APA Proposed Findings ¶¶ 47–49, 60–61.  Given the facts in this case, the

Court does not agree.

As an initial matter, a debtor must approach the negotiations under Section 1113 from a

different vantage point than is usually taken during collective bargaining.  In typical labor

negotiations, both sides will begin with a more aggressive position than they believe can be

---

[60]  Section 1113(b)(2) provides that between filing of the proposal and the hearing on the application for rejection, the Debtor must "meet, at reasonable times, with the authorized representative."  11 U.S.C. § 1113(b)(2).  The Court finds that American has expressed its willingness and availability to meet for negotiations and no serious allegations have been made to the contrary.  American argues that it is the APA that effectively abandoned negotiations in favor of discussions with US Airways.  It appears that negotiations between American and the APA did stall for a period of time.  (Trial Tr. 115:17-116:21, May 14, 2012 (Roghair)).  But given that discussions continued to take place, the Court finds that both sides have demonstrated their willingness to take part in the negotiation process.

[61]  The APA also argues that American did not negotiate in good faith because the Company unilaterally decided where savings resulting from valuation changes should be applied, as opposed to seeking input from the APA.  However, the APA admitted that it never suggested alternative methods for allocating these savings.  (Trial Tr. 75:8-76:21, May 14, 2012 (Roghair)).

achieved, and then negotiate towards a middle ground.  (Brundage Decl. ¶ 39).  The Company

here understood, however, that Section 1113 imposes a statutory obligation to put forth proposals

that are necessary for reorganization.  (Brundage Decl. ¶ 39).  It was concerned, therefore, that

following the traditional pattern of collective bargaining negotiations—by putting forward a

proposal that exceeds what is necessary and then shifting towards the center—would fail the

statutory test.  (Brundage Decl. ¶ 39).

    While American did not make many changes to the APA proposal, it did make some

changes that demonstrate good faith bargaining, both to its valuations and its proposals.  (Trial

Tr. 74:9–75:7, May 14, 2012 (Roghair); Trial Tr. 188:15–189:10, April 26, 2012 (Brundage);

Brundage Decl. ¶¶ 44, 46).  One of these changes was particularly significant: American decided

to freeze its pensions rather than terminate them.  (Trial Tr. 187:15–188:4, April 26, 2012

(Brundage)).[62]  It is undisputed that the economic effect of the change in the treatment of

pensions is sizable and benefits the APA.  Indeed, all the Unions objected to the termination of

the pension plan.  As compared to termination, a pension freeze is a significant improvement.

Significantly, the Company did not seek to offset the added costs from the pension freeze

through additional labor cost reductions, but chose to address it through other means.  (Brundage

Decl. ¶ 43; Trial Tr. 258:15–259:24, April 24, 2012 (Goulet) (American chose to address the

issue through the concept of a rights offering)).[63]

---

[62]  In addition to freezing the pension plan, American also decreased the amount of contributions for
medical benefits from 23 to 21 percent.  (Wright Decl. ¶¶ 26-27).

[63]  There are hurdles to American's plan to freeze the pilots' pension plans.  (Brundage Decl. ¶ 43 n.26).
The APA and American are working together with the PBGC to resolve these issues and move
forward with freezing, as opposed to terminating, the plan.  (Brundage Decl. ¶ 43 n.26).  In any event,
these issues are not before the Court.

The change also represents a significant additional hurdle to American's re-emergence

from bankruptcy. As explained by American's investment banker, American will now be

required to make significant cash contributions that had not originally been factored into the

initial Business Plan. (Resnick Decl. ¶ 17). Additionally, freezing the pension plans would

result in significant pension underfunding liability upon emergence from bankruptcy. (Resnick

Decl. ¶¶ 17–18). American must compete against LCCs that do not carry the same pension

obligations. To compete, therefore, American must carry a cost structure that enables it to

generate cash flow consistent with these competitors. (Resnick Decl. ¶ 19). Additionally,

retaining the pension liabilities and the related ongoing cash payments impacts the credit profile

of the Company, which must be taken into account when evaluating the capital structure,

liquidity profile and capital needs of the Company on a going forward basis. (Resnick Decl. ¶

20).

American's unwillingness to move on the other savings requested in its initial proposal is

not necessarily a failure to confer in good faith. While "a debtor [generally] cannot be said to

comply with its obligation . . . to 'confer in good faith in attempting to reach mutually

satisfactory modifications' when it steadfastly maintains that its initial proposal . . . is non-

negotiable," parts of a debtor's Section 1113 proposal may be non-negotiable if they are essential

to its reorganization. *Delta*, 342 B.R. at 697 (citation omitted) (cited in *Mesaba*, 350 B.R. at

458). Thus, it is not bad faith to adhere to a necessary cost-saving target. *See, e.g.*, *Northwest*,

346 B.R. at 327 ("[D]epending on the facts of the case, a debtor may not be obligated to reduce

the total amount of cost savings requested in its original proposal to demonstrate good faith.");

*Indiana Grocery*, 136 B.R. at 195–96 (holding debtor's proposal was not "on a take it or leave it

basis" where it was willing "to negotiate on any point as long as result was the overall 16.5%

labor cost reduction"); *Mesaba*, 350 B.R. at 458 ("Because the Court affirms the bankruptcy court's finding that a 19.4% labor cost cut and six-year fixed contracts were necessary, it also affirms the bankruptcy court's finding that Mesaba negotiated in good faith by presenting those necessary provisions and refusing to negotiate away from them.").[64]  American has made clear to the Unions that it is open to ways to achieve its labor ask that are different from those proposed by the Company provided that the same overall monetary reduction is achieved.  (Brundage Decl. ¶ 28).

Relatedly, the APA objects that American's proposals after bankruptcy are far more draconian than those presented earlier, including those discussed in November 2011.  For example, the APA disputes that the $370 million ask from the pilots is necessary.  It cites to a presentation given to American's Board of Directors in November 2011 and subsequently provided to the Unions during the Section 1113 process to demonstrate that the Company reached its $260 million figure of a pilot labor cost gap by using an overall labor cost gap for all employee groups of $625 million.  (APA Ex. 410).  The APA notes that under the presentation, American projected that if it could achieve its November 2011 proposals, it would be able to close the pilot labor cost gap by 2014.  (Roghair Decl. ¶ 31).  But that exhibit does not support the APA's position.  While the presentation cites a *contractual* labor cost gap of $600 million, it also identifies other sources that contribute to American's labor cost deficiencies, including retiree medical and pension costs, seniority costs, fleet mix, and other differences.  The

---

[64]  *See also In re Hostess Brands, Inc.*, Case No. 12-22052 (Bankr. S.D.N.Y.), Hr'g Tr. 106:11-107:19, May 14, 2012 ("I conclude first that it is more common in an 1113 context for debtors-in-possession to move the pieces around in a collective bargaining proposal to try to obtain the result that is in monetary terms acceptable to the debtor and in terms of specific emphasis still acceptable to the union.").

presentation thus identified a combined labor related gap of approximately $1 billion.  (APA Ex.

410 at 43; Trial Tr. 71:5–72:11, May 14, 2012 (Roghair)).[65]

In any event, American concedes that its current proposal goes further than the pre-

petition concessions sought from the Unions.  Those pre-petition negotiations, however, were an

attempt to balance the twin goals of lowering the Company's costs and enhancing productivity

while at the same time trying to reach a consensual deal with the Unions that could avert a

Chapter 11 filing.  (Brundage Decl. ¶ 30).  These proposals were designed to be acceptable to the

Unions, as opposed to fully addressing the Company's financial issues.  (Trial Tr. 170:19–171:1,

183:19–24, April 26, 2012 (Brundage)).  In contrast, the Section 1113 proposals are designed as

part of a comprehensive Business Plan for a reorganized entity that will be profitable going

forward.  (Brundage Decl. ¶ 31).  American notes that, in hindsight, the pre-petition proposals

would have been inadequate, as they were based on assumptions that have not yet come to pass:

improvement in the economy, stabilization of fuel prices, and convergence with other airline

costs.  (Trial Tr.171:4–10, April 26, 2012 (Brundage); Brundage Decl. ¶ 33).  As noted

previously, "restructurings [often] require management to reconsider long-held beliefs on the

composition and strategy of the company."  Adrian Frankum, Armen Emrikian & James

Guglielmo, *Liquidity Provides Optionality: An Approach for Boards During a Liquidity Crisis*,

*in* NAVIGATING TODAY'S ENVIRONMENT: THE DIRECTORS' AND OFFICERS' GUIDE TO

RESTRUCTURING 128 (John Wm. Butler, Jr. & Nigel Page eds., 2010).

---

[65]    Indeed, the APA admits that the $600 million figure in this document does not provide a full picture
of the cost differential between American and other airlines.  (Trial Tr. 44:3-13, May 15, 2012
(Clark)).

## 2. American's Alleged Refusal to Negotiate over Specific Terms

The APA contends that American has refused to negotiate over certain terms of its proposal, such as the scope clause and sick leave. The APA specifically argues that American has not shown that these particular terms are essential to its reorganization and that the APA's counterproposals would enable the Company to achieve the revenue enhancements contemplated in the Business Plan. *See* APA Proposed Findings ¶ 23. Essentially this objection is not based on American's refusal to negotiate, but rather American's refusal to adopt the counterproposals of the APA. As such, the objection appears to conflate the requirement to negotiate in good faith with the requirement of necessity. *See Maxwell Newspapers*, 981 F.2d at 89 (noting that making the requirement of good cause dependent on necessity or unfair burden makes the "requirement of § 1113(c)(2) depend entirely upon the satisfaction of the requirements of § 1113 (b)(1)(A)," thereby rendering the requirement "surplusage because it would add nothing to the existing substantive requirements of § 1113(c)(1) of the statute."); *see also Carey Transp.*, 816 F.2d at 91–92 (same).

The APA admits that reasonable people can disagree on the type of valuation issues that are left between itself and the Company. (Trial Tr. 54:7–20, May 15, 2012 (Clark)). There is no evidence on the record that American has taken these positions in bad faith or to stalemate negotiations. *See Northwest*, 346 B.R. at 327 ("A union may also argue that any part of a proposal was included by the employer in bad faith, in an attempt to stalemate negotiations and allow it to obtain outright rejection rather than a negotiated compromise. . . . There is no room, on the record of these cases, to contend that the Debtors have insisted on terms in bad faith or in an effort to stalemate negotiations.") (internal citations and quotations omitted).

92

As noted above, American has shown flexibility in the allocation of concessions. Specifically, "almost without exception, the Company is willing to consider any reasonable alternative suggestions the Union might have to the Company's cost reduction proposals so long as the total cost reduction total is met." (Brundage Decl. ¶ 28). If anything, the failure to come to an agreement shows that both sides have become entrenched. Given these circumstances, the Court does not find that American's failure to adopt the proposals of the APA constitutes a failure to negotiate in good faith. *See Kentucky Truck Sales*, 52 B.R. at 802 ("After evaluating the parties' differences on the major issues of health care benefits and salary reductions, it is clear that the parties were unable to reach a compromise on these issues due to their differing interests and the 'distance' between their two offers, rather than to any lack of good faith on the part of either party."); *In re Salt Creek Freightways*, 47 B.R. 835, 840 (Bankr. D. Wyo. 1985) ("With regard to the second area of disagreement, the concerns and interests of the parties are great. Resolution of this issue will require a major realignment of the competing interests, and the failure to reach agreement appears to be the result of the difficultness of the task, rather than the lack of "good faith" of either party.").

### 3. American's Alleged Refusal to Accept the APA's Counterproposal

Under Section 1113(c)(2) a collective bargaining agreement can only be rejected if the union has refused to accept the proposal without good cause. "[E]ven though the debtor retains the ultimate burden of persuading the court that the union lacked good cause for refusing proposed modifications, the union must come forward with evidence of 'its reasons for declining to accept the debtor's proposal in whole or in part.'" *Carey Transp.*, 816 F.2d at 92 (quoting *Royal Composing*, 62 B.R. at 407 & n.5. If a union insists on economically unworkable terms without offering a compromise that will provide the debtor with necessary savings, the court will

93

find that the union has not acted with good cause.  *See Maxwell Newspapers*, 981 F.2d at 85

(citing *Royal Composing*, 848 F.2d at 349).

The APA argues that it has put forth two alternatives that would permit the Debtors to

reorganize.  First, it states that it negotiated a contingent labor agreement with US Airways that

would generate $240 million in annual savings for the Company.  But this merger transaction

with US Airways has been discussed above, and the Court rejects the argument that an

agreement on labor costs between the Unions and US Airways constitutes a viable alternative

that would permit American to reorganize.

Second, the APA contends that it has put forward a package that would allow American,

as a standalone company, to generate between $260 and $270 million in annual savings.  *See*

APA Proposed Findings ¶ 25.  Courts have held that "a union will not have good cause to reject

an employer's proposal that contains only those modifications essential for the debtor's

reorganization, that is, the union's refusal to accept it will be held to be without good cause. On

the other hand . . . where the union makes compromise proposals during the negotiating process

that meet its needs while preserving the debtor's savings, its rejection of the debtor's proposal

would be with good cause." *Maxwell Newspapers*, 981 F.2d at 90 (citing *Royal Composing*, 848

F.2d at 349).   The Court finds that the APA's reliance on its counterproposal was not a good

cause basis for the APA to reject American's proposals.  American has stated that it needs at

least $370 million in cuts to successfully reorganize, excluding changes to the scope clauses.

The APA admits that its counterproposal will generate only between $260 and $270 million in

annual savings.  As the APA has admittedly failed to provide cuts in that amount, its rejection of

American's proposals lacks good cause.

Moreover, while the APA's counterproposal addresses key issues like use of regional jets, codesharing and sick leave, the terms of the counterproposal are highly conditioned and flawed.[66] The APA's counterproposal for regional jets provides one example. The counter-proposal provides, among other things, that American could utilize a total of up to 534 regional aircraft, including 150 regional jets with 51 to 70 seats and a MTOW of 80,500 pounds, but requires that American add an aircraft in the 70 to 110 seat range to the mainline operations on a one to one basis for every aircraft added in that range (except for the 47 already in service). (Eaton Decl. ¶ 27; APA Ex. 514; Roghair Decl. ¶ 51). But even with this heavily conditioned offer, American would still be unable to use any regional jets over 70 seats, in stark contrast to two of its competitors. (APA Ex. 514). Relatedly, the APA's offer to do all regional flying at the mainline at similar market pay rates and productivity to the regional carriers, (Trial Tr. 99:16–20, May 14, 2012 (Roghair)), is also heavily conditioned; the APA acknowledges that costly mainline contract provisions would apply to this flying, including pension, benefits, sick leave and vacation. (Trial Tr. 99:21–100:10, May 14, 2012 (Roghair)).

Similarly, the APA counterproposal to American for codesharing removes even the existing limited right to arbitration to change those limits and permits expanded codesharing with only three airlines. (Trial Tr. 89:15–22, May 14, 2012 (Roghair)). The counterproposal comes with numerous restrictions that could ultimately result in codesharing becoming unprofitable, including being limited to certain operations, out of certain specific airports and only if the Company meets certain conditions such as maintaining the number of American departures from

---

[66] In addition, the APA's counterproposal touches on a range of other topics, such as freezing the defined benefit pension plans, increasing required contributions for medical coverage for active pilots as well as those that retire in the future, instituting a preferential bidding system, eliminating guaranteed pay for pilot "lineholders," increasing monthly maximums on flying.

95

those airports, meeting certain American block hours requirements or certain percentages of American passengers on those flights. (APA Ex. 516). The APA's counterproposal for sick leave is also problematic. While the APA would consent to a medical verification program, it would not require verification until a pilot has been out for 30 days of uninterrupted sick leave, at which time the Company would have to make a demand for substantiation. (Trial Tr. 102:10–18, May 14, 2012 (Roghair)). If the pilot then returned to work, no substantiation would be required, but the pilot could again call in sick the next day and restart the 30 day period. (Trial Tr. 102:16–23, May 14, 2012 (Roghair)). The APA proposal would also establish a sell-back program for unused pilot sick leave. (Roghair Decl. ¶ 57). Rather than saving money, therefore, this proposed program might cost American additional money because pilots could sell either 30 or 60 hours of sick for pay depending on whether the pilot had accrued more than 1,000 hours of sick time. (Roghair Decl. ¶ 57).

### E. Balance of the Equities

As noted above, the Second Circuit has set forth a non-exclusive list of factors to consider when determining whether the equities clearly favor rejection of a collective bargaining agreement:[67]

(1) the likelihood and consequences of liquidation if rejection is not permitted;
(2) the likely reduction in the value of creditors' claims if the bargaining agreement remains in force;
(3) the likelihood and consequences of a strike if the bargaining agreement is voided;

---

[67] The APA argues that American's burden for this requirement—alone among the Section 1113 factors—must be proven by clear and convincing evidence. *See* APA Opp. at 75 (citing *In re Walway Co.*, 69 B.R. 967, 974 (Bankr. E.D. Mich. 1987); *In re K&B Mounting, Inc.*, 50 B.R. 460, 467 (Bankr. N.D. Ind. 1985)). While the Court does not agree that the appropriate standard is clear and convincing evidence, it concludes that American has satisfied this requirement regardless of whether it must be proved by clear and convincing evidence or merely by a preponderance of the evidence.

96

(4) the possibility and likely effect of any employee claims for breach of contract if rejection is approved;

(5) the cost-spreading abilities of the various parties, taking into account the number of employees covered by the bargaining agreement and how various employees' wages and benefits compare to those of others in the industry; and

(6) the good or bad faith of the parties in dealing with the debtor's financial dilemma.

*Carey Transp.*, 816 F.2d at 93. When balancing these factors, the Court must examine them in relation to the debtor's attempts to reorganize. *See Bildisco*, 465 U.S. at 527 ("[T]he Bankruptcy Court must focus on the ultimate goal of Chapter 11 when considering these equities. The Bankruptcy Code does not authorize freewheeling consideration of every conceivable equity, but rather only how the equities relate to the success of the reorganization.").

The first two factors favor rejection of the collective bargaining agreement. It is clear that rejection of the agreement is necessary for American to successfully reorganize. The Court has noted above that the existing APA agreement is a burden that American is unable to maintain on an ongoing basis and the APA itself has recognized that continuation of the status quo is not a viable option. (Trial Tr. 25:9–11, May 14, 2012). And while the Company has built up a significant cash reserve to carry them through the reorganization process, this reserve would not last for long, as they have historically suffered losses of approximately $6.6 billion since 2003 and cumulative losses of more than $10 billion since 2001. (Goulet Decl. ¶ 7; Kasper Decl. ¶ 33; AA Exs. 10–12, 104). American lost $1.06 billion in 2011, the only network carrier that failed to earn a profit last year. (Trial Tr. 98:20–25, April 24, 2012 (Goulet); Goulet Decl. ¶ 9; AA Exs. 106, 125). While other airlines maintained positive net margins in 2011, American had net margins of -4.4%. (Kasper Decl. ¶¶ 31–32; AA Exs. 10–11). American is currently overleveraged and without change, it will be unable to obtain the capital necessary to emerge as a going concern. American has a much higher percentage of secured debt than the other network

97

carriers, (Trial Tr. 214:13–18, May 14, 2012 (Yearley)), and has run out of unencumbered assets
to pledge as collateral for additional financing.  (Goulet Decl. ¶ 39; Trial Tr. 97:19–98:2, May
23, 2012 (Goulet)).  Furthermore, leaving the agreement intact would severely impact the return
that creditors would receive on their claims.

The diminished likelihood of a strike also weighs in favor of approving rejection of the
agreement.  The Second Circuit has held that following rejection of a collective bargaining
agreement, it would be unlawful for labor to strike until the bargaining process set forth in the
Railway Labor Act has been exhausted.  *See Northwest Airlines Corp. v. Ass'n of Flight
Attendants-CWA, AFL-CIO (In re Northwest Airlines Corp.)*, 483 F.3d 160, 175 (2d Cir. 2007).
Following rejection of the agreement, therefore, both management and a union under the
Railway Labor Act such as the APA would be required to continue negotiating in good faith.
Moreover,

> A strike is an inherent risk in every § 1113 motion, and in the end, it makes little
> difference if the Debtors are forced out of business because of a union strike or
> the continuing obligation to pay union benefits to avoid one. The unions may have
> the legal right to strike, but that does not mean that they must exercise that right.

*Northwest*, 346 B.R. at 329–330 (*quoting Horsehead Indus.*, 300 B.R. at 587).

The Court must also consider the possibility and likely effect of any employee claim for
breach of contract in the event of rejection.  It is unlikely that the Unions would have rejection
claims for breach of contract, as the Second Circuit has observed that "a debtor who rejects a
contract pursuant to [Section 1113] abrogates rather than breaches the [collective bargaining
agreement] at issue."  *Northwest*, 483 F.3d at 170 n.3.  Even if that were not the case, rejection
would relegate employee damage claims "to the status of unsecured debt. . . . . Absent rejection,
and assuming they have the money, the Debtors [would] have to pay these claims, as they

98

accrue, on an administrative basis.  From the viewpoint of the other creditors, rejection is

preferable."  *Horsehead Indus.*, 300 B.R. at 587 (citing 11 U.S.C. § 365(g)(1)).

The Court must also consider the cost-spreading abilities of the various parties, taking

into account the number of employees covered by the agreement and how various employees'

wages and benefits compare to those of others in the industry.  It is undoubted that the sacrifices

the Union employees are being asked to make will affect them deeply.  However, American's

Section 1113 proposal to each Union requested the same sacrifice, together with non-union

employees, of 20% across the board.  This request for across the board reduction must be viewed

in light of the fact that the wages and benefits of APA are above industry standard, a point

conceded by the APA.  *See* APA Findings of Fact, ¶30 ("American's current pilot labor costs are

admittedly greater than those of the other legacy carriers . . .").

Finally, the Court must examine the good or bad faith of the parties in dealing with

American's financial dilemma.  American has asserted that the APA has shown bad faith by

abandoning negotiations with American while pursuing an agreement with US Airways.  Given

that negotiations subsequently resumed and continued even after the close of the Trial, however,

the Court does not find bad faith on the side of either party and this factor is in equipoise.[68]

For all these reasons, the Court concludes that the balance of the equities clearly favors

rejection of the APA agreement.[69]

---

[68]  Notwithstanding all these factors, the APA's primary argument regarding balance of the equities
relies on the possibility of a merger.  For the reasons previously discussed, this argument is rejected.

[69]  The Court has addressed a multitude of the issues raised by the APA, including the issues addressed
in live testimony at Trial.  To the extent an objection was raised by the APA that was not specifically
addressed in this Opinion, however, it is hereby overruled.

### F.  Objections to the Motion By Other Parties

During the course of these Section 1113 proceedings, various subgroups to the APA, specifically the Supplement B and the Supplement CC pilot beneficiaries ("Supplement B Pilots" and "Supplement CC Pilots" respectively), objected to the Motion.  For the reasons stated below, the Court overrules these objections.

The Supplement B Pilots are current American pilots who have been on American's active payroll since November 1, 1983.  Supplement B Pilots Opp. at 1 n.1.  These individuals are party to Supplement B of the APA collective bargaining agreement, an agreement between American and the APA that was executed on November 4, 1983.  Supplement B Pilots Opp. at 2 and 6.  Supplement B permitted American to introduce lower rates of pay and benefits for newly-hired pilots, but required American to maintain the status quo for incumbent pilots—those on the seniority list as of the agreement's date—and guaranteed their employment and certain retirement benefits.  Supplement B Pilots Opp. at 4 and 6; Debtors' Reply to Supplement B Pilots Opp. at 2.  Before the Trial, these Supplement B Pilots filed an objection to the Motion on grounds that American failed to negotiate in good faith.  Supplement B Pilots Opp. at 5.  Specifically, they argue that the "sweeping" Section 1113 changes proposed by American violate the express terms of Supplement B, which prohibits any modification to the Supplement B Pilots' pension and benefits except in instances of "unanimous agreement between the parties and a majority of the [covered] pilots . . . ."  Ex. B to Supplement B Pilots Opp. at 2.   The Supplement B Pilots have interpreted this provision to be a "'permanent guarantee' of employment and financial security for pre-1983 pilots."  Supplement B Pilots Opp. at 7, citing *Renneisen v. American Airlines, Inc.*, 990 F.2d 918, 924–25 (7th Cir. 1993).  The Supplement B Pilots further argue that, in the absence of the majority consent of Supplement B pilots described

100

above, any agreement between American and the APA to modify benefits would be a breach of

the duty of fair representation by the APA and American.  Supplement B Pilots Opp. at 9.

The Supplement CC Pilots are former TWA pilots that American employed following

American's purchase of certain TWA assets after the TWA was liquidated in bankruptcy.

(*Declaration of Dennis Newgren in Support of Response of American Airlines to Objection of*

*"Former TWA Pilots" to Motion Pursuant to 11 U.S.C. § 1113* at ¶ 4 (ECF No. 2296)).  As part

of the former TWA pilots' transition to American, American and the APA entered into

Supplement CC on November 8, 2001, which provides for the seniority integration of the former

TWA pilots as well as certain job guarantees and protections. *Id.* at ¶ 5.  Moreover, Supplement

CC further reserves for the former TWA pilots a certain number of captain positions assigned to

American's St. Louis, Missouri hub. *Id.*  With respect to the St. Louis operations, American

contends that they are no longer economically viable and the Section 1113 proposal seeks the

"[o]rderly elimination of Supplement CC [and closure of] the STL pilot base [by the] end of

2012[, for the former] TWA pilots [to] retain [their] current position on the integrated Pilot

System Seniority List [, and for the parties to discuss] [p]ossible protections for TWA pilots."

(AA Ex. 914).  Before the Trial, these Supplement CC Pilots filed an objection to the Motion.[70]

---

[70] On June 21, 2012, certain other pilots covered by the Supplement CC Pilots, collectively known as the TWA Pilots Seniority Defense Fund LLC and represented by other counsel, filed a motion to intervene in these Section 1113 proceedings Court for the limited purpose of arguing (a) why the rejection of Supplement CC should be considered separately from American's initial Section 1113 application, and (b) why American will not satisfy its burden under the requirements of Section 1113 with respect to Supplement CC.  *Memorandum of Law in Support of Motion to Intervene by TWA Pilots Seniority Defense Fund LLC*, at 6–7 (ECF No. 3329).  The Court heard argument with respect to the Supplement CC Pilots' request to intervene on July 19, 2012 and denied the motion on grounds that (a) the request would require undue delay in these Section 1113 proceedings and prejudice the parties who actively participated in the Section 1113 proceeding, and (b) that the APA is their exclusive authorized collective bargaining representative.  *In re AMR Corp.*, Case No. 11-15463 (Bankr. S.D.N.Y.), Hr'g Tr. 25:10–26:24; 27:22–30:18, July 19, 2012.  In reaching a decision on the motion to intervene, the Court noted that the Supplement CC Pilots provided no explanation whatsoever for the delay in its filing of its Motion to Intervene.  (*Id.* at 26:25–27:6).

The Supplement CC Pilots argue that American's Section 1113 proposal is objectionable on five grounds: (1) the proposal is unfair and inequitable because it disproportionately shifts restructuring costs onto the Supplement CC Pilots; (2) the proposal subjects the Supplement CC Pilots' dispute to a mandatory arbitration proceeding and therefore violates the fair and equitable requirement of Section 1113; (3) the proposal's mandatory arbitration proceeding violates the RLA as it does not provide for the participation of the Supplement CC Pilots as a party in interest and reflects a lack of good faith by American; (4) the proposal amounts to an actionable breach of the APA's duty of fair representation, for which American is jointly liable; and (5) the proposal is not based on the most complete and reliable information as it completely ignores a no-cost proposal made by the Supplement CC Pilots. Supplement CC Pilots Opp. at 3, 10–20.

American argues that these two pilot groups have no standing to object to the Motion because the APA, as the pilots' authorized collective bargaining representative, has been litigating on their behalf. Section 1113(d)(1) provides that "[u]pon the filing of an application for rejection the court shall schedule a hearing" at which "[a]ll *interested* parties may appear and be heard at such hearing." 11 U.S.C. § 1113(d)(1) (emphasis added). In the context of Section 1113, at least one court has concluded that an "interested" party under Section 1113 is limited to the collective bargaining representative for the union employees. *See In re UAL Corp.*, 408 F.3d 847, 851 (7th Cir. 2005); *see also United Retired Pilots Ben. Prot. Ass'n v. United Airlines, Inc.*, 443 F.3d 565, 571 (7th Cir. 2006). As the Seventh Circuit explained, the term "interested party" in Section 1113:

> is most naturally read to mean 'party to the collective bargaining agreement' or a guarantor of that contract. . . . Otherwise every employee individually would have to be notified and allowed to participate when the employer proposes to reject a collective bargaining agreement, though for every other purpose the union acts as the employees' representative; more, every retiree would receive separate notice

102

and an opportunity to be heard; tax collectors, unsecured creditors that might gain
if the debtor altered its obligations to labor—the list would go on and on.

*UAL Corp.*, 408 F.3d at 851.  It is not hard to see the reasoning for such a rule in the Section

1113 context.  On the one hand, American is not permitted to negotiate separately with the

Supplement B and Supplement CC pilots because these employees are represented by the APA.

Indeed, Section 1113 acknowledges the need to communicate with the authorized representative

of the union employees.  *See* Section 1113(b)(1)(A) (requiring the making of a proposal to "the

*authorized* representative of the employees") (emphasis added); *see also* Section 1113(c)(2)

(requiring that "the authorized representative of the employees" refuse to accept the proposal

without good cause").  On the other hand, the APA must balance the concerns of all its members

in litigating this Section 1113 Motion including, but not limited to, deciding whether or not to

accept American's proposal, what counter-proposal should be made on behalf of APA members

and how to litigate the matter at trial.   By granting separate groups within a union the right to

pursue their own objections to a Section 1113 application, a court would open up a Section 1113

proceeding to all the inconsistent views of members of the same union on these whole host of

issues.   Moreover, a court would hand such groups a potential veto over the ability for a debtor

to enter into a new collective bargaining agreement.  This might be true even if, as a result of the

Section 1113 process, a debtor had reached an agreement with the union's collective bargaining

representative but not with the separate groups within that union who would be pursuing their

own interests.[71]

---

[71]   Indeed, a debtor might conceivably be forced to file a Section 1113 application to reject a collective
bargaining agreement simply to address objections of a subgroup within a union even though the
official representative for that same union had reached an agreement on a new collective bargaining
agreement.  Such a situation would appear to be inconsistent with the plain wording of the statute,
which is tied to the views of the authorized collective bargaining representatives.  *See* Section

In any event, the Court overrules both objections on the merits for several reasons. As a

threshold matter, there is nothing in Section 1113 itself that supports the notion that a collective

bargaining right can exist in perpetuity. Indeed, the case law says otherwise. In *Maxwell*

*Newspapers*, the Second Circuit permitted debtors to reject an agreement containing a lifetime

job guarantee for certain employees, sadly observing

> The typographers' union [asked the court] what such guarantees mean, if they are
> not honored. All but 15 of these employees, under the debtor's proposal, will lose
> their jobs over time. To this question there is no convincing answer except
> perhaps that nothing is forever today.

*Maxwell Newspapers*, 981 F.2d at 87.

Moreover, the underlying purpose of Section 1113 is to promote negotiations among the

parties towards new collective bargaining agreements; the notion that these supplemental

agreements exist in perpetuity is antithetical to Section 1113's purpose. *See Maxwell*

*Newspapers*, 981 F.2d at 90 (stating that the "entire thrust of [Section] 1113 is to ensure that

well-informed and good faith negotiations occur in the market place, not as part of the judicial

process. Reorganization procedures are designed to encourage such a negotiated voluntary

modification."); *Northwest*, 483 F.3d at 180 (stating that an "order pursuant to [Section] 1113 is .

. . implicitly the product of negotiations (successful or unsuccessful)"). The position of the

Supplement B and Supplement CC Pilots that their rights cannot be changed is also inconsistent

with Section 1113's call for equal sacrifice from all employees. 11 U.S.C. § 1113(b)(1)(A)

(proposal must "assure[] that all creditors, the debtor and all of the affected parties are treated

fairly and equitably"); *Century Brass Prods.*, 795 F.2d at 273 ("The purpose [of the 'fairly and

equitably' requirement] is to spread the burdens of saving the company to every constituency

---

1113(c)(2) (permitting rejection where, *inter alia*, the "authorized representative of the employees has
refused to accept [the debtor's] proposal [for a new agreement] without good cause").

while ensuring that all sacrifice to a similar degree."); *Maxwell Newspapers*, 981 F.2d at 89

(stating that Section 1113(b)(1)(A) "requires all affected parties to compromise in the face of

financial hardship").

      Considering these objections against the backdrop of the proposal as a whole, the Court

concludes that these supplemental agreements do not bar rejection of the APA collective

bargaining agreement under Section 1113. *See, e.g., Royal Composing Room*, 848 F.2d at 348.

In reaching this conclusion, the Court notes that the only agreement that appears to have been

reached thus far as to these two groups relates to the use of arbitration with the National

Academy of Arbitrators to determine what rights former TWA pilots should be given in

connection with the termination of Supplement CC and the closing of a St. Louis base. *See* ECF

Nos. 2133, 2295, and 2364 (regarding Supplement CC); *see* ECF Nos. 2134, 2297, and 2360

(regarding Supplement B). The Court cannot say that the use of such a neutral third party

violates any of the principles of Section 1113.[72]

## CONCLUSION

      The Court concludes that American's proposed changes to furlough and codesharing

have not been justified by either reference to the Business Plan or the practices of American's

competitors. Given the significance of these two provisions collectively to American's proposal,

the Court finds that American has not shown that the proposal is necessary as required by

Section 1113. For the reasons set forth above, therefore, American's Motion to reject the

collective bargaining agreements of the APA is denied. This denial is without prejudice to

---

[72]   Both of these pilot groups have complained that the APA and American have violated their right to fair representation. But as the Court today denies the Motion, the question of fair representation is premature, even assuming that such an issue is properly before this Court.

remedying the two defects identified in this Opinion and submitting a new application under

Section 1113.  Debtors' counsel shall settle an order on three days' notice.

Dated: New York, New York
        August 15, 2012

                     */s/ Sean H. Lane*
                     UNITED STATES BANKRUPTCY JUDGE